David D. Lin, Esq.
Justin Mercer, Esq.
LEWIS & LIN, LLC
45 Main Street, Suite 608
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
david@ilawco.com
justin@ilawco.com

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BMADDOX ENTERPRISES LLC,<br><br>        Plaintiff,<br><br>   v.<br><br>MILAD OSKOUIE, OSKO M LTD, and<br>PLATINUM AVENUE HOLDINGS PTY, LTD,<br><br>        Defendants. | Case No. 1:17-cv-01889-RA |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

June 28, 2017

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................ **1**

**FACTUAL BACKGROUND** .......................................................................... **3**

   **A.** **Defendants' Establish FFLTrust.com** ................................................ **3**

   **B.** **Plaintiff's Campaign of Fraudulent DMCA Notices** ........................ **6**

   **C.** **Plaintiff Engages in Defamatory Attacks and Cybersquatting Against Mr. Oskouie**
     **10**

**ARGUMENT** ................................................................................................. **13**

   **I.** **Plaintiff Has Not Made A Clear Showing That It Is Entitled to a Preliminary Injunction** ...................................................................... **13**

     A. Legal Standard for Preliminary Injunction ................................ 13

     B. Plaintiff's Unclean Hands Preclude Preliminary Injunctive Relief ............ 14

     C. Plaintiff's Application Fails to Meet Legal Standard for Preliminary Injunction ........ 17

     i. Plaintiff Has Not Shown a Likelihood of Success on the Merits ................. 17

       a. No copyright infringement or false advertising because Plaintiff presented inaccurate screenshots of <FFLTrust.com> ................................ 17

       b. Even if Plaintiff's screenshots were real, the use is *de minimis*, and insufficient to support a copyright claim or preliminary injunction ................ 19

       c. No evidence of computer hacking or use of customer list .................. 20

     ii. Irreparable Harm .................................................................. 23

     iii. Balance of Hardships tips sharply in favor of Defendants ................ 26

     iv. Injunction not in public interest .......................................... 27

     D. The Relief Requested in the Preliminary Injunction is Inappropriate ........ 28

     E. There is No Risk of Dissipation of Assets that Would Warrant an Asset Freeze ........ 28

**CONCLUSION** ............................................................................................. **29**

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Gidatex, S.R.L. v. Campaniello Imports, Ltd.,* 13 F.Supp.2d 417, 419 (S.D.N.Y.1998) ............. 24

*Gucci America, Inc. v. Weixing Li,* 768 F. 3d 122, 129 (2d Cir. 2014) ........................................ 28

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d
    366, 389 (S.D.N.Y. 2003) ................................................................................................. 28

*Mattel, Inc. v. Mga Entm't, Inc.*, 705 F.3d 1108, 1111 (9th Cir. 2013) ....................................... 27

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Callahan*, 265 F. Supp. 2d 440, 444-445 (D. Vt.
    2003) ................................................................................................................................... 14

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ................... 14

*Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 477 (S.D.N.Y. 2004) ..................... 23

*Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F. Supp. 1227, 1238 (S.D.N.Y. 1990)........................... 14

*Richard A. Leslie Co., Inc. v. Birdie, LLC,* No. 07 Civ. 5933(LAK), 2007 WL 4245847, at *2
    (S.D.N.Y. Nov. 26, 2007) ................................................................................................. 24

*Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015)............................................................... 22

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533-534 (S.D.N.Y. 2009) ...... 14

*Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir. 1995).............................. 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) .............................................. 13, 24

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ............................................... 24

### <u>Statutes</u>

17 U.S.C. § 102.............................................................................................................................. 17

18 U.S.C. § 1030(e)(8).................................................................................................................. 22

Defendants Milad Oskouie ("Mr. Oskouie"), Osko M Ltd ("OML") and Platinum Avenue Holdings Pty, Ltd. ("Platinum," collectively with Mr. Oskouie and OML, "Defendants"), by their attorneys, Lewis & Lin LLC, hereby submit this Memorandum of Law in opposition to Plaintiff's Application for a Preliminary Injunction ("Application").

## <u>INTRODUCTION</u>

This case is about two competitors in the business of marketing educational materials for people seeking to get a federal firearms license ("FFL"). Plaintiff claims it created a guidebook on how to get an FFL, created a Wordpress™-based website to promote it <FFL123.com>, and that Defendants surreptitiously "hacked" into Plaintiff's Wordpress™-based website and copied everything to create a competing website <FFLTrust.com>, *over a year ago*. In reality, Defendants did nothing of the sort. Instead, Plaintiff comes to the Court with unclean hands, engaging in a campaign of harassment and bigotry against Defendants with the sole purpose to unfairly stifle competition. Under these circumstances a preliminary injunction should not issue.

First, Plaintiff's "guidebook" is really a wholesale copy of the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF's") website, <atf.gov/firearms/apply-license>. Thus, it is no coincidence that Plaintiff selectively presented only 3 allegedly infringing paragraphs out of hundreds of pages of the parties' guidebook, as the shown similarities are *de minimis* and the balance of the parties' respective guidebooks are lifted from the ATF's website.

 Second, the text content of <FFLTrust.com> looks nothing like the fraudulent images presented to the Court—the real content was vastly different (wholly dissimilar to Plaintiff's alleged guidebook) and made none of the allegedly false representations that Plaintiff claims appeared thereon. Further, the visual elements of <FFLTrust.com> website were based on

commonly available Wordpress™ website themes—content which Plaintiff does not have, nor could ever have, a copyright.

Third, Defendants did not "hack" into Plaintiff's Wordpress™-based website or any other account, and Plaintiff presents no evidence connecting Defendants to the alleged hacking activity.

However, Plaintiff's Application conveniently omits and/or blatantly misrepresents key facts regarding Defendant Platinum's website in seeking an injunction that would wrestle control of Platinum's assets and stifle competition. Instead, faced with the reality that <FFLTrust.com> was simply a competitor, and not an infringer, it was Plaintiff that for the past 17 months resorted to self-help by defaming and disparaging Defendants, misused extra-judicial methods to takedown Platinum's website using falsified screenshots and committed cybersquatting. Defendants intend to assert counterclaims in this action—which claims will offset and/or exceed any monetary remedy Plaintiff would be entitled to.  Plaintiff's incomplete store belies the true nature of dispute between foreign nationals that has no connection to this district.

In short, Plaintiff's Application fails to establish that Plaintiff is entitled to the extraordinary relief it seeks because a number of Plaintiff's key allegations are unfounded, lack evidentiary support and warrant dismissal. Plaintiff is not entitled to preliminary injunctive relief because its claims fail to state a cause of action or can be redressed via monetary damages.

Plaintiff has not suffered irreparable harm, cannot show a likelihood of success on the merits of its claims and the balancing of equities weighs in favor of Defendants.  Finally, as Defendants have taken Plaintiff's copyright infringement claims seriously, engaging counsel both in Australia and the United States to respond to Plaintiff's year-long campaign of unfair competition and false statements, there is absolute zero reason to freeze Defendants' personal

and business assets.  As such, Defendants respectfully submit that the Court should not issue any preliminary injunction and should vacate the temporary order permitting this action to proceed in its normal course.

## FACTUAL BACKGROUND

### A.  Defendants' Establish FFLTrust.com

Defendant Milad Oskouie ("Oskouie") is an Australian businessman and former lawyer residing in the UK, focusing his current work on developing web properties. Declaration of Milad Oskouie dated June 28, 2017 ("Oskouie Decl."), ¶ 3.  Oskouie, a Director of Defendant Platinum Avenue Holdings Pty, Ltd. ("Platinum"), which until June 2017, operated a website at <FFLTrust.com> which sold educational materials for securing FFLs or federal firearms licenses ("Platinum's Website"). Oskouie Decl., ¶ 3. Defendant OML is a British limited company, of which Mr. Oskouie is a Director, but which has no material involvement in the operation of Platinum's Website.  Oskouie Decl., ¶ 3.

Prior to starting Platinum, from 2013 until early 2015, Mr. Oskouie was involved with another web property, <infiniteconversions.com>, which was run by Infinite Conversions Pty Ltd ("Infinite Conversions") and of which Mr. Sandip Banerjee was a Director. Oskouie Decl., ¶ 4.  Infinite Conversions was an Internet marketing firm which specialized in conversion rate optimization ("CRO"), focusing on third party website design and content variations to determine which layouts, copy, offers and images perform best. Oskouie Decl., ¶ 4. Upon information and belief, Mr. Banerjee performed CRO services in his personal capacity for Mr. Maddox and Plaintiff's FFL business, FFL123.com. Oskouie Decl., ¶ 5.  Mr. Maddox provided a glowing endorsement of Infinite Conversions—and even reviewed, edited and approved for publication a case study about FFL123.com to appear on Infinite Conversions Website. Oskouie Decl., ¶ 5.   Through these interactions with Mr. Banerjee and Infinite Conversions, Mr. Oskouie

3

became familiar with FFLs. Oskouie Decl., ¶ 6.  At no point in time did Mr. Oskouie ever have access to any information about Plaintiff or FFL123.com other than what was publically available on their website. Oskouie Decl., ¶ 6. However, given the revenue potential for educational materials about FFLs at that time, Mr. Oskouie decided to pursue an online business to compete with Plaintiff. Oskouie Decl., ¶ 7.

Mr. Oskouie first registered the domain <FFLTrust.com> (the "Domain") on behalf of Platinum in December 2015. Oskouie Decl., ¶ 8.  Despite his familiarity with web domains, CRO and basic web publishing, Mr. Oskouie has limited experience with website development. Thus, to create the <FFLTrust.com> website, Platinum engaged a freelance web developer, Mr. Stefan Ciobanu. Oskouie Decl., ¶ 8. Given Mr. Oskouie's familiarity with Mr. Maddox via his former business relationship with Infinite Conversions, Mr. Oskouie understood what worked content-wise, knew that simplicity for websites is key; so, he instructed Mr. Ciobanu to create a WordPress™-based website for <FFLTrust.com> that Platinum could easily edit and manage. Oskouie Decl., ¶ 8.  Ms. Oskouie was also aware that FFL123.com used a simple Wordpress™ theme. Oskouie Decl., ¶ 8. Since he wanted Platinum's Website to be on par with, compete with and outrank Plaintiff's website on Internet search engines for consumers searching for "FFLs"— Mr. Oskouie instructed Mr. Ciobanu to design <FFLTrust.com> to improve upon <FFL123.com>'s layout. Oskouie Decl., ¶ 9.  Thereafter, Mr. Ciobanu created a custom WordPress™ theme for Platinum's Website with a blue and orange color scheme, original "software box" images. *Id.*

Indeed, while this simple website design was successful, it was in no way unique. Oskouie Decl., ¶ 10. Hundreds of websites use a similar WordPress™ layout, including other competitors in the same industry, such as <RocketFFL.com>. Oskouie Decl., ¶ 10.



Oskouie Decl., ¶ 10.

Leveraging his legal research skills, through many months of research, reviewing the ATF Website, and reading blog posts about FFLs, Mr. Oskouie drafted and created a FFL e-book ("Platinum's FFL Guidebook")—which he supplied to Mr. Ciobanu for inclusion on Platinum's Website in late December 2015 and early January 2016. Oskouie Decl., ¶ 11. Platinum also engaged freelance writers, several of whom are FFL holders (including one who advised Platinum that he held a license since 1995), to fact-check, edit and draft other portions of Platinum's FFL Guidebook.  Oskouie Decl., ¶ 12.  Platinum also purchased print books and subscriptions to various FFL e-books on the Internet, including FFL123.com. Oskouie Decl., ¶ 13.  However, Platinum realized that the overwhelming majority of information in these FFL print books and e-books were culled directly from the National Firearms Act ("NFA") and/or the ATF's Website. Oskouie Decl., ¶ 14.

On or around January 2016, Platinum launched <FFLTrust.com>. Oskouie Decl., ¶ 15. In order to access Platinum's FFL Guidebook, users must register and purchase subscriptions to

access the password-protected e-book online. Oskouie Decl., ¶ 16.   Excerpts of Platinum's FFL

Guidebook are annexed to the Oskouie Decl. at Exhibit A.  Platinum wanted to grow

<FFLTrust.com> organically, so it relied heavily on Google Adwords advertising to promote the

website.  Oskouie Decl., ¶ 17. That notwithstanding, the first <FFLTrust.com> user purchased a

subscription to Platinum's FFL Guidebook on February 14, 2016. Oskouie Decl., ¶ 17.  Platinum

admits that its website appeared as reflected on pages 15 and 16 of the Complaint, i.e.:

  but denies

that any other exhibit accurately depicts the website as it existed from January 2016 until June

2017—when the website was shut down again by Mr. Maddox's actions. Oskouie Decl., ¶ 18.

### B.  Plaintiff's Campaign of Fraudulent DMCA Notices

Nearly immediately after launch but before <FFLTrust.com> had any active users,

between February 11, 2016 and March 1, 2016, Platinum received no less than 7 cryptic, DMCA

notices forwarded from various third party service providers wherein Mr. Maddox and/or

Plaintiff claimed, *inter alia*, that "FFLTrust.com is a 100% copy of my website [FFL123.com],"

and falsely accused Platinum of being a "thief" and "hackers." Oskouie Decl., ¶ 19.

On February 11, 2016, Mr. Maddox falsely alleged to Platinum's domain name registrar that the content on <FFLTrust.com> had been stolen in violation of the DMCA. Oskouie Decl., ¶ 20.

On February 12, 2016, Mr. Maddox falsely alleged to Platinum's domain name security proxy, Cloudflare, that the content on <FFLTrust.com> was "stolen" in violation of the DMCA and the Website was a "phishing website." Oskouie Decl., ¶ 21.

On February 12, 2016, Mr. Maddox falsely alleged to Google that Platinum were "hackers" that "stole 100% of the content from my website" and were violating the DMCA. Oskouie Decl., ¶ 22.

On February 13, 2016, Mr. Maddox made another false DMCA allegation to Cloudflare that "www.FFLtrust.com, they hacked my company's website (FFL123.com) on 12/30/15 and stole 100% of our digital content." Oskouie Decl., ¶ 23.

While Platinum's Website was live between February 11-13, 2016, the only "users" on the website that could view Platinum's FFL Guidebook were Ms. Oskouie and Mr. Ciobanu. Oskouie Decl., ¶ 24.  Thus, not only are Plaintiff's allegations as to what was on Platinum's Website on or around February 11-13, 2016 demonstrably false, there was no way Plaintiff could have know what Platinum's FFL Guidebook contained at the time it issued those false DMCA notice.  Oskouie Decl., ¶ 25.  It had only wanted to stifle competition because Platinum's Website used a similar, generic WordPress™ theme. Oskouie Decl., ¶ 26.

On February 16, 2016, Mr. Maddox issued a third false DMCA notice to Cloudflare. Oskouie Decl., ¶ 27.

On March 1, 2016, Mr. Maddox issued another false DMCA notice to Google. Oskouie Decl., ¶ 28.

Much like the Complaint, none of the DMCA notices particularized what content from <FFL123.com> was copied or appeared on <FFLTrust.com>, other than blanket statements that the "entire website" was copied.  Oskouie Decl., ¶ 29. Notwithstanding same, Platinum's various service providers took down <FFLTrust.com> on various occasions, causing serious disruptions to Platinum's business.  Oskouie Decl., ¶ 30. Platinum responded to each of these notices and denied that any content was copied from <FFL123.com>. Oskouie Decl., ¶ 30.  In each of Platinum's responses, it identified who it was, and that it was the owner of the website and content in question. Oskouie Decl., ¶ 31.  Plaintiff's claims that Platinum somehow hid its identity to "avoid detection" are false. Oskouie Decl., ¶ 31.

From on or around March 1, 2016 until March 30, 2016, <FFLTrust.com>'s hosting provider, Root, S.A. informed Platinum that it was receiving various DDoS attacks on the server hosting <FFLTrust.com>, which caused the website to go down for days at a time. Oskouie Decl., ¶ 32.  During these attacks, Platinum was also unable to send, receive or access its @ffltrust.com email hosted on the MX server at <FFLTrust.com>. Oskouie Decl., ¶ 32.  Plaintiff claims that Platinum responded to a DMCA notice on March 3, 2016 and falsely identified itself as a "Jerome Kohlberg" from Russia.  *See* ECF Doc No. 24-5.  Defendants did not send this message or counter-notice, as it did not have access to its email account on March 3, 2016. Oskouie Decl., ¶ 333.  Further, Defendants have no knowledge who "Jerome Kohlberg" is, Mr. Oskouie has never gone by the name "Jerome Kohlberg," and Defendants were never in Russia, nor used a computer located in Russia. Oskouie Decl., ¶ 33.   No evidence exists that Defendants authored any emails purported to be from "Jerome Kohlberg."

On or around March 24, 2016, Platinum and Mr. Oskouie received a letter from Australian counsel for Plaintiff, which repeated many of these false allegations of copying,

hacking, website alteration alleged in the DMCA notices, and claimed that Platinum had stolen a customer list. Oskouie Decl., ¶ 34.  As with DMCA notices, none of the allegations in Plaintiff's Australian counsel's letter particularized what content was infringing nor provided any evidence of the alleged hacking. Oskouie Decl., ¶ 34.

On or around the same time, Mr. Maddox's false DMCA notice efforts intensified. Oskouie Decl., ¶ 36. On March 29, 2016, Mr. Maddox issued a *fourth* false DMCA notice to Cloudflare, this time falsely claiming that the FBI were about to arrest Mr. Oskouie. *Id.*  On March 30, 2016, Mr. Maddox issued a false DMCA notice to MailChimp, which resulting in MailChimp deactivating Platinum's MailChimp account. Oskouie Decl., ¶ 37.  Then, on the same March 30, 2016, Mr. Maddox made another false DMCA notice to Root, S.A., Plaintiff's website host, again claiming that the FBI were involved and that Platinum and Mr. Oskouie were wanted criminals. Oskouie Decl., ¶ 38.   As a result of Mr. Maddox's successive defamatory and false DMCA notice campaign, Platinum's website was shut down by its host and it was forced to move to another provider: VentraIP. Oskouie Decl., ¶ 39.   From March 30, 2016 to around April 13, 2016, <FFLTrust.com>'s website was down, and Platinum had no way to send or receive emails from its customers and vendors. Oskouie Decl., ¶ 29.

Because Platinum took Plaintiff's allegations of copyright infringement seriously, it engaged legal counsel in Australia, Yves Hazan of Hazan Hollander. Oskouie Decl., ¶ 40.   On April 5, 2016, Mr. Hazan responded on behalf of Platinum to the March 24, 2016 letter from Australian counsel for Plaintiff, admitting that Platinum was the owner of <FFLTrust.com> but denying the allegations of copyright infringement and criminality. Oskouie Decl., ¶ 41; Exhibit C.

Upon information and belief, on or around April 15, 2016, Mr. Maddox sent another false DMCA notice to Platinum's new hosting provider, VentraIP. Oskouie Decl., ¶ 42.

Plaintiff then hired another Australian law firm, who emailed Platinum's attorney another letter on April 21, 2016, again claiming copyright infringement, threatening to file a lawsuit but this time with accompanying screenshots of what they purported to be Platinum's website dated April 9, 2016 and April 13, 2016 respectively. Oskouie Decl., ¶ 43; Exhibit D.  The April 21, 2016 letter accused Platinum of "chang[ing]" the <FFLTrust.com> website since it had received the March 24, 2016 letter—but it had not changed anything, and could not change anything as the website was shut down. *Id.*  The April 21, 2016 letter also claimed that Platinum "changed" the website to remove references to and images of "Henry Jackson" and falsely accused Platinum of sending email blasts via MailChimp during this same period. *Id.*

By letter dated May 23, 2016, Mr. Hazan responded on behalf of Platinum to the April 21, 2016 letter from Australian counsel for Plaintiff, immediately calling into question the authenticity of the "screenshots" of Platinum's website and "email blasts" as they were allegedly taken when the <FFLTrust.com> website was down and when it did not have a MailChimp account. Oskouie Decl., ¶ 45; Exhibit E.   Upon information and belief, Plaintiff annexed these same suspect "screenshots" to the Complaint as Exhibit C. Oskouie Decl., ¶ 44.

Between May 26, 2016 and June 4, 2016, the parties' Australian counsel exchanged various letters via email, however no resolution was reached. Oskouie Decl., ¶ 46.

### C.  Plaintiff Engages in Defamatory Attacks and Cybersquatting Against Mr. Oskouie

Apparently dissatisfied that the parties' attorneys would resolve the matter, on or around June 2016, Mr. Maddox again took matters into his own hands by issuing more false DMCA notices. Oskouie Decl., ¶ 47.  Then, on July 8, 2016, Mr. Maddox authored a defamatory and

harassing letter to Mr. Oskouie's parents, repeating the false allegations of hacking and copyright infringement, claiming that law enforcement authorities in the US and Australia were involved, and threatening Mr. Oskouie's parents' businesses. Oskouie Decl., ¶ 47; Exhibit F.  In the July 8, 2016 Letter, Mr. Maddox (i) falsely claimed to Mr. Oskouie's parents that he "reviewed the website at ffltrust.com and quickly identified the content was identical to my website, FFL123.com;" (ii) falsely claimed that "ffltrust.com has taken my licenses and altered them to appear as if they hold these licenses as well," when no such image ever appeared on Platinum's website, and (iii) threatened physical violence by claim that he was "licensed to buy and sell military grade weapons" and stating that he "[did] not see this ending well [for Mr. Oskouie]." *See id* at Exhibit F.

Upon information and belief, Mr. Maddox sent various email blasts to his customer list (of allegedly 100,000 persons), repeating these false allegations of criminal and fraudulent activity. Oskouie Decl., ¶ 48.

Platinum and Mr. Oskouie then engaged another attorney in Australia, Mr. Robert Haralovic of HAL Lawyers. Oskouie Decl., ¶ 49.  On or about September 28, 2016, Mr. Haralovic sent a cease and desist letter to Mr. Maddox concerning his July 8, 2016 defamatory missive to Mr. Oskouie's parents and again denying the allegations of copyright infringement. Mr. Haralovic did not receive a reply to the September 28, 2016 letter. Oskouie Decl., ¶ 49; Exhibit G.

However, on or around December 27, 2016, Mr. Haralovic received an email from a police detective in Australia, Mr. Alexander Moffat, claiming to be conducting an investigation into the allegations by the owner of <FFL123.com>, i.e. Plaintiff, and seeking response to several questions.  Oskouie Decl., ¶ 50.  By email dated December 30, 3016, Mr. Haralovic, on

behalf of Platinum and Mr. Oskouie, responded to Mr. Moffat's inquires, again denying copyright infringement by Defendants and requesting the detective forward any evidence supporting the alleged hacking claims. Oskouie Decl., ¶ 51; Exhibit H.  Mr. Haralovic did not receive a reply to the December 30, 2016 email. Oskouie Decl., ¶ 51; Exhibit H.

Once again dissatisfied that law enforcement would pursue the matter, on or around February 15, 2017, Mr. Maddox took matters into his own hands again by registering the domain name <MiladOskouie.com>. Oskouie Decl., ¶ 52; Exhibit I.  The domain name precisely tracks the spelling of Mr. Oskouie's legal name. Mr. Maddox then created a website on the domain name to further defame and disparage Mr. Oskouie and Platinum. Oskouie Decl., ¶ 52.  The Website at <MiladOskouie.com> continues Mr. Maddox's online campaign to disparage and defame Mr. Oskouie on the Internet, claiming that Mr. Oskouie was an "Islamic hacker" and falsely associating Mr. Oskouie with Islamic extremism in an attempt to stifle competition and harass Mr. Oskouie personally. Oskouie Decl., ¶ 53; Exhibit J.

On March 7, 2017, Mr. Haralovic received an email from police detective in Australia confirming that no criminal charges would be pursued against Mr. Oskouie. Oskouie Decl., ¶ 54.

On or about April 2, 2017, Mr. Haralovic, on behalf of Platinum and Mr. Oskouie, sent a letter to Mr. Maddox's and Plaintiff's US counsel, notifying him of the disparaging website and various false, public comments regarding Defendants circulated by Mr. Maddox. Oskouie Decl., ¶ 51; Exhibit K.   Mr. Haralovic did not receive a reply to the April 2, 2017 letter. Oskouie Decl., ¶ 55.

On or about May 19, 2017, Mr. Maddox sent another harassing and defamatory letter to Mr. Oskouie's parents. Oskouie Decl., ¶ 56; Exhibit L.

Unbeknownst to Defendants, on or about March 15, 2017, nearly 13 months after Mr. Maddox began asserting his false claims of copyright infringement in February 2016, Plaintiff filed the instant action under seal against Defendants sounding, *inter alia*, in copyright infringement, false advertising and claims under the Computer Fraud and Abuse Act. Oskouie Decl., ¶ 57.

Contrary to the allegations in the Complaint, Platinum's *actual* FFL Guidebook contains little to no resemblance to Plaintiff's Guidebook. Oskouie Decl., ¶ 58. The chapter structure is not the same and the text content is different. *Id.* Admittedly, because both Guidebooks explain the procedure to procure an FFL license, there is some overlap in content, however those procedures, methods and facts are all information in the public domain, and readily available of the ATF's Website. *Id.*; *see also* Oskouie Decl., ¶ 65; Exhibit N (ATF Website). The respective guides are not novels or works of fiction. Oskouie Decl., ¶ 58. They both take you through the steps of filing out paperwork. Oskouie Decl., ¶ 58.

Further, Plaintiff's claims that the "backend" of its Wordpress™-based website was illicitly changed to tell Internet search engines to not index its website are belied by public information showing *no changes* to that "backend" during the period in question. Oskouie Decl., ¶¶ 59, 69-72; Exhibits O & P.

## ARGUMENT

**I.    Plaintiff Has Not Made A Clear Showing That It Is Entitled to a Preliminary Injunction**

**A.    Legal Standard for Preliminary Injunction**

Preliminary injunctions are extraordinary remedies available only on a clear showing of entitlement to the relief requested. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). (It is "an extraordinary remedy never awarded as of right.").

"A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus [3] a balance of the hardships tipping decidedly in favor of the moving party; and [4] that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).   There is also heightened standard when a movant seeks a "mandatory" (status-quo altering) rather than "prohibitive" (status-quo preserving) preliminary injunction: in such cases, the Court asks whether the movant has shown "a clear or substantial likelihood of success on the merits and ma[d]e a strong showing of irreparable harm, in addition to showing that the preliminary injunction is in the public interest." *Id.* (internal citations and quotation marks omitted).

**B.    Plaintiff's Unclean Hands Preclude Preliminary Injunctive Relief**

In particular, a party seeking the extraordinary equitable remedy of a preliminary injunction must have clean hands and cannot have engaged in the same type of conduct that forms the basis for its request for injunctive relief. *See, e.g., Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533-534 (S.D.N.Y. 2009) (plaintiff's "own unclean hands … preclude the equitable relief of a preliminary injunction"); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Callahan*, 265 F. Supp. 2d 440, 444-445 (D. Vt. 2003) ("Even if Merrill Lynch had demonstrated irreparable harm, the Court would deny its demand for preliminary injunctive relief under the doctrine of unclean hands."); *Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F. Supp. 1227, 1238 (S.D.N.Y. 1990) (equitable relief inappropriate where plaintiff engaged in the same conduct it had challenged).

Plaintiff has shown unclean hands in two relevant instances. First, Plaintiff's Chapter 6.2 is a virtual copy of the ATF's Website regarding filing out a Fingerprint Card, and Plaintiff improperly claims a copyright in said content.  Plaintiff has attached documents to the Complaint which we believe establish that Plaintiff has perpetrated a fraud on the United States Copyright Office, thereby invalidating the registration on which it relies.  As evidenced, by the examples referenced above and below, Plaintiff claimed copyrights in works that were not original to it, but instead authored and created by others—including information straight from the ATF's Website and the ATF's images of government forms. Oskouie Decl., ¶¶ 64-66; Exhibit N. Plaintiff's chapter 6.2 is nearly a carbon copy of the ATF's Website under the subheading "Sample Fingerprint Cards and Instructions" at https://www.atf.gov/firearms/instructions-form-7-application-federal-firearms-license.  *Id.*

Plaintiff's alleged Chapter 6.2 (Exhibit C of the Complaint) is on the left while the ATF's Website is on the right. *See* Oskouie Decl., Exhibits N.





1. Your last name, first name and middle name. If no middle name, enter NMN. If middle initial only, enter MIO.
2. Your signature – full name
3. Your complete address, including city, state and zip code.
4. Your maiden name or any previous married names. Also, include any other previous names and nicknames.
5. Your date of birth in the following format MM/DD/YYYY.
6. The country where you are a citizen. Ex: USA
7. M for male or F for female.
8. Use one letter; W=White, B=Black, A=Asian, I=American Indian or Alaskan Native, U=Unknown.
9. Your height in 3 digits; e.g., 410= 4 feet 10 inches, 500= five feet, 602= 6 feet two inches.
10. Your weight in 3 digits; e.g., 098= ninety-eight pounds, 185=one hundred eighty five pounds.
11. Your eye color in 3 letters; BLU=Blue, BRO=Brown, GRN=Green, GRY=Gray and HAZ=Hazel.
12. Your hair color in 3 letters; BAL=Bald, BLK=Black, BLN=Blond, BRO=Brown, GRY=Gray, RED=Red or Auburn, SDY=Sandy, and WHI=White.
13. The state where you were born in two letters; e.g., FL=Florida. Otherwise, enter the country where you were born.
17. Your complete social security number.
18. Miscellaneous number (non-US citizen – please enter alien registration number or I-94 number)
19. Date fingerprints were taken – MM/DD/YYYY
20. Signature of official taking your fingerprints
21. Enter the company name of your corporation/business (LLC) and address of the FFL in this section.  If filing FFL License as an individual, just place your name and address of where FFL License will be located.  Not asking for full time job employer if you have a full time job, asking related to your FFL License application.
22. Write "Firearms Background Check FFLC"
23. Fingerprint impressions – **one card per applicant** – complete and legible.

1. Full Name (last, first, middle)
2. Signature of Person Fingerprinted
3. Residence of Person Fingerprinted (complete address, city, state, ZIP code)
4. Aliases (AKA and/or maiden names)
5. Date of Birth (DOB) - MM/DD/YYYY
6. Country of Citizenship
7. Sex
   - Female - "F"
   - Male - "M"
8. Race
   - American Indian - "I"
   - Hispanic / Latino - "H"
   - Black or African American - "B"
   - Asian - "A"
   - Native Hawaiian / Pacific Islander - "P"
   - White / Caucasian ? "W"
   - Unknown - "U"
9. Height (3 characters: example - Five foot Four inches is 504)
10. Weight (3 characters - weight must be expressed in pounds)
11. Eye Color
12. Hair Color
13. Place of Birth (POB): State (US citizen) or Country
14. Social Security Number
15. Miscellaneous Number (non-US citizen - please enter alien registration number or I-94 number)
16. Date Fingerprints Were Taken - MM/DD/YYYY
17. Signature of Official Taking Fingerprints
18. Applicant's Employer and Address of Employer
19. Reason Fingerprinted
   - Firearms License - "Firearms Background Check FFLC"
20. Fingerprint Impressions (Complete and Legible)

Plaintiff's application for copyright registrations identified Mr. Maddox, alone, as the author of these works.  Similarly, Plaintiff claims it created the source code and html for its website, when that too was authored and created by Automattic, Inc. (the owner of WordPress™). To the extent that there is a colorable copyright claim in any of the works, Defendants are not able to determine which portions of its FFL Guidebook or WordPress website are similar to Plaintiff's Guidebook and WordPress website respectively.  However, Plaintiff

cannot falsely claim that Defendants engaged in copying to support a preliminary injunction over material that Plaintiff copied from somewhere else.

Second, as described above, faced with evidence that Platinum was not an infringer, Plaintiff and its principal, Mr. Maddox, have engaged in a self-help campaign of defamation, unfair competition, and cybersquatting, which not only exposes them both to damages, but also undermines Plaintiff's request for mandatory injunctive relief for the alleged copyright infringement that beget Plaintiff's defamatory campaign.

Plaintiff cannot have it both ways. The Court should not reward Plaintiff for its own copying and unlawful behavior by issuing a preliminary injunction against Defendants for the very same conduct.

**C.      Plaintiff's Application Fails to Meet Legal Standard for Preliminary Injunction**

        i. Plaintiff Has Not Shown a Likelihood of Success on the Merits

                **a.      No copyright infringement or false advertising because Plaintiff presented inaccurate screenshots of <FFLTrust.com>**

Copyright protection applies to "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102.  To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.

As a threshold matter, the passages that Plaintiff references in the Complaint (¶¶ 67 and 69) and attached thereto as exhibits are **not** Platinum's Website. Oskouie Decl., ¶¶ 59, 69-72; Exhibits O & P. At no point in time did <FFLTrust.com> appear like that, nor did it include the text that Plaintiff claims it did. *Id.* Indeed, the doctored and/or forged photos presented to the Court have at no time been live on the website. *Id.*  Defendants have no knowledge as to the origin of those screenshots that Plaintiff created.  Oskouie Decl., ¶ 60.  Further, two of the

exhibits show that the user allegedly logged in to the Platinum's Website was "Stefan Ciobanu"—the same web developer that Platinum hired to create it is website and had administrative access and privileges to Platinum's backend. *See* Exhibits C. Given Plaintiff's history of altering information to support Mr. Maddox's false DMCA notices (*See* Oskouie Decl., ¶ 45), it is possible that Mr. Maddox coordinated with Mr. Ciobanu and/or others to create forged screenshots of Platinum's Website which did not reflect the actual content that was live to the public. *See* Oskouie Decl., ¶ 61.

For instance, first, Plaintiff claims that the Introduction chapters to the parties' Class 3 guidebooks are identical. As a threshold matter, Platinum "published" its Class 3 Introduction to its WordPress site on December 29, 2015—two days *before* Plaintiff claims Defendants "hacked" into its <FFL123.com> website and "stole" the very Class 3 guide it claims was reproduced on <FFLTrust.com>. *See* Oskouie Decl., ¶ 62; Exhibit M. Even if no hacking occurred, beyond congratulating the newly minted FFL holders on securing a license, the introductions have nothing in common. *See* Oskouie Decl., ¶ 63. Importantly, Platinum's actual introduction to is Class 3 guide contains no reference to a "Henry Jackson" nor makes claims that Platinum's owners are FFL holders. *Id.*; *See* Oskouie Decl., Exhibit A.

Next, second, Plaintiff claims that Platinum copied Plaintiff's "Chapter 6.2" on "Completing Fingerprint Cards," including images thereon. As an initial matter, Platinum's FFL Guidebook has no such Chapter 6.2. *See* Oskouie Decl., ¶ 64. Instead, the section regarding FBI fingerprint cards is under Chapter "*9.3*" and is entitled "Filling Out Fingerprint Cards." *See* Oskouie Decl., ¶ 64. Each of the Plaintiff's Guidebook, Platinum's FFL Guidebook and the ATF's Website use the same images of the fingerprint card and the same numerical listing of explanations corresponding to numbered sections of the fingerprint card. *See* Oskouie Decl., ¶

65. It is no coincidence that that parties' explanations are similar—it is exactly what the ATF's Website says you should do to fill out the fingerprint card. *Id.*

Third, Plaintiff claims that Platinum copied Plaintiff's "Chapter 9.4" entitled "How Do I Keep Accurate Logs," including images thereon. This again is false. *See* Oskouie Decl., ¶ 67. Platinum's FFL Guidebook has no such Chapter 9.4. *Id.* Instead, the section regarding keeping accurate logs is under Chapter "*10.6*" and is entitled, not surprisingly, "Keeping Accurate Logs." A quick glance at the parties' respective chapters on same reveal little similarities other than references to the style of log books the ATF recommends. *See* Oskouie Decl., ¶ 67.

Finally, fourth, Plaintiff claims that Platinum copied Plaintiff's "Chapter 15" entitled "Additional Resources" which are links to other websites, such as the ATF's Website.  Again, Platinum's Class 3 Guide has no such Chapter 15, rather a Chapter "*16*" which has admittedly similar links, including the ATF's Website, but other different links as well. *See* Oskouie Decl., ¶ 68.  Here again, Plaintiff improperly alleges copyright ownership in content that is not his own, namely, the acronyms "ATF" and "NFA," as well as links to the website for the ATF and a copy of the NFA.

If the Court compares Platinum's actual content to the Plaintiff's guidebook, it is clear that they are not substantially similar.  Further, Platinum's Website makes no mention of a "Henry Jackson," much less claims that its owners are holders of FFLs. Thus, Plaintiff's copyright infringement claims that rely upon the similarity of the guidebooks and its false advertising claims that assert Platinum misrepresented the nature of its services fail as a matter of law.

      **b.**      **Even if Plaintiff's screenshots were real, the use is *de minimis*, and insufficient to support a copyright claim or preliminary injunction**

In the four instances alleged by Plaintiff as being an infringement of its copyright, the portions allegedly used are so small and lacking in creativity that they do not merit copyright protection. Because copyright law does not protect all elements of a work—especially those elements that are not original to the author—the Court need only determine if the purported use of Plaintiff-created elements rises above a *de minimis* level when determining if "appropriation" is improper.

To the extent that Plaintiff's screenshots are real, Plaintiff only submits evidence that 4 pages of its 294 total page guides were copied.  Of those 4 pages, the overwhelming majority of same are comprised of facts, phrases, titles and names in the public domain (namely from the ATF's Website).  In sum, less than .01% of Plaintiff's guides are alleged to have been copied. This is trivial, and the damages in this instance would be nominal at best.  Such *de minimis* use would be unlikely to support a copyright infringement claim at all, much less provide a basis to issue such a broad preliminary injunction that would have the effect of shutting down Defendant Platinum's entire business.

Plaintiff may claim the arrangement of its guide is useful and has taken it substantial time and effort to come up with. However, the amount of time or effort nor degree of emotional attachment Plaintiff has in is guide are <u>not</u> grounds for copyright protection. Moreover, Plaintiff's copyright registration for its e-book does not identify it as a compilation.

### c.      No evidence of computer hacking or use of customer list

Similarly, Plaintiff's "computer hacking" claims against Defendants border on frivolous in that (i) they are demonstrably false based on publically-available information about Plaintiff's website and (ii) they are not supported by any cognizable evidence either connecting Defendants to that conduct alleged, demonstrating that the "misappropriation" even occurred.

The only basis for Plaintiff's "computer hacking" claims against Defendants is the fact that Defendants Mr. Oskouie's and Platinum's former residence in Australia.  Plaintiff's own evidence claims this theory is at best circumstantial.  *See* ECF Doc No. 24-1.  Circumstantial evidence pitted against a sworn denial by Defendants and public information that contradicts Plaintiff's evidence does not demonstrate a likelihood of success on the merits.

Further, Plaintiff claims that Defendants' illicitly accessed Plaintiff's WordPress account to change settings to Discourage search engines from indexing  <FFL123.com> in or around January 2016.  This is false. *See* Oskouie Decl., ¶ 69.  First, according to contemporaneous Google searches, Plaintiff created and published several webpages on its website that were indexed by Google in January 2016. *See* Oskouie Decl., ¶ 70; Exhibit O.  Second, there is no competent evidence presented that any settings were changed.  *See* Oskouie Decl., ¶ 71. WordPress™-based websites do have a setting that a user can check entitled "Discourage search engines from indexing this site"—which is the functional equivalent of what Plaintiff claims is what happened. *See* Oskouie Decl., ¶ 71. A "Discourage search engines" selection changes the "robots.txt" file at the root of a WordPress™ installation on a website (i.e. <mycoolwebsite.com/robots.txt>). *See* Oskouie Decl., ¶ 71. A website with a "Discourage search engines" selection would have text on its "robots.txt" file that read "Disallow: / ".  *See id.* However, according to historical records of Plaintiff's <FFL123.com/robots.txt> webpage, not only did no such "Disallow: / " language appear thereon in January 2016, there was *no change* to Plaintiff's website from December *2013* until sometime in mid-2016. *See* Oskouie Decl., ¶ 72; Exhibit P.

Thus, if there was any reason that Plaintiff's website performed poorly on Google searches during January 2016, it was not because of a "hacking" attempt by Defendants to edit <FFL123.com>'s "Discourage search engines" selection.

Similarly, Plaintiff claims that Defendants sent emails via MailChimp to Plaintiff's customer list in April 2016. However, while Plaintiff alleges that the images annexed as Exhibit F to the Complaint are in fact the emails that were sent out, those images contain no header information indicative of an email receipt (i.e., TO: and FROM: fields). Further, due to Plaintiff's false DMCA campaign, Platinum's MailChimp account was deactivated on March 30, 2016, well before the alleged dates of the email blasts (April 2016).  Finally, Plaintiff's Application fails to identify a single person who received an email from Defendants.  Defendants affirmatively state that they never sent those messages.  Plaintiff's claims otherwise lack credulity and evidentiary support.

Finally, Assuming arguendo that Plaintiff's accounts are a protected computer for the purpose of the CFAA (which Defendants argue they are not), Plaintiff has failed to allege damages other than unfair competition damages and lost revenue in support of its CFAA claim, much less has submitted any proof that its damages for a single intrusion exceed $5,000.  This is insufficient to support a claim under the CFAA. *See, e.g.*, *Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015). Under the CFAA, "damage" means "any impairment to the integrity or availability ofdata, a program, a system, or information[.]" 18 U.S.C. § 1030(e)(8). In the instant matter, Plaintiff's pleading is noticeably deficient in that it fails anywhere therein to allege that the Plaintiff suffered any impairment to the integrity or availability of data or information as a result of the Defendants' alleged conduct. Here, the crux of the Plaintiff's argument is that the Defendants stole Plaintiff's trades secrets and proprietary information. The Plaintiff

summarily alleges that Defendants' acts caused damage and loss. Plaintiff simply fails to allege that it suffered any damages that fall within CFAA's statutory definition of "loss" or "damage." Plaintiff does not allege in its complaint that there was any impairment to its computer system or data as a result of Defendants' alleged conduct. After the alleged copying of the data, Plaintiff did not allege that it did not have access to the data just as it had before Defendants' alleged actions.  he alleged CFAA violation is not that Defendants impaired, deleted or altered any data but that Defendants allegedly used the data inappropriately. While a remedy may exist for such conduct, Congress did not provide one in CFAA. *See Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 477 (S.D.N.Y. 2004) (finding that lost revenue due to unfair competition and lost business opportunity does not constitute a loss under CFAA). Here, the Complaint does not allege that Plaintiff ever lost the ability to access any data or that the integrity of the data was impaired. The claim that its website was "effectively disabled. . . from operation" by virtue of "disabling indexing on search engines" is false (Plaintiff's WordPress functionality was not changed) and misleading (Plaintiff's website was functional and there was no interruption in service).  Thus, the Plaintiff cannot premise a private right of action on the proposition that it suffered "damage" as defined in the CFAA. The absence of an allegation of "any impairment to the integrity or availability of data, a program, a system, or information" and an evidentiary demonstration that it suffered $5,000 or more of such damages, means that the Plaintiff's assertion of liability for CFAA damages fails.

Simply put, there was no improper copying, no hijacking, no misappropriation, nor any wrongful behavior on the part of Defendants that would warrant even a reasonable probability of success on the merits of Plaintiff's claims. As such, a preliminary injunction is not warranted.

ii. Irreparable Harm

23

A plaintiff seeking preliminary relief must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Moreover, even with a *prima facie* claim, a plaintiff's delay in bringing suit "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Grout Shield Distributors, LLC*, 824 F. Supp. 2d at 403 (citing *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir. 1995)); *Richard A. Leslie Co., Inc. v. Birdie, LLC,* No. 07 Civ. 5933(LAK), 2007 WL 4245847, at *2 (S.D.N.Y. Nov. 26, 2007) ("The period from April 10 through June 8 may be excused ... on the basis that the parties appear to have been engaged in discussions with a view to resolving the matter. The three month period from June 8 through September 18 cannot. It is sufficiently long, in and of itself, to warrant denial of preliminary relief...."); *Gidatex, S.R.L. v. Campaniello Imports, Ltd.,* 13 F.Supp.2d 417, 419 (S.D.N.Y. 1998) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.").

Here, Plaintiff's claims of irreparable harm are gravely exaggerated and virtually non-existent. While the Second Circuit has flatly rejected the principle that irreparable harm is presumed in copyright infringement cases, Plaintiff ignores that authority by presenting this Court with no evidence of irreparable harm absent the existence of a copyright registration.

Plaintiff claims, without any legal support or specific facts, that it will suffer irreparable harm if it is not awarded injunctive relief. Neither the law nor the facts of the situation suggest that Plaintiff's alleged harm cannot be compensated through damages rather than an extraordinary mandatory injunction forcing Defendants to hand over their Domain Name back to a competitor improperly exploiting the copyright act and actively engaging in cybersquatting.

No one is attempting to steal a business from Plaintiff. Further, Plaintiff's reliance on the principle of consumer confusion in the context of copyright infringement is borderline frivolous when virtually none of Plaintiff's guidebook is original, protectable or not readily available in identical form on the ATF website.  Assuming *arguendo* that a line or two of Plaintiff's guidebook and Platinum's guidebook (whether the actual guidebook or Plaintiff's forged version) are similar, those *de minimis* similarities do not support an inference of irreparable harm.

Again, assuming *arguendo*, even if all of Plaintiff's claims of copyright infringement and false advertising were true as of February 2016, Plaintiff's own counsel admitted that by April 21, 2016, the <FFLTrust.com> website had "changed" and made none of the references that Plaintiff asserted in its Complaint *currently* exist. *See* Oskouie Decl., ¶ 43; Exhibit D at ¶¶ 7-8 ("We note that the image and description of 'Henry Jackson', in addition to references to a Texas street address, . . . have been removed from the external content on [<FFLTrust.com>]" . . . and "the content the subject of the March Letter [copyright infringement] allegations has been removed or altered from at least the external content on [<FFLTrust.com>]"). Thus, at best, Plaintiff's entire action concerns conduct that, if it happened at all—which Defendants vehemently deny—, occurred in the past, and ended *over a year ago*.  As such, the Court should find that Plaintiff has not suffered irreparable harm because the complained of harm occurred in the past and monetary damages are an appropriate remedy, even if difficult to determine.

Next, Plaintiff unreasonably delayed in bringing this action and motion, which undercuts the argument for irreparable injury. Plaintiff did not file this action until March 15, 2017, over a year after Plaintiff alleges it discovered Platinum's website. Such a delay undercuts Plaintiff's argument that its injury is actual, urgent and irreparable. *See Grout Shield*, 824 F.Supp.2d at 389.

Plaintiff, individually and with Counsel, engaged in numerous demands about the Defendants' website. Platinum's business plan and website has not changed since February 2016. All that changed was Plaintiff's fervor to suppress a well-thought out business enterprise. The desire to suppress another's business, however, is not a viable basis to impose a preliminary injunction. *See Gidatex, S.r.L.*, 13 F. Supp. 2d at 420 (plaintiff's several month delay "is consistent with the hypothesis that [plaintiff] is concerned less with the loss of control over the Saporiti Italia mark and more with the suppression of [defendant] as a potential competitor").

Plaintiff could have sought injunction in February 2016 when FFLtrust.com first commenced trading. If it were indeed Plaintiff's practice generally to aggressively and immediately pursue acts of infringement, it failed to do so here and does appear to use the legal system as another method to hinder legitimate competition. It is clear Mr. Maddox's intention was to bypass the legal system at first and, in doing so, avoid the cost of any litigation or court action. Instead, he wanted to take the thriftier yet more harmful route of harassment and intimidation.  It was only once he realised that Mr. Oskouie would not give into his illegal demands, he sought an injunction. Defendants are prejudiced by Plaintiff's inexcusable and unreasonable delay.

As Plaintiff has not shown a likelihood of success on the merits and waited too long to bring this motion, Plaintiff has failed to demonstrate that it would suffer irreparable harm (and not simply monetary damages) if its motion for a preliminary injunction is not granted.

iii. Balance of Hardships tips sharply in favor of Defendants

As stated above, Plaintiff has not shown a likelihood of success on the merits or that it will suffer irreparable harm.  The absence of these two elements is fatal to Plaintiff's

Application, and the Court need not evaluate the balance of hardships. *See Grout Shield*, 824 F. Supp. 2d at 419. Nonetheless, the balance of hardships tips in favor of Defendants.

Defendant Platinum's entire business will be derailed to the point of complete destruction if a preliminary injunction is granted. Platinum was founded exclusively for this business and that is its sole activity. On the other hand, Plaintiff will solely be deprived of the ability to have exclusive control over a couple of short phrases—the balance of content in Plaintiff's guidebook is stripped from the AFT website. To grant Plaintiff control over the business that Platinum continued to run exclusively for the past year (by transferring Platinum's domain name it Plaintiff) on that basis, would be a grave miscarriage of justice. Even if Plaintiff could demonstrate sufficiently serious questions going to the merits of its claims, Plaintiff has failed to demonstrate that the balance of hardships weigh decidedly in Plaintiff's favor. *Grout Shield*, 824 F. Supp. 2d at 419. Therefore the balance of hardships tips in favor of Defendants.

iv.      Injunction not in public interest

This is not a case where Defendants are posing as Plaintiff to deceive the public. Instead, this is a run-of-the-mill, yet overreaching, copyright dispute. Plaintiff's failure to demonstrate a likelihood of success on the merits of any of its claims is proof positive that the public interest would not be served by shutting down Defendants' going concern business. Further, the public interest would be better served by not rewarding overreaching copyright owners who abuse their rights by bullying and promoting bigotry. Rather than "stimulat[ing] artistic creativity for the general public good," granting a preliminary injunction on the basis of unreasonably broad copyright claims for the FFL process would be against the public interest. *See Mattel, Inc. v. Mga Entm't, Inc.*, 705 F.3d 1108, 1111 (9th Cir. 2013) ("MGA's failure to vigorously defend against Mattel's claims could have ushered in a new era of copyright litigation aimed not at

promoting expression but at stifling the 'competition' upon which America thrives. The district court did not abuse its discretion in awarding MGA fees for fighting against Mattel's claim that was stunning in scope and unreasonable in the relief it requested.").

**D.      The Relief Requested in the Preliminary Injunction is Inappropriate**

While courts rarely grant preliminary injunctions, the type of injunctive relief that Plaintiff seeks (disabling and/or transferring to Plaintiff, Platinum's Domain Name) is beyond ridiculous.  Again, at best, Plaintiff has a *de minimis* copyright infringement claim warranting nominal damages. At worst, Plaintiff's claims warrant outright dismissal. In neither of those instances should the Court shut down Platinum's website *and* strip it of its most valuable asset (its domain name).

**E.      There is No Risk of Dissipation of Assets that Would Warrant an Asset Freeze**

Normally, "district courts have no authority to issue a prejudgment asset freeze pursuant to Rule 65 where such relief was not traditionally accorded by courts of equity." *Gucci America, Inc. v. Weixing Li,* 768 F. 3d 122, 129 (2d Cir. 2014).  In the rare cases where the Court may exercise its equitable power to do so, Courts by and large decline to do so when the Plaintiff has not shown irreparable harm or a likelihood of success on the merits. *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003).

Plaintiff's request for a prejudgment attachment of assets is premised solely on the ground that Defendants reside in foreign countries. This blatant xenophobia is insufficient, alone, to support such an extraordinary remedy. Plaintiff's request for an asset freeze contains no particularized argument that *Defendants*, rather simply foreign individuals and entities, will dissipate funds.

Plaintiff's claims of non-responsiveness to Plaintiff's allegations as being an indication that Defendants are "above the law" are false. Defendants hired two law firms in Australia to counteract Plaintiff's specious claims of infringement, and engaged in discourse denying same for over a year. During that time, Defendants did not obfuscate their identity, nor move assets out of any account but for legitimate business purposes.  Further, Defendant Platinum's attempt to get a US-based payment processor ("PAI") undermines Plaintiff's argument that Defendants are trying to evade US enforcement.  Furthermore, the use of WHOIS privacy services is not indicative of an attempt to hide.

Further, Defendants have appeared here now to again dispute Plaintiff's claims, hiring US counsel to defend its rights and to assert their counterclaims against Plaintiff and Mr. Maddox. The damages for defendants' counterclaims for defamation, false DMCA notice and unfair competition exceed the potential value of Plaintiff's alleged damages. An asset freeze is wholly unwarranted under these circumstances.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiff's application for a preliminary injunction, as it is unlikely to succeed on the merits of its claim, and has unreasonably delayed in bringing this action and motion.

DATED this 28th day of June 2017,

Respectfully Submitted:

LEWIS & LIN, LLC

By:      */s/  David D. Lin*
         David D. Lin, Esq.
         Justin Mercer, Esq.

         *Attorneys for Defendants*