DAVID D. LIN (DL-3666)
JUSTIN MERCER (JM-1954)
LEWIS & LIN, LLC
45 Main Street, Suite 608
Brooklyn, NY 11201
David@iLawco.com
Justin@iLawco.com

Telephone: (718) 243-9323
Facsimile: (718) 243-9326

*Attorneys for Milad Oskouie, Osko M Ltd.,*
*and Platinum Avenue Holdings Pty, Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BMADDOX ENTERPRISES LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>MILAD OSKOUIE, OSKO M LTD, and<br>PLATINUM AVENUE HOLDINGS PTY,<br>LTD,<br><br>     Defendants. | Case No. 1:17-cv-01889-RA<br><br>**VERIFIED ANSWER TO**<br>**COMPLAINT AND**<br>**COUNTERCLAIMS** |
| MILAD OSKOUIE and PLATINUM AVENUE<br>HOLDINGS PTY, LTD,<br><br>     Counterclaimants,<br><br>v.<br><br>BMADDOX ENTERPRISES LLC and<br>BRANDON MADDOX,<br><br>     Counterdefendants. | |

Defendants Milad Oskouie ("Mr. Oskouie"), Osko M Ltd ("OML") and Platinum Avenue Holdings Pty, Ltd. ("Platinum," collectively with Mr. Oskouie and OML, "Defendants"), through their undersigned counsel, Lewis & Lin LLC, hereby answer the Verified Complaint of Plaintiff BMaddox Enterprises, LLC ("BMaddox" or "Plaintiff"):

1.      Paragraph 1 contains characterizations of this lawsuit and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied except to admit that Plaintiff seeks the relief set forth therein.

2.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 2 of the Complaint.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 3 of the Complaint.

4.      Denied.

5.      Denied except to admit that Plaintiff seeks the relief set forth therein.

6.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 of the Complaint.

7.      Deny the allegations set forth in Paragraph 7 of the Complaint, except admit that Mr. Oskouie is an individual.

8.      Deny the allegations set forth in Paragraph 8 of the Complaint, except admit that OML is a company.

9.      Deny the allegations set forth in Paragraph 9 of the Complaint.

10.     Deny the allegations set forth in Paragraph 10 of the Complaint.

11.     Deny the allegations set forth in Paragraph 11 of the Complaint.

12.     Deny the allegations set forth in Paragraph 12 of the Complaint.

13.     Paragraph 13 contains characterizations of this lawsuit and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

14.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 of the Complaint.

15.     Deny the allegations set forth in Paragraph 15 of the Complaint.

16.     Deny the allegations set forth in Paragraph 16 of the Complaint.

17.     Deny the allegations set forth in Paragraph 17 of the Complaint, except admit that this Court has subject matter jurisdiction over the claims asserted in the Complaint.

18.     Deny the allegations set forth in Paragraph 18 of the Complaint.

19.     Deny the allegations set forth in Paragraph 19 of the Complaint.

20.     Deny the allegations set forth in Paragraph 20 of the Complaint.

21.     Deny the allegations set forth in Paragraph 21 of the Complaint.

22.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 22 of the Complaint.

23.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Complaint.

24.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24 of the Complaint.

25.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25 of the Complaint.

26.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26 of the Complaint.

27.     Deny so much of the allegations set forth in Paragraph 27 of the Complaint as is inconsistent with the referenced statute, and Defendants respectfully refer the Court to the referenced statute for a full and accurate statement of its contents and effect.

28.     Paragraph 28 contains conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

29.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29 of the Complaint.

30.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 30 of the Complaint, and respectfully refer the Court to the referenced copyright registration for a full and accurate statement of its contents.

31.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 31 of the Complaint.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 32 of the Complaint.

33.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 33 of the Complaint.

34.     Admit that BMaddox refers to the items referenced in Paragraph 34 of the Complaint as "Plaintiff's Works," except denied to the extent that BMaddox purports to have and/or be eligible for copyright protection in any of the referenced items pursuant to 17 U.S.C. § 102(a).

35.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35 of the Complaint.

36.     Deny knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in Paragraph 36 of the Complaint.

37.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 37 of the Complaint.

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 38 of the Complaint, and respectfully refer the Court to the referenced trademark registration for a full and accurate statement of its contents .

39.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 39 of the Complaint.

40.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 40 of the Complaint, except admit that Mr. Sandip Banerjee assisted BMaddox in increasing conversions of website visitors to paying customers.

41.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 41 of the Complaint.

42.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 42 of the Complaint, except admit that BMaddox agreed to and did prepare a client testimonial video.

43.     Deny the allegations set forth in Paragraph 43 of the Complaint.

44.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first clause of Paragraph 44 of the Complaint, except admit the remaining allegations.

45.     Admit that Mr. Oskouie "complied with the takedown request", except deny the remaining allegations and conduct alleged in Paragraph 45 of the Complaint.

46. Admit that Mr. Oskouie "complied", except deny the remaining allegations and conduct alleged in Paragraph 46 of the Complaint.

47. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 47 of the Complaint.

48. Deny the allegations set forth in Paragraph 48 of the Complaint.

49. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 49 of the Complaint.

50. Deny the allegations set forth in Paragraph 50 of the Complaint.

51. Deny the allegations set forth in Paragraph 51 of the Complaint.

52. Deny the allegations set forth in Paragraph 52 of the Complaint.

53. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 53 of the Complaint.

54. Deny the allegations set forth in Paragraph 54 of the Complaint.

55. Deny the allegations set forth in Paragraph 55 of the Complaint.

56. Deny the allegations set forth in Paragraph 56 of the Complaint.

57. Deny the allegations set forth in Paragraph 57 of the Complaint.

58. Admit that Mr. Oskouie registered <ffltrust.com>, except deny the remaining allegations set for in Paragraph 58 of the complaint.

59. Deny the allegations set forth in Paragraph 59 of the Complaint.

60. Deny the allegations set forth in Paragraph 60 of the Complaint.

61. Admit that counsel in Australia purporting to act on behalf of BMaddox sent correspondence to Mr. Oskouie beginning in March 2016, affirmatively state that counsel hired by Mr. Oskouie and Platinum responded to such correspondence contemporaneously,

and deny any wrongdoing on behalf of Defendants.

**COUNT 1**
**COPYRIGHT INFRINGEMENT (Reg. No. TX0007388901)**

62.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

63.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 63 of the Complaint, and respectfully refer the Court to the referenced copyright registration for a full and accurate statement of its contents.

64.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 64 of the Complaint.

65.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 65 of the Complaint.

66.     Deny the allegations set forth in Paragraph 66 of the Complaint.

67.     Deny the allegations set forth in Paragraph 67 of the Complaint.

68.     Deny the allegations set forth in Paragraph 68 of the Complaint.

69.     Deny the allegations set forth in Paragraph 69 of the Complaint.

70.     Deny the allegations set forth in Paragraph 70 of the Complaint.

71.     Deny the allegations set forth in Paragraph 71 of the Complaint, further deny that the exhibits attached to the Complaint match the references set forth in this paragraph.

72.     Admit that BMaddox submitted "multiple DCMA requests" and "letters," except deny the remaining allegations set forth in Paragraph 72 of the Complaint and deny any wrongdoing on behalf of Defendants.

73.     Deny the allegations set forth in Paragraph 73 of the Complaint.

74.     Deny the allegations set forth in Paragraph 74 of the Complaint.

75. Deny the allegations set forth in Paragraph 75 of the Complaint.

76. Deny the allegations set forth in Paragraph 76 of the Complaint.

## COUNT 2
## COPYRIGHT INFRINGEMENT (LOOK & FEEL OF <FFL123.COM>)

77. Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

78. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 78 of the Complaint.

79. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 79 of the Complaint.

80. Deny the allegations set forth in Paragraph 80 of the Complaint.

81. Deny the allegations set forth in Paragraph 81 of the Complaint.

82. Deny the allegations set forth in Paragraph 82 of the Complaint.

83. Deny the allegations set forth in Paragraph 83 of the Complaint.

84. Deny the allegations set forth in Paragraph 84 of the Complaint.

85. Admit that BMaddox submitted "multiple DCMA requests" and "letters," except deny the remaining allegations set forth in Paragraph 85 of the Complaint and deny any wrongdoing on behalf of Defendants.

86. Deny the allegations set forth in Paragraph 86 of the Complaint.

87. Deny the allegations set forth in Paragraph 87 of the Complaint.

88. Deny the allegations set forth in Paragraph 88 of the Complaint.

89. Deny the allegations set forth in Paragraph 89 of the Complaint.

## COUNT 3
## COPYRIGHT INFRINGEMENT (<FFL123.COM> HTML)

90.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

91.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 91 of the Complaint.

92.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 92 of the Complaint.

93.     Deny the allegations set forth in Paragraph 93 of the Complaint.

94.     Deny the allegations set forth in Paragraph 94 of the Complaint.

95.     Deny the allegations set forth in Paragraph 95 of the Complaint.

96.     Admit that BMaddox submitted "multiple DCMA requests" and "letters," except deny the remaining allegations set forth in Paragraph 96 of the Complaint and deny any wrongdoing on behalf of Defendants.

97.     Deny the allegations set forth in Paragraph 97 of the Complaint.

98.     Deny the allegations set forth in Paragraph 98 of the Complaint.

99.     Deny the allegations set forth in Paragraph 90 of the Complaint.

100.    Deny the allegations set forth in Paragraph 100 of the Complaint.

**COUNT 4**
**DMCA VIOLATION PURSUANT TO 17 U.S.C. § 512(f)**

101.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

102.    Deny the allegations set forth in Paragraph 102 of the Complaint.

103.    Deny the allegations set forth in Paragraph 103 of the Complaint.

104.    Deny the allegations set forth in Paragraph 104 of the Complaint.

105.    Deny the allegations set forth in Paragraph 105 of the Complaint.

106.     Deny the allegations set forth in Paragraph 106 of the Complaint.

107.     Deny the allegations set forth in Paragraph 107 of the Complaint.

108.     Deny the allegations set forth in Paragraph 108 of the Complaint.

**COUNT 5**
**FALSE ADVERTISING PURSUANT TO 15 U.S.C. § 1125**

109.     Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

110.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 110 of the Complaint.

111.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 111 of the Complaint.

112.     Deny the allegations set forth in Paragraph 112 of the Complaint.

113.     Deny the allegations set forth in Paragraph 113 of the Complaint.

114.     Deny the allegations set forth in Paragraph 114 of the Complaint.

115.     Deny the allegations set forth in Paragraph 115 of the Complaint.

116.     Deny the allegations set forth in Paragraph 116 of the Complaint.

117.     Deny the allegations set forth in Paragraph 117 of the Complaint.

118.     Deny the allegations set forth in Paragraph 118 of the Complaint.

119.     Deny the allegations set forth in Paragraph 119 of the Complaint.

120.     Deny the allegations set forth in Paragraph 120 of the Complaint.

121.     Deny the allegations set forth in Paragraph 121 of the Complaint.

122.     Deny the allegations set forth in Paragraph 122 of the Complaint.

**COUNT 6**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**

123.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

124.    Deny the allegations set forth in Paragraph 124 of the Complaint.

125.    Deny the allegations set forth in Paragraph 125 of the Complaint.

126.    Deny the allegations set forth in Paragraph 126 of the Complaint.

127.    Deny the allegations set forth in Paragraph 127 of the Complaint.

128.    Deny the allegations set forth in Paragraph 128 of the Complaint.

129.    Deny the allegations set forth in Paragraph 129 of the Complaint.

## COUNT 7
## TRADE SECRET MISAPPROPRIATION PURSUANT TO NEW YORK LAW

130.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

131.    Deny the allegations set forth in Paragraph 131 of the Complaint.

132.    Deny the allegations set forth in Paragraph 132 of the Complaint.

133.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 133 of the Complaint.

134.    Deny the allegations set forth in Paragraph 134 of the Complaint.

135.    Deny the allegations set forth in Paragraph 135 of the Complaint.

136.    Deny the allegations set forth in Paragraph 136 of the Complaint.

137.    Deny the allegations set forth in Paragraph 137 of the Complaint.

## COUNT 8
## DECEPTIVE TRADE PRACTICES PURSUANT TO NEW YORK LAW

138.    Restate and incorporate by reference the responses contained in all preceding paragraphs as if set forth here in full.

139.    Deny the allegations set forth in Paragraph 139 of the Complaint.

140.    Deny the allegations set forth in Paragraph 140 of the Complaint.


With respect to BMaddox's prayer for relief, no response is required. To the extent a response is deemed necessary, Defendants deny the allegations contained after the WHEREFORE clause and further avers that BMaddox is not entitled to the requested relief or any relief whatsoever from Defendants.

## AFFIRMATIVE DEFENSES

1.    Plaintiff's Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiff's Complaint is barred by laches.

3.    Plaintiff's claims are barred for a lack of subject matter jurisdiction because it lacks valid copyright registrations for the intellectual property rights asserted, or has not properly or timely registered its works.

4.    Plaintiff's copyrights are invalid and/or unenforceable.

5.    Plaintiff's claims are barred by the doctrine of copyright misuse.

6.    Plaintiff's request for statutory damages and attorneys' fees as to its claims in Counts 2 and 3 are barred by 17 U.S.C. § 412.

7.    Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

8.    Plaintiff's claims are barred, in whole or in part, by the doctrines of acquiescence, waiver, release, consent, ratification, estoppel and excuse.

9.    Plaintiff's claims are barred, in whole or in part, by the doctrine of fair use.

10. Plaintiff has not suffered any compensable damages as a result of Defendants' actions.

11. Plaintiff's damages, if any, were not proximately caused by Defendants.

12. Plaintiff's damages, if any, were caused in whole or in part by Plaintiff's own acts, omissions, and/or negligent conduct.

13. To the extent that Plaintiff suffered any damages, Plaintiff failed to mitigate such damages.

14. Defendants raise each and every defense available to it under the applicable laws of the State of New York. Defendants reserve the right to raise additional defenses.

## CONCLUSION

WHEREFORE, Defendants respectfully request that the Court enter judgment dismissing the Complaint, with prejudice, granting Counterclaims the relief requested in their counterclaims, and awarding Counterclaimants/Defendants costs and such other relief as the Court may deem appropriate.

## COUNTERCLAIMS

Counterclaimants Milad Oskouie ("Mr. Oskouie") and Platinum Avenue Holdings Pty Ltd ("Platinum," and collectively with Mr. Oskouie "Counterclaimants"), for their counterclaim for damages and injunctive relief against BMaddox Enterprises, LLC ("BME") and Brandon Lane Maddox ("Maddox," and collectively with BME, "Counterdefendants") allege as follows:

### PARTIES

1.     Counterclaimant Milad Oskouie is an individual domiciled in England.

2.      Counterclaimant Platinum Avenue Holdings Pty Ltd d/b/a "FFLTrust.com" is an Australian proprietary limited company duly organized and existing under the laws of New South Wales, Australia with a principle place of business in New South Wales.

3.     Upon information and belief, Counterdefendant BME is a limited liability company organized and existing under the laws of the State of South Dakota, with a principal place of business in the State of Dakota, and that transacts business in the State of New York and within this judicial district.

4.     Upon information and belief, Counterdefendant Maddox is an individual domiciled in the State of South Dakota and is the principal and a member of BME.

5.     Upon information and belief, Maddoz has an ownership interest in, operates and/or manages the business of the corporate counterdefendant BME.

6.     Upon information and belief, there exists, and at all times herein mentioned there existed, a unity of interest between and among counterdefendants vis-à-vis the ownership, operation and/or management of BME.

7.    Upon information and belief, BME is so dominated and controlled by Maddox, such that counterdefendants may be considered interchangeable with one another.

8.    Upon information and belief, BME is doing business in the State of New York and within this district, derives revenues from intrastate and interstate commerce, and BME is otherwise within the jurisdiction of this Court.

9.    Upon information and belief, Maddox is doing business in the State of New York and within this district, derives revenues from intrastate and interstate commerce, and Maddox is otherwise within the jurisdiction of this Court.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq. and the laws of the State of New York.  This Court has subject matter jurisdiction, *inter alia*, pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 1367,  and 2201 *et seq*.

11.    This Court has personal jurisdiction over Counterdefendants because, upon information and belief, they regularly do business in this judicial district and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

12.    Venue in this judicial district is proper under 28 U.S.C. § 1391 in that Counterdefendants reside in and/or conduct substantial business in this judicial district and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## FACTS RELEVANT TO COUNTERCLAIMS

**A.  Counterclaimants Establish FFLTrust.com**

13.     Counterclaimant Milad Oskouie ("Mr. Oskouie") is an Australian businessman and former lawyer residing in the UK, focusing his current work on developing web properties.

14.     Mr. Oskouie is a Director of Counterclaimant Platinum Avenue Holdings Pty, Ltd. ("Platinum"), the entity that operates the website at <FFLTrust.com> which sells educational materials for securing FFLs or federal firearms licenses ("Platinum's Website").

15.     Mr. Oskouie is the owner of all common law rights in the MILAD OSKOUIE™ trademark (the "MILAD OSKOUIE™ Mark"), and has used his first and last name in commerce since as early as 2013. Mr. Oskouie has been a licensed lawyer over four (4) years, and has extensively used his personal name as a source identifier in conjunction with a variety of business and web properties. As a result, he has established a reputation and goodwill in his personal name.  It is unique, inherently distinctive and has acquired distinctiveness through its association with various businesses.

16.     Prior to starting Platinum, from 2013 until early 2015, Mr. Oskouie was involved with another web property, <infiniteconversions.com>, which was run by Infinite Conversions Pty Ltd ("Infinite Conversions").   Infinite Conversions was an Internet marketing firm which specialized in conversion rate optimization ("CRO"), focusing on third party website design and content variations to determine which layouts, copy, offers and images perform best.

17.     Infinite Conversion's Website listed Mr. Oskouie's personal name "Milad Oskouie" and photograph—the very same photograph that Counterdefendants stole and republished on their Defamatory Website at <MiladOskouie.com>.

18.     Mr. Oskouie has used the MILAD OSKOUIE™ Mark continuously and extensively in connection with the marketing and sale of Infinite Conversions' services, resulting business transactions and commercial networking.  As a result of such efforts and association with his personal name, Infinite Conversions earned approximately $50,000 in the first year and a half of business.

19.     As his renown as a CRO expert grew, so did unsolicited requests for articles and use of the MILAD OSKOUIE™ Mark.

20.     On or around March 16, 2015, Mr. Oskouie's personal name was published alongside an article entitled "How to Create Value Propositions That Work by Milad Oskouie, Infinite Conversions," in *Website Magazine* (websitemagazine.com), a premier print and web magazine for Internet professionals and online marketers with articles related to search engine optimization, web design, e-commerce, and marketing.

21.     Mr. Oskouie has also used the MILAD OSKOUIE™ Mark with another web property <TheUniTutor.com> ("The UniTutor"), starting in 2012.  The UniTutor's gross sales associated with the MILAD OSKOUIE™ Mark have been between £300,000–400,000 annually since 2012.

22.     In sum, due the breadth that I would use the MILAD OSKOUIE™ Mark alongside the web properties above, Infinite Conversions' and The UniTutor's businesses were synonymous with the MILAD OSKOUIE™ Mark as well as his personal name.

23.     I promoted these goods/services and the MILAD OSKOUIE™ Mark extensively, spending roughly $30,000 or more on advertising and marketing services since 2012.

24.     Promotional efforts have included professional networking and online advertising via websites and search engines.  The website at Infinite Conversions, social media marketing, print marketing and other advertising prominently displayed the MILAD OSKOUIE™ Mark and name.

25.     From 2012 to the present, Mr. Oskouie's business ventures earned total revenues of over $1 Million dollars, primarily from the sale of services under the MILAD OSKOUIE name and mark.

26.     Mr. Oskouie first registered the domain <FFLTrust.com> (the "Domain") on behalf of Platinum in December 2015.

27.     Despite his familiarity with web domains, conversion rate optimization ("CRO") and basic web publishing, Mr. Oskouie has limited experience with website development. Thus, to create the <FFLTrust.com> website, Platinum engaged a freelance web developer, Mr. Stefan Ciobanu.

28.     Given Mr. Oskouie's familiarity with CRO via a former business relationship with a company called Infinite Conversions, Mr. Oskouie understood what worked content-wise and knew that simplicity for websites is key.  So, he instructed Platinum's developer, Mr. Ciobanu to create a WordPress™-based website for <FFLTrust.com> that Platinum could easily edit and manage.

29.     Thereafter, Mr. Ciobanu created a custom WordPress™ theme for Platinum's Website with a blue and orange color scheme and original "software box" images.

30.     Indeed, while this simple website design was successful, it was in no way unique. Hundreds of websites use a similar WordPress™ layout, including other competitors in the same industry, such as <RocketFFL.com> and Counterdefendants' <FFL123.com>.

31.	Leveraging his legal research skills, through many months of research, reviewing the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF's") Website, and reading blog posts about FFLs, Mr. Oskouie drafted and created an FFL e-book ("Platinum's FFL Guidebook")—which he supplied to Mr. Ciobanu for inclusion on Platinum's Website in late December 2015 and early January 2016.

32.	Platinum also engaged freelance writers, several of whom are FFL holders (including one who advised Platinum that he held a license since 1995), to fact-check, edit and draft other portions of Platinum's FFL Guidebook.

33.	Platinum also purchased print books and subscriptions to various FFL e-books on the Internet. However, Platinum realized that the overwhelming majority of information in these FFL print books and e-books were culled directly from the National Firearms Act ("NFA") and/or the ATF's Website.

34.	On or around January 2016, Platinum launched <FFLTrust.com>.

35.	In order to access Platinum's FFL Guidebook, users must register and purchase subscriptions to access the password-protected e-book online.

36.	Platinum wanted to grow <FFLTrust.com> organically, so it relied heavily on Google AdWords advertising to promote the website. That notwithstanding, the first <FFLTrust.com> user purchased a subscription to Platinum's FFL Guidebook on February 14, 2016.

37.	In March 2016, after Platinum discovered which combination of Google AdWords advertising would reach the most potential customers, its business boomed to nearly $19,000 in gross sales for that month.

38. However, after Counterdefendants' overt and covert attempts to run Platinum's business into the ground starting in early 2016 (described below), Platinum's sales plummeted to less than $1,600 in April 2016 and to $0 in May 2016.

39. While Platinum was able to recover slightly by staving off Counterdefendants' constant barrage of false DMCA notices, hacking attempts and public harassment, its sales have not returned to their March 2016 level.

**B. Counterdefendants' Competing Business and Monopolization**

40. Upon information and belief, Counterdefendants Maddox and BME own and operate the website <FFL123.com>, a competitor of Platinum's in the business of marketing educational materials for people seeking to get a federal firearms license ("FFL"). Upon information and belief, Counterdefendants sell a "guidebook" regarding filling out paperwork for FFLs on their website ("Counterdefendants' Guidebook").

41. Upon information and belief, Maddox asserts that he is the owner and registrant of a U.S. Copyright for Counterdefendants' Guidebook.

42. As a result, a relevant product market exists for the online sale of FFL guides.

43. Upon information and belief, BME dominates this market, controlling 80% or more of it.

44. Counterdefendants have sought to misappropriate Platinum's and other competitors' intellectual property and attempted to expropriate for its exclusive use processes, methods and even terminology for obtaining an FFL that are and always have been in the public domain. As a result, Platinum and other competitors are forced to initiate or respond to administrative or judicial proceedings or take other steps to protect their rights and maintain their ability to freely use ideas and/or works in the public domain necessary to

effectively compete in the marketplace.  But those competitors that have the audacity to challenge Counterdefendants' misconduct and fraud on the U.S. Copyright Office, such as Platinum, have been met with Counterdefendants' own covert hacking campaigns and scorched-earth litigation, including a barrage of vexatious and frivolous claims.

45.     In fact, contrary to the allegations in the Complaint, in DMCA notices issued by Counterdefendants and statements posted online, Platinum's *actual* FFL Guidebook contains little to no resemblance to Counterdefendants' Guidebook.  The chapter structure is not the same and the text content is different.

46.     Although both guidebooks explain the procedure to procure an FFL license, those procedures, methods and facts are all information in the public domain, and readily available on the ATF's website, <atf.gov/firearms/apply-license> ("ATF's Website").

47.     Counterdefendants know that they have no protectable or exclusive copyrights in the process or steps of filling out paperwork to procure an FFL and that their claimed copyright in public domain materials from the ATF's Website is contrary to law.

48.     Given the public domain and/or noncopyrightable nature of the process or steps of filling out paperwork to procure an FFL, Counterdefendants also have no right to prevent others from using that public domain material from the ATF's Website or the noncopyrightable facts regarding an FFL, and it knows it.

49.     Notwithstanding its clear knowledge that it cannot prevent any competitor from using these facts and information, Counterdefendant BME still filed this action claiming it has exclusive copyrights to noncopyrightable materials and that Counterclaimants' use of same now allegedly is infringing its claimed rights.

**C.  Counterdefendants' Campaign of Fraudulent DMCA Notices and Hacking**

50.     Nearly immediately after launch but before <FFLTrust.com> had any active users, between February 11, 2016 and March 1, 2016, Platinum received no less than 7 cryptic, DMCA notices forwarded from various third party service providers wherein Maddox and/or BME claimed, *inter alia*, that "FFLTrust.com is a 100% copy of my website [FFL123.com]," and falsely accused Platinum of being a "thief" and "hackers."

51.     On February 11, 2016, Maddox falsely swore under penalty of perjury to Platinum's domain name registrar that the content on <FFLTrust.com> had been stolen in violation of the DMCA.

52.     On February 12, 2016, Maddox falsely swore under penalty of perjury to Platinum's domain name security proxy, Cloudflare, that the content on <FFLTrust.com> was "stolen" in violation of the DMCA and the Website was a "phishing website."

53.     On February 12, 2016, Maddox falsely swore under penalty of perjury to Google that Platinum were "hackers" that "stole 100% of the content from my website" and were violating the DMCA.

54.     On February 13, 2016, Maddox made another false DMCA sworn statement under penalty of perjury to Cloudflare that "www.FFLtrust.com, they hacked my company's website (FFL123.com) on 12/30/15 and stole 100% of our digital content."

55.     While Platinum's Website was live between February 11-13, 2016, the only "users" on the website that could view Platinum's FFL Guidebook were Mr. Oskouie and Mr. Ciobanu. Thus, not only are Counterdefendants' allegations as to what was on Platinum's Website on or around February 11-13, 2016 demonstrably false, there was no way Counterdefendants could have known what Platinum's FFL Guidebook contained at the time it issued those false DMCA notices.

56. Upon information and belief, Counterdefendants only wanted to stifle competition because Platinum's Website used a similar, generic WordPress™ theme as FFL123.com's website.

57. On February 16, 2016, Maddox issued a third false DMCA notice sworn under penalty of perjury to Cloudflare.

58. On March 1, 2016, Maddox issued another false DMCA notice sworn under penalty of perjury to Google.

59. Much like the complaint in the instant lawsuit, none of the DMCA notices particularized what content from <FFL123.com> was copied or appeared on <FFLTrust.com>, other than blanket statements that the "entire website" was copied.

60. Notwithstanding same, Platinum's various service providers took down <FFLTrust.com> on various occasions, causing serious disruptions to Platinum's business.

61. Platinum responded to each of the above notices and denied that any content was copied from <FFL123.com>. In each of Platinum's responses, it identified who it was, and that it was the owner of the website and content in question. At no time did Platinum hide its identity to "avoid detection" in connection with its DMCA responses.

62. From on or around March 1, 2016 until March 30, 2016, <FFLTrust.com>'s hosting provider, Root, S.A., informed Platinum that it was receiving various distributed denial of service ("DDoS") attacks on the server hosting <FFLTrust.com>, which caused the website to go down for days at a time.

63. A DDoS attack is an attack in which multiple compromised computer systems are used to attack a specific target, causing a denial of service ("DoS") for users of that target—in this instance users attempting to reach <FFLTrust.com>.

64.     During these DDoS attacks, Platinum was also unable to send, receive or access its @ffltrust.com email hosted on the MX server at <FFLTrust.com>.

65.     Upon information and belief, Counterdefendants, or their hired agents, caused the DDoS attacks on Platinum's Website.

66.     On or around early April 2016, Platinum received an anonymous ransom note email attaching three screenshots demonstrating Maddox's attempts to employ hackers, via the Upwork™ freelancing platform at Upwork.com, to "take down" <FFLTrust.com>. Copies of the Upwork messaging screenshots are attached hereto as **Exhibit A**.

67.     The email claimed that Counterdefendants were responsible for the DDoS attacks on Platinum's Website.

68.     In the first and second screenshots, Maddox repeated the false allegations of copyright infringement by Platinum and asked the hacker named "Rabiul Islam" if it is "[p]ossible to hire you to focus efforts on getting ffltrust.com removed?"  See Exhibit A. Rabiul Islam replied, "Shall I take down the site [FFLTrust.com] or only help your attorney to file the case?" See Exhibit A.

69.     When Maddox expressed concern to Rabiul Islam that "Attorney maybe expensive and time consuming," Mr. Islam suggested "We hit the fake site [FFLTrust.com] and take that down for a few times until they don't take down your content." See Exhibit A. Thereafter, Maddox agreed and said "okay." See Exhibit A.

70.     Upon information and belief, Counterdefendants hired Rabiul Islam to conduct the DDoS attacks on Platinum's Website.

71.     In the third screenshot, Maddox repeated the false allegations of copyright infringement by Platinum and asked another hacker named "Alexey Bubily," (whose Upwork

profile states he is an "ethical hacker") "Do you think you can help me get FFLtrust.com down?" See Exhibit A.

72.     Upon information and belief, Counterdefendants hired Alexey Bubily to conduct additional DDoS attacks on Platinum's Website.

73.     As a direct and proximate result of <FFLTrust.com> being shut down by the attacks, Platinum suffered monetary harm in the form of lost sales and business beginning in March 2016—i.e., the same month it had its highest growth—in an amount that has not yet be determined, but likely in the tens of thousands of dollars.  Platinum also spent several hours over the span of many days with its developers and hosting provider to investigate the attacks and intrusions.

74.     On or around March 24, 2016, Platinum and Mr. Oskouie received a letter from Australian counsel for Counterdefendants, which repeated many of the false allegations of copying, hacking, website alteration alleged in the DMCA notices, and claimed that Platinum had stolen a customer list. As with the DMCA notices, none of the allegations in Counterdefendants' Australian counsel's letter particularized what content was infringing nor provided any evidence of the alleged hacking.

75.     On or around the same time, Maddox's false DMCA notice efforts intensified. On March 29, 2016, Mr. Maddox issued a *fourth* false DMCA notice to Cloudflare, this time falsely claiming that the FBI was about to arrest Mr. Oskouie.

76.     On March 30, 2016, Maddox issued a false DMCA notice sworn under penalty of perjury to MailChimp, Platinum's email marketing platform, which resulted in MailChimp deactivating Platinum's MailChimp account.

77.     Then, on the same March 30, 2016, Maddox made another false DMCA notice to Root, S.A., Platinum's website host, again claiming that the FBI was involved and that Platinum and Mr. Oskouie were wanted criminals.

78.     As a result of Mr. Maddox's successive defamatory and false DMCA notice campaign, Platinum's website was shut down by its host and it was forced to move to another provider.   From March 30, 2016 to around April 13, 2016, <FFLTrust.com>'s website was down, and Platinum had no way to send or receive emails from its customers and vendors.

79.     Because Platinum took Counterdefendants' allegations of copyright infringement seriously, it engaged legal counsel in Australia, Yves Hazan of Hazan Hollander.

80.     On April 5, 2016, Mr. Hazan responded on behalf of Platinum to the March 24, 2016 letter from Australian counsel for Counterdefendants admitting that Platinum was the owner of <FFLTrust.com> but denying the allegations of copyright infringement and criminality.

81.     Upon information and belief, on or around April 15, 2016, Maddox sent another false DMCA notice to Platinum's new hosting provider, VentraIP.

82.     Counterdefendants then hired another Australian law firm, who emailed Platinum's attorney another letter on April 21, 2016, again claiming copyright infringement, threatening to file a lawsuit but this time with accompanying screenshots of what they purported to be Platinum's website dated April 9, 2016 and April 13, 2016 respectively.

83.     The April 21, 2016 letter accused Platinum of "chang[ing]" the <FFLTrust.com> website since it had received the March 24, 2016 letter—but Platinum had not changed anything, and could not change anything as the website was shut down.

84.    The April 21, 2016 letter also claimed that Platinum "changed" the website to remove references to and images of "Henry Jackson" and falsely accused Platinum of sending email blasts via MailChimp during this same period.

85.    By letter dated May 23, 2016, Mr. Hazan responded on behalf of Platinum to the April 21, 2016 letter from Australian counsel for Counterdefendants, immediately calling into question the authenticity of the "screenshots" of Platinum's website and "email blasts" as they were allegedly taken when the <FFLTrust.com> website was down and when it did not have a MailChimp account.

86.     Between May 26, 2016 and June 4, 2016, the parties' Australian counsel exchanged various letters via email, however no resolution was reached.

**D.  Counterdefendants Engage in Defamatory Attacks and Cybersquatting Against Mr. Oskouie and Platinum**

87.    Apparently dissatisfied that the parties' attorneys would resolve the matter, on or around June 2016, Maddox again took matters into his own hands by issuing more false DMCA notices.

88.    Then, on July 8, 2016, Mr. Maddox authored a defamatory and harassing letter to Mr. Oskouie's parents, repeating the false allegations of hacking and copyright infringement, claiming that law enforcement authorities in the US and Australia were involved, and threatening Mr. Oskouie's parents' businesses.

89.    In the July 8, 2016 Letter, Maddox (i) falsely claimed to Mr. Oskouie's parents that he "reviewed the website at ffltrust.com and quickly identified the content was identical to my website, FFL123.com;" (ii) falsely claimed that "ffltrust.com has taken my licenses and altered them to appear as if they hold these licenses as well," when no such image ever appeared on Platinum's website, and (iii) threatened physical violence by

claiming that he was "licensed to buy and sell military grade weapons" and stating that he "[did] not see this ending well [for Mr. Oskouie]."

90.    Upon information and belief, Maddox sent various email blasts to his customer list (of allegedly 100,000 persons), repeating these false allegations of criminal and fraudulent activity on or around July 2016 to the present.

91.    Upon information and belief, those July 2016 false email blasts stated, in relevant part, as follows:

> Subject: Important Notice - Our Email List Was Compromised
>
> Dear Prospective FFL123.com Customer -
>
>         *     *     *
>
> We recently learned our email list was accessed without our permission.
>
> The company now using this list is an Australian company, Platinum Avenue Holdings PTY LTD, doing business as ffltrust.com. Public records indicate the sole owner to be, Milad Oskouie (Born: Tehran, Islamic Republic of Iran).
>
> We understand getting emails from an unknown company that appears to be impersonating our business can be confusing for a potential customer.

92.    The July 2016 email blasts falsely claimed that Counterclaimants:

    a.  Accessed Counterdefendants' email list without permission;

    b.  Were using Counterdefendants' email list without permission; and

    c.  Were "impersonating" FFL123.com.

93.    The above statements are false and disparage Mr. Oskouie and/or Platinum in their business, trade and profession.

94.     Platinum and Mr. Oskouie then engaged another attorney in Australia, Mr. Robert Haralovic of HAL Lawyers.

95.     On or about September 28, 2016, Mr. Haralovic sent a cease and desist letter to Maddox concerning his July 8, 2016 defamatory missive to Mr. Oskouie's parents and again denying the allegations of copyright infringement.  Mr. Haralovic did not receive a reply to the September 28, 2016 letter.

96.     However, on or around December 27, 2016, Mr. Haralovic received an email from a police detective in Australia, Mr. Alexander Moffat, claiming to be investigating the allegations by the owner of <FFL123.com>, i.e. Counterdefendants and seeking response to several questions.

97.     By email dated December 30, 3016, Mr. Haralovic, on behalf of Platinum and Mr. Oskouie, responded to Mr. Moffat's inquires, again denying copyright infringement by and requesting the detective forward any evidence supporting the alleged hacking claims. Mr. Haralovic did not receive a reply to the December 30, 2016 email.

98.     Upon information and belief, Counterdefendants repeated their false allegations to Australian authorities to cause disruption to Platinum's business.

99.     Once again dissatisfied that law enforcement would pursue the matter, on or around February 15, 2017, Maddox took matters into his own hands again by registering the domain name <MiladOskouie.com>. The domain name precisely tracks the spelling of Mr. Oskouie's legal name.

100.    Counterdefendant Maddox registered and has used <MiladOskouie.com> with the bad faith intent to profit from said use.

101.    Mr. Oskouie did not authorize Counterdefendants to use or register the domain name bearing his full name and the MILAD OSKOUIE™ Mark.

102.    Counterdefendants have never been known by the name Milad Oskouie.

103.    Counterdefendants have not made any legitimate noncommercial or fair use of the domain name <MiladOskouie.com>.  Counterdefendants have not used that domain name in connection with any bona fide offering of goods and services.

104.    In fact, Counterdefendants have used that domain name and others to directly and unfairly compete with Counterclaimants by spreading blatantly false and misleading information about Platinum, and its director, Mr. Oskouie on a website accessible on the Internet.

105.    On or around the same date, February 15, 2017, Maddox registered the domain name <AustralianHacker.com>.  Upon information and belief, from February 2017 to the present, Maddox has posted messages on various forums where users discuss FFLs and firearms across the Internet directing and encouraging users to visit <AustralianHacker.com>.

106.    Maddox created a website on <MiladOskouie.com> to further defame and disparage Mr. Oskouie and Platinum.  The heading of the website states "Milad Oskouie (aka Australian Hacker)."

107.    The domain name <AustralianHacker.com> redirects to <MiladOskouie.com>.

108.    The website at <MiladOskouie.com> continues Maddox's online campaign to disparage and defame Mr. Oskouie and Platinum on the Internet, claiming that Mr. Oskouie was a "hacker" and/or "Islamic hacker" and falsely associating Mr. Oskouie with Islamic

extremism in an attempt to stifle competition between Platinum and BME and harass Mr. Oskouie personally (the "Defamatory Website"). A screenshot of the Website is attached hereto as **Exhibit B**.

109. The Defamatory Website also makes the following false statements:

    a. That Counterclaimants are sending spam emails to Counterdefendants and their customers;

    b. That Mr. Oskouie is a "hacker";

    c. That Mr. Oskouie is a "criminal";

    d. That Counterclaimants "criminal[ly]" and "fraud[ulently]" altered official firearms documents;

    e. That Mr. Oskouie is a "fraud[ulent]" person;

    f. That Mr. Oskouie has not told the truth when he claimed to be a lawyer;

    g. That Mr. Oskouie falsely claimed to be a lawyer; and

    h. That Mr. Oskouie falsely claimed to have attended law school.

110. Each of the above statements are false and disparage Mr. Oskouie and/or Platinum in their business, trade and profession.

111. The Defamatory Website also includes links to various documents, including

    a. an apparently false "statement" to Australian police wherein Counterdefendants admit to sending the July 8, 2016 defamatory letter to Mr. Oskouie's parents and the July 2016 false email blast to their 125,000 customers (and republishes same within);

    b. reproductions of the July 8, 2016 defamatory letter to Mr. Oskouie's parents; and

c. reproductions of the July 2016 false email blast.

112. The Defamatory Website also lists nonpublic, personal information concerning Counterdefendants and that of Mr. Oskouie's parents, including, *inter alia*, phone numbers and personal email addresses.

113. Upon information and belief, Counterdefendants intend to continue displaying the Defamatory Website on <MiladOskouie.com> and <AustralianHacker.com> unless and until Platinum's business is shut down, effectively eliminating a competitor and thereby profiting commercially in the field of selling educational materials for procuring FFLs.

114. Counterdefendants have refused all demands to transfer or assign <MiladOskouie.com> to Mr. Oskouie.

115. Counterdefendants' conduct have caused Mr. Oskouie to lose control over the reputation and goodwill associated with this personal name, both for personal and business purposes, and he has suffered and continues to suffer other immeasurable damages. For the harm and loss Mr. Oskouie has suffered, and for the harm and loss that will continue but for the intervention of this Court, Mr. Oskouie has no adequate remedy at law. Unless Counterdefendants are enjoined from further misuse of the domain name <MiladOskouie.com>, or any name substantially and confusingly similar thereto, Mr. Oskouie will suffer irreparable harm because the damages sustained will be immeasurable, unpredictable, and unending.

116. On or about February 16, 2017, Counterdefendants published a false and defamatory email to their customers and prospects of and concerning Mr. Oskouie and Platinum entitled "Hacker Alert – ffltrust Hacker Alert – Warning." The email stated, in relevant part, as follows:

> You may be getting unsolicited emails from ffltrust[.com].
>
>         \*        \*        \*
>
> These emails are being sent by an Islamic Hacker by the name of Milad Oskouie.
>
> See Australianhacker.com to learn more.
>
> We assure you we have no affiliation with this international criminal.

117.    The February 16, 2017 email is false and defamatory.

118.    On or about February 17, 2017, Counterdefendants published another false and defamatory email blast to their customers and prospects of and concerning Mr. Oskouie and Platinum. Upon information and belief, the February 17, 2017 email was identical to the July 2016 false email blast except it included a link to <AustralianHacker.com> (which, of course, redirects to <MiladOskouie.com> and the Defamatory Website).

119.    After February 17, 2017 until the present, Counterclaimants have received numerous harassing emails and messages from third parties containing racial and religious slurs, including threats of physical violence, that reference the email blasts sent by Counterdefendants. Upon information and belief, Counterdefendants scripted, directed the authoring of and caused to be disseminated these messages.

120.    On February 19, 2017, Counterdefendants published yet another false and defamatory email blast to their customers entitled "Islamic Hacker alert – getting spam from ffltrust". The February 19, 2017 email stated, in relevant part, as follows:

> You may be getting spam emails from ffltrust.
>
>         \*        \*        \*
>
> These emails are being sent by an Islamic Hacker by the name of Milad Oskouie.

See Australianhacker.com to learn more.

We assure you we have no affiliation with this international criminal. We take our Intellectual Property very serious and are working with law enforcement to resolve this situation.

121. On or about February 20, 2017, Platinum received a threatening and harassing email via the contact form on Platinum's Website, reproduced in relevant part, below:

```
Name: Spike
Email: spiketheworld@gmail.com

Message Body:
Brandon (from ffl123.com) is following the correct procedure to see that your
operation ends.

I am not that nice- and dont need law enforcement. If I were you, I would confess in
an email to Brandon, close up shop forever, and leave NOW.

This is your only warning-if we find you, it will be bad for you and whomever
supports you.
```

122. On or about February 20, 2017, Platinum received another threatening and harassing email entitled "BE ADVISED." The February 20, 2017 email is reproduced in relevant part below:

| | |
|---:|:---|
| **Subject:** | BE ADVISED |
| **From:** | "Spike Theworld" <spiketheworld@gmail.com> |
| **Date:** | Mon, February 20, 2017 3:08 pm |
| **To:** | info@ffltrust.com |
| **Priority:** | Normal |
| **Options:** | View Full Header | Print | Download this as a file |

Brandon (123ffl.com) is being kind and offering you a way out and to cease and desist. You should take it seriously.

We, are not that nice.

We have successes in permanently ending illegal operations like yours all over the world-with and without the assistance of law enforcement.

If you do not cease your illegal operation, immediately, we will end it for you.

123.     Upon information and belief, Counterdefendants scripted, directed the authoring of and caused to be disseminated the above February 20, 2017 messages as a part of their intentional, malicious, systematic and months-long campaign to interfere Platinum's business, and upon information and belief, to wreak havoc on Platinum's business by further employing hackers to cause interruptions to Platinum's Website—inducing Platinum's customers and prospective customers to cease doing business with Platinum.

124.     On or about February 25, 2017, Counterdefendants published another false and defamatory email concerning Counterclaimants entitled, "Iranian Hacker alert – getting spam from ffltrust."  The February 25, 2017 email was identical to the February 19, 2017 email, except it replaced the words "Islamic" with "Iranian."

125.     On March 7, 2017, Mr. Haralovic received an email from police detective in Australia confirming that no criminal charges would be pursued against Mr. Oskouie.

126.     On or about April 2, 2017, Mr. Haralovic, on behalf of Platinum and Mr. Oskouie, sent a letter to Counterdefendants' US counsel, notifying him of the Defamatory Website and various false, public comments regarding Counterclaimants circulated by

Maddox. The April 2, 2017 letter demanded Counterdefendants cease their bad faith use of <MiladOskouie.com>. Mr. Haralovic did not receive a reply to the April 2, 2017 letter.

127. On or about May 19, 2017, Maddox sent another harassing and defamatory letter to Mr. Oskouie's parents. The May 19, 2017 letter stated, as follows:

> **Subject – Your Son Milad Oskouie**
>
> Dear Mr. & Mrs. Oskouie –
>
> Greetings from the USA.
>
> You and your family (daughter) can find up to date information online at MiladOskouie.com. This letter will be added online the day it is delivered.
>
> Why does your son continue to terrorize me, my business, and my family? Is it because I am Christian? Is it because I am American? Your sick son calls and terrorizes my wife on her cell phone. I created Milad a free testimonial to help his business and he repays me with theft and terrorization for over eighteen months.
>
> The USA agencies that regulate firearms are not impressed with your son's cyber jihad against my business. I can assure you, this is not going to end well. Milad's ongoing criminal actions are going to negatively impact your entire family.
>
> As his parents, you must stop Milad's ongoing criminal activities immediately.
> What is the punishment for theft in Iran?
>
> Do you have no influence over your own son?
>
> Sincerely,
>
> Brandon L. Maddox, Pharmacist, MBA
> BMADDOX ENTERPRISES, LLC
> Owner, FFL123.com

128. Each of the above statements are false and disparage Mr. Oskouie and/or Platinum in their business, trade and profession.

129. Upon information and belief, on May 20, 2017, Counterdefendants republished the May 19, 2017 letter on <MiladOskouie.com>, where it remains accessible on the Internet.

130. As a result of the Counterdefendants' false and defamatory publications Counterclaimants have suffered damages to their reputations, good will and well-being.

131. Counterdefendants have persisted and continued in making and disseminating the defamatory publications described above despite requests from Counterclaimants to cease and desist. As such, their conduct is willful and malicious.

132. Moreover, Mr. Oskouie is unable to secure employment because the defamatory publications described above (including but not limited to the Defamatory Website at <MiladOskouie.com>) are revealed during background checks performed by prospective employers. Furthermore, the Defamatory Website contains false statements that Mr. Oskouie is a dangerous "criminal," who could cause immense damage by simply having access to a computer. The statements thereon impugn Mr. Oskouie's capacity as a professional and lawyer, making him look dishonest and untrustworthy. As a result, Mr. Oskouie does and will have difficulty in obtaining any approval where an element of trust is required, e.g., being a lawyer and/or applying for a loan, both personally and professionally. The impact of these extreme, bigoted, false statements to Mr. Oskouie's personal and professional life is great as no one wants to associate (much less do business with) a "hacker" or "criminal" or "jihadist" or "terrorist."

133. The magnitude of baseless claims asserted by Counterdefendants in this action and online have been draining and will continue to drain significant resources from Counterclaimant Platinum, which is a competitive threat to BME. Counterdefendants are

thereby causing a substantial negative impact on the relevant FFL guide market and relevant online FFL guide submarket.

### E. Counterdefendants' Malicious Invasion of Privacy for Commercial Gain

134.    Apparently dissatisfied that the Court would temporarily restrain Counterclaimants' Website based solely upon Counterdefendants' baseless allegations herein, on or around July 19, 2017, Maddox again took matters into his own hands by publishing additional private information concerning Counterclaimants on the Defamatory Website at <MiladOskouie.com> and <AustralianHacker.com>.

135.    Specifically, in addition to the private information above, Counterdefendants recently published Mr. Oskouie's passport number.  Mr. Oskouie's passport number is not public.

136.    Upon information and belief, Counterdefendants obtained Mr. Oskouie's passport number via covert and surreptitious methods (i.e. hacking into his personal computers) and/or from his private accounts with the very same financial institutions that this Court permitted BME to obtain information therefrom for the purposes of the litigation.

137.    Such intrusion upon the seclusion of Mr. Oskouie's private information is unreasonable, unwarranted, serious and offensive. With such additional private information, coupled with the disclosure of other information as alleged above, Counterdefendants and/or nefarious third parties could get access to Counterclaimants personal and business financial accounts and other online accounts that support Counterclaimants' business, without Counterclaimants' authorization.

138.    Given Counterdefendants' history of employing third parties to do their hacking bidding for them, upon information and belief, Counterdefendants intend to continue

publishing such information on the Defamatory Website until Counterclaimants shut down their competing business, or a third party does the same for Counterdefendants.

139.    In short, Counterdefendants have recently published this private information of Counterclaimants, while simultaneously promoting their own business, to stifle competition and for commercial gain.

**FIRST CAUSE OF ACTION**
**Violation of Anticybersquatting Consumer Protection Act, 15 U.S.C. § 8131**

140.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

141.    The domain name <MiladOskouie.com> consists of the name of another living person, specifically that of Counterclaimant Milad Oskouie.

142.    Counterdefendant Maddox registered the domain name <MiladOskouie.com> without Mr. Oskouie's consent, and did so with the specific intent to profit from such name by selling the domain name for financial gain to Counterclaimants and using the domain name (and others) to cyber-extort Counterclaimants into shutting down FFLTrust.com.

143.    Counterdefendants have used and continue to use the domain name <MiladOskouie.com> in bad faith and with the bad-faith intent to profit from said use.

144.    Counterdefendants have no trademark or any other intellectual property rights in the domain name <MiladOskouie.com>.

145.    Counterdefendants have not used the domain name in connection with the bona fide offering of any goods or services, nor for any other good faith purpose.

146.    Counterdefendants have made no good faith use of the domain name, nor did they register said domain name in good faith.

147. Through use of Mr. Oskouie's name, Counterdefendants intended to and actually did diver consumers, associates, family members, customers, prospective employers and/or business contacts to the Defamatory Website accessible under the domain name <MiladOskouie.com> that could and does harm the goodwill represented by the name "Milad Oskouie" for commercial gain and with the intent to tarnish and disparage the name, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the website.

148. Upon information and belief, Counterdefendants have offered to sell the domain name to third parties for financial gain without having used or having any intent to use the domain name in the bona fide offering of any goods or services.

149. Counterdefendants' conduct as described above has caused irreparable and substantial harm to Mr. Oskouie and to his reputation and goodwill.

150. As a direct result of Counterdefendants' conduct, Mr. Oskouie has been substantially harmed. Accordingly, Counterclaimants seek recovery from Counterdefendants of all amounts to which Counterclaimants are entitled, including, without limitation, Counterdefendants' profits from the use of the domain name <MiladOskouie.com>, an award of damages in the maximum amount permitted by law, transfer of the domain name to Counterclaimants, a preliminary and permanent injunction requiring divesture of the domain name, attorneys' fees, the costs of suit and such further relief that the Court considers just.

151. Title 15, Section 8131(2) of the United States Code specifically provides for junctive relief, costs and attorneys' fees.

## SECOND CAUSE OF ACTION
## Violation of Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)

152.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

153.    Mr. Oskouie is the owner of all common law rights in the MILAD OSKOUIE™ Mark, and has used my first and last name in commerce since as early as 2013. It is unique, inherently distinctive and has acquired distinctiveness through its association with various businesses.

154.    The domain name <MiladOskouie.com> consists of the name of another living person, specifically that of Counterclaimant Milad Oskouie, and Mr. Oskouie uses this name both as his personal name and Counterclaimants use as a source of business identity under the MILAD OSKOUIE™ Mark.

155.    By using the MILAD OSKOUIE™ Mark and Mr. Oskouie's personal name as a domain name, Counterdefendants have registered, trafficked in and used a domain name with the bad faith intent to profit unlawfully.

156.    The aforesaid actions constitute cybersquatting, in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

157.    The unauthorized use of the MILAD OSKOUIE™ Mark as a domain name has caused, and unless and until enjoined will continue to cause, irreparable injury to the MILAD OSKOUIE™ Mark and the good will associated with same.  An award of monetary damages alone cannot fully compensate Mr. Oskouie for his injuries and therefore he lacks an adequate remedy at law.

158.    By reason of Counterdefendants' acts alleged herein, Counterclaimants are entitled to recover profits, actual damages, and the costs of the action, or statutory damages

under 15 U.S.C. § 1117, on election by Counterclaimants, in the amount of One Hundred Thousand Dollars ($100,000).

159.    The foregoing acts have been, and continue to be, deliberate, willful and wanton, making this an "exceptional" case within the meaning of 15 U.S.C. § 1117.

160.    Counterclaimants have incurred costs, including without limitation, attorneys' fees and court costs, in seeking to retrieve the domain name <MiladOskouie.com>.

## THIRD CAUSE OF ACTION
### Defamation Per Se and Trade Libel

161.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

162.    Defendants have intentionally made knowingly false statements of fact about Counterclaimants.

163.    These statements were made maliciously and willfully, and were intended to cause harm to Counterclaimants' business and reputation.

164.    The aforementioned statements were false when made and Counterdefendants knew or should have known that the statements were false when made.

165.    These statements were made maliciously and willfully, and were intended to cause harm to Mr. Oskouie's personal reputation. The statements were made with reckless disregard for their truth or falsity or with knowledge of their falsity and with wanton and willful disregard of the reputation and rights of Mr. Oskouie.

166.    The aforementioned statements where made of and concerning Counterclaimants, and were so understood by those who read Counterdefendants' publication of them.

42

167.    Among other statements, Counterdefendants falsely accused Counterclaimants of being "criminal[s]," "fraud[s]," and "hacker[s]," and perpetrators of fraudulent and "illegal" behavior.

168.    Counterdefendants' false statements of fact tend to injure Mr. Oskouie in his business, trade, and/or profession.

169.    These statements were false, and were published to third parties in this district and across the Internet.

170.    As a result of Counterdefendants' acts, Counterclaimants have suffered irreparable damage to their reputations and further damages in the form of lost sales and profits, in an amount to be determined at trial.

171.    As a result of the willful and malicious nature of the defamatory campaign, Counterclaimants are entitled to punitive damages.

**FOURTH CAUSE OF ACTION**
**Violation of the Lanham Act (15 U.S.C. § 1125(a)(1)(B))**

172.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

173.    Counterdefendants' publication of false and misleading statements about Platinum and Platinum's services constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

174.    Counterdefendants' publication of false and misleading statements about Platinum and Platinum's services is likely to deceive consumers as to the nature and quality of Platinum and Platinum's services.

175. By reason of Counterdefendants' actions, Counterclaimant Platinum has suffered irreparable harm to its reputation. Platinum has been, and unless Counterdefendants are preliminarily and permanently restrained from their actions, will continue to be irreparably harmed.

176. As a direct and proximate result of Counterdefendants' conduct, Platinum has suffered and will continue to significant monetary and reputational injury in amounts to be determined at trial.

### FIFTH CAUSE OF ACTION
### Unfair Competition

177. Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

178. Counterdefendants registered and are using domain names and the Defamatory Website to divert users searching for Platinum's Website to Counterdefendants competing business and website.

179. Counterdefendants posted and published false and defamatory statements about Counterclaimants via letter, email and on the Internet.

180. Upon information and belief, Counterdefendants intended to use their defamatory statements as a means to generate business by turning customers away from Platinum, and redirecting them to Counterdefendants.

181. These acts and others stated above constitute a pattern of common law unfair competition, entitling Counterdefendants to the recovery of compensatory and punitive damages.

### SIXTH CAUSE OF ACTION
### Tortious Interference with Contractual Relations & Prospective Contractual Relations

182.     Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

183.     Counterclaimants had existing contracts with its customers and hosting providers and reasonably expected that its contractual relationships with its customers and hosting providers would continue into the future.

184.     Counterdefendants knew of Counterclaimants' contracts.

185.     By the wrongful conduct described above, Counterdefendants intentionally and improperly interfered with Counterclaimants' contracts with its customers and hosting providers and did so with the intent and purpose of damaging Counterclaimants' business.

186.     Counterdefendants' interference caused Counterclaimants' customers and hosting providers to cease doing business with Counterclaimants.

187.     As a result of Counterdefendants' actions, Counterclaimants have been and continue to be damaged in an amount to be determined at trial.

188.     Counterclaimants have also suffered and will continue to suffer irreparable harm in the form of damage to their reputations as a result of Counterdefendants' conduct described herein unless preliminary and permanent injunctive relief is granted.

189.     While an award of damages may be adequate to compensate Counterclaimants for the loss of particular contracts or customers, an award of monetary damages will not be adequate to compensate Mr. Oskouie or Platinum for the damage to their reputations caused by Counterdefendants.

**SEVENTH CAUSE OF ACTION**
**Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030(g))**

190. Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

191. Counterdefendants accessed a protected computer, specifically, Counterclaimants' account on its website hosting provider's computers and/or servers, Root.lu, knowingly with an intent to defraud.

192. By reason of the acts and omissions complained of herein, Counterdefendants, and/or others acting in concert with Counterdefendants, or with their knowledge, knowingly caused the transmission of a program, information, code or command without authorization and intentionally and/or knowingly caused damage to a computer protected by the Computer Fraud and Abuse Act, resulting in monetary damages to Counterclaimants exceeding the statutory minimum for civil liability, and likely in excess of $10,000.

193. Alternatively, by reason of the acts and omissions complained of herein, Counterdefendants, and/or others acting in concert with Counterdefendants, or with their knowledge, knowingly caused the transmission of a program, information, code or command without authorization and intentionally and/or knowingly accessed to a computer protected by the Computer Fraud and Abuse Act, resulting in monetary damages to Counterclaimants exceeding the statutory minimum for civil liability, and likely in excess of $10,000.

194. Alternatively, by reason of the acts and omissions complained of herein, Counterdefendants, and/or others acting in concert with Counterdefendants, or with their knowledge, knowingly and with intent to defraud accessed a computer protected by the Computer Fraud and Abuse Act, resulting in monetary damages to Counterclaimants exceeding the statutory minimum for civil liability, and likely in excess of $10,000.

## EIGHTH CAUSE OF ACTION
### Declaration of Invalidity of Copyright

195.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

196.    This is a declaratory judgment action under the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* and 28 U.S.C. §§§ 2201-02.

197.    An actual justiciable controversy exists by way of the existing action and various demands to cease and desist the distribution of Platinum's Website and FFL Guidebook by Counterdefendants.

198.    Counterclaimants request an order declaring the alleged copyright(s) asserted by Counterdefendants in the form of public domain and/or noncopyrightable facts regarding the process to procure an FFL and nonexclusive WordPress™ website themes are invalid and unenforceable for, *inter alia*, the following reasons:

a.  an absence of sufficient creativity and originality to be entitled to copyright protection or registration; and

b.  the Counterdefendants' guidebook and website merely consist of a combination of known elements, components, depictions and/or shapes, all of which are in the public domain, and are not entitled to copyright protection or registration.

## NINTH CAUSE OF ACTION
### Declaratory Judgment of Non-infringement of Copyright (28 U.S.C. §§ 2201-02)

199.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

200.     This is a declaratory judgment action under the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* and 28 U.S.C. §§§ 2201-02.

201.     An actual justiciable controversy exists by way of the existing action and various demands to cease and desist the distribution of Platinum's Website and FFL Guidebook by Counterdefendants.

202.     Counterclaimants are entitled to declaratory judgment that they are not infringing, has not infringed, and is not liable for infringing any valid copyright owned by Counterdefendants relating to Platinum's Website and FFL Guidebook, either directly or by inducing others to infringe or by contribution to infringement by others.

## TENTH CAUSE OF ACTION
### False DMCA Notices in Violation of 17 U.S.C. § 512(f)(1)

203.     Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

204.     As stated above, Counterdefendants filed various DMCA notices with, *inter alia*, Counterclaimants' email service providers, website hosting providers, domain name registrars alleging that Counterclaimants material or activity was infringing.

205.     Counterdefendants' DCMA notices were knowing and material misrepresentations.

206.     Counterclaimants have suffered damages as a result of Counterdefendants' misrepresentations in the form of disruption of service and access to their materials, lost business sales and profits, and damage to their goodwill and reputations, in addition to attorneys' fees in responding to the various misrepresentations.

207.     Counterdefendants are liable for Counterclaimants' damages pursuant to 17 U.S.C. § 512(f).

## ELEVENTH CAUSE OF ACTION
## Monopolization in Violation of the Sherman Act (15 U.S.C. § 2)

208.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the

Counterclaim as if fully stated herein.

209.    BME has unlawfully monopolized the FFL guidebook market and the online

FFL guidebook submarket in violation of the Sherman Act, 15 U.S.C. § 2.

210.    Counterdefendants committed and perpetrated a fraud on the U.S. Copyright

Office by obtaining copyright registrations in works that that were not original to it, but

instead authored and created by others—including generic WordPress™ themes, information

straight from the ATF's Website, and the ATF's images of government forms.  In addition,

Counterdefendants have made numerous intentional misrepresentations to the U.S. Copyright

Office, this Court and in DMCA notices in executing on their scheme to disrupt competition

by asserting copyrights in these generic and public domain works and/or content not owned

by them.

211.    Counterdefendants know that they have no protectable copyrights in public

domain materials, generic facts and/or otherwise unprotectable facts, terms, and designs used

by Platinum to compete against BME.

212.    BME has nevertheless threatened to bring objectively baseless claims, upon

information and belief has asserted objectively baseless claims against others, and filed

numerous administrative proceedings, false DMCA notices, and the instant lawsuit—an

objectively baseless copyright infringement action—claiming that Counterdefendants have

protectable copyrights that enable it to prevent others from using public domain materials,

generic facts and/or otherwise unprotectable facts, terms, and designs concerning FFLs and WordPress™ themes.

213.    Counterdefendants' copyright claims and their copyright infringement suit are objectively baseless and have been asserted in bad faith with the purpose of interfering with competitors' businesses, maintaining or acquiring monopoly power, and restraining competition in the relevant market and/or submarket.

214.    Counterdefendants have also asserted in bad faith a series of actual and threatened lawsuits and legal claims without regard to whether they had any merit merely as a means to disrupt their competitors' businesses and thereby reduce competition that otherwise would have existed. To support their bad faith threats and legal claims, Counterdefendants engaged in a campaign of improper conduct before the U.S. Copyright Office.  The series of actual and threatened lawsuits, legal claims, DMCA notices, and misconduct before the U.S. Copyright Office collectively amount to a pattern of sham petitioning activities undertaken in bad faith to use administrative and legal processes to reduce and eliminate competition.

215.    Counterdefendants' objectively baseless copyright threats and lawsuits, their pattern of sham petitioning activities undertaken in bad faith, and their intentional misrepresentation, including fraudulent misrepresentations, made to administrative agencies and judicial bodies have reduced and injured and will reduce and injure competition in the relevant market and/or submarket.

216.    Counterdefendants know that they have no objectively reasonable prospects of prevailing on the merits of their lawsuit or their threatened copyright claims, that the process of commencing this lawsuit (and doing so under seal) and/or threatening to assert other

claims and lawsuits would stifle competition, and that the suits would cause damage to Counterclaimants and other actual and potential competitors, thereby reducing or eliminating the competition in the relevant market and/or submarket.

217.    BME has monopoly power in both the relevant market and submarket, and Counterdefendants have the ability to control process and exclude competitors in the relevant market and submarket.

218.    Counterdefendants have no legitimate business justification for their conduct.

219.    Unless enjoined, Counterdefendants will continue to reduce and eliminate completion and thereby continue to monopolize the relevant market and submarket.

220.    With no other choices available, consumers will have to accept the increased prices and/or lower quality provided by BME in the FFL guide market and/or the online FFL guide submarket.

221.    This suppression of competition has caused and will cause great harm to consumers in the online market for FFL guidebooks who are, and will be, deprived of the benefits of robust competition and choices.

222.    Counterclaimants have suffered antitrust injury as a direct result of BME's monopolization of the relevant market for FFL guidebooks and the online FFL guide submarket.  The injury is direct and substantial, and includes, *inter alia*, loss of sales and profits, attorneys' fees and other costs spent responding to and defending against Counterdefendants' objectively baseless claims and lawsuit, impaired ability for growth, loss of business and personal reputation, reduction in value of business, and other increase costs to market, advertise and sell FFL guides.

## TWELFTH CAUSE OF ACTION
### Attempted Monopolization in Violation of the Sherman Act (15 U.S.C. § 2)

223.  Counterclaimants repeat and incorporate by reference Paragraphs 1-222 of the Counterclaim as if fully stated herein.

224.  BME has unlawfully attempted to monopolize the FFL guidebook market and the online FFL guidebook submarket in violation of the Sherman Act, 15 U.S.C. § 2.

225.  Counterclaimants have suffered antitrust injury as a direct result of BME's attempts to monopolize of the relevant market for FFL guidebooks and the online FFL guide submarket.  The injury is direct and substantial, and includes, *inter alia*, loss of sales and profits, attorneys' fees and other costs spent responding to and defending against Counterdefendants' objectively baseless claims and lawsuit, impaired ability for growth, loss of business and personal reputation, reduction in value of business, and other increase costs to market, advertise and sell FFL guides.

## THIRTEENTH CAUSE OF ACTION
### Trespass to Chattels

226.  Counterclaimants repeat and incorporate by reference Paragraphs 1-123 of the Counterclaim as if fully stated herein.

227.  Platinum is and was at all relevant times the owner of the website <FFLTrust.com>.

228.  By reason of the foregoing, Counterdefendants intentionally interfered with Platinum's use of that property and/or chattel, without Platinum's consent, resulting in damages in the form of lost business sales and profits while <FFLTrust.com> was inaccessible.

## FOURTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

229. Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

230. Counterdefendants' statements that Mr. Oskouie is, *inter alia*, a hacker, a criminal and a terrorist occurred intentionally with a desire to harm Mr. Oskouie.

231. Counterdefendants' publication of sensitive, private information concerning Mr. Oskouie on the Defamatory Website also occurred intentionally with a desire to harm Mr. Oskouie and promote Counterdefendants' competing business.

232. The manner by which Counterdefendants sought to harm Mr. Oskouie, including the steps described herein to communicate with his family and the public at large, was extreme and outrageous.

233. As a result of Counterdefendants' past and continued wrongful acts, including, *inter alia*, besmirching Mr. Oskouie's reputation, Mr. Oskouie has experienced extreme emotional distress.

234. As a result of Counterdefendants' past and continued wrongful acts, the character and reputation of Mr. Oskouie were harmed and he suffered mental anguish and personal humiliation.

235. As a direct and proximate result of Counterdefendants' past and continued wrongful acts, Mr. Oskouie has been materially and substantially harmed in an amount to be determined at trial, including compensation for Mr. Oskouie's time, effort and attorneys' fees.

236.     Due to the extreme and outrageous nature of Counterdefendants' past and continued wrongful acts, and given Counterdefendants' history and probability to continue and repeat said behavior, monetary damages are inadequate to compensate Mr. Oskouie for the harms alleged above. As such, punitive damages and preliminary and permanent injunctive relief are necessary.

### FIFTEENTH CAUSE OF ACTION
### Invasion of Privacy under South Dakota Law

237.     Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

238.     At all relevant times, Counterdefendants maintained and disseminated communications on the Defamatory Website from South Dakota and/or outside the State of New York.

239.     By reason of Counterdefendants' actions described above, Counterdefendants made an unreasonable, unwarranted, serious and offensive intrusion upon the seclusion of Mr. Oskouie.

240.     Such invasion by Counterdefendants is and would be offensive and objectionable to a reasonable man of ordinary sensibilities.

241.     As a direct and proximate result of Counterdefendants' past and continued wrongful acts, Mr. Oskouie has been materially and substantially harmed in an amount to be determined at trial, including compensation for Mr. Oskouie's time, effort and attorneys' fees.

242.     Due to the extreme and outrageous nature of Counterdefendants' past and continued wrongful acts, and given Counterdefendants' history and probability to continue and repeat said behavior, monetary damages are inadequate to compensate Mr. Oskouie for

the harms alleged above. As such, punitive damages and preliminary and permanent injunctive relief are necessary.

### SIXTEENTH CAUSE OF ACTION
### Violation of New York Civil Rights Law §§ 50-51

243.    Counterclaimants repeat and incorporate by reference Paragraphs 1-139 of the Counterclaim as if fully stated herein.

244.    By reason of Counterdefendants' actions described above, Counterdefendants have used for purposes of advertising or trade, Counterclaimants' images, likeness and/or information on the Defamatory Website.

245.    Upon information and belief, because the Defamatory Website is accessible on the Internet, Counterclaimants' images, likeness and/or information was available for use on a worldwide basis. Any person with a computer and an Internet connection, anywhere, including within New York State, has access to the Defamatory Website.

246.    Such use was without Counterclaimants' consent.

247.    As a direct and proximate result of Counterdefendants' past and continued wrongful acts, Counterclaimants have been materially and substantially harmed in an amount to be determined at trial.

248.    As a direct and proximate result of Counterdefendants' past and continued wrongful acts, punitive damages and preliminary and permanent injunctive relief are necessary.

### PRAYER FOR RELIEF

WHEREFORE, Counterclaimants request the Court enter a judgment in their favor and against Counterdefendants Maddox and BME, granting, as follows:

a.    Dismissal of BME's affirmative claims against Counterclaimants with prejudice;

b. That Counterdefendants Maddox and BME and all persons acting in concert be preliminarily and permanently enjoined from using the domain names <MiladOskouie.com> and <AustralianHacker.com>, and be ordered to file with the Court and serve on Counterclaimants within thirty (30) days after the service on Counterdefendants of such injunction, or such shorter or extended period as the Court may direct, a report in writing under oath setting forth in detail the manner in which Counterdefendants has complied with the injunction;

c. That Counterdefendants their respective domain name registrar, and/or domain name registry, be ordered to transfer the domain name <MiladOskouie.com> to Counterclaimants pursuant to 15 U.S.C. § 8131(2) and/or 15 U.S.C. § 1125(d);

d. That Counterclaimants recover from Counterdefendants all damages sustained pursuant to 15 U.S.C. § 8131 and/or 15 U.S.C. § 1125(d);

e. That Counterdefendants be ordered to pay Counterclaimant Oskouie all reasonable costs, expenses, and attorneys' fees in prosecuting this action, pursuant to 15 U.S.C. § 8131(2) and/or 15 U.S.C. § 1125(d);

f. That Counterdefendants, their respective domain name registrar, and/or domain name registry, be Ordered to transfer the domain names <MiladOskouie.com> and <AustralianHacker.com> to the registrar and account of Counterclaimants' choice. In the alternative, the domain name registry be order to cause the domain names listed above to not resolve to any website on the Internet;

g. That Counterdefendants be ordered to relinquish control over any websites, webpages, web hosting, social media and/or email accounts which include, are associated with, or similar to Mr. Oskouie's personal name;

h.  An Order directing Counterdefendants to engage in appropriate and commensurate corrective advertising;

i.  That Counterdefendants Maddox and BME and all persons acting in concert be preliminarily and permanently enjoined from further contacting any of Counterclaimants' websites, webpages, website hosting providers, email marketing platforms or providers accounts;

j.  a Preliminary and Permanent Injunction enjoining and restraining Counterdefendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Counterdefendants, from disparaging or otherwise posting defamatory comments about Counterclaimants;

k.  Actual damages in an amount to be determined at trial, due to defamation per se and trade libel, and an order directing Counterdefendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Counterdefendants, to remove, delete, or otherwise disable such defamatory comments;

l.  Actual damages in an amount to be determined at trial, but in no event less than $1,000,000, due to common law tortious interference;

m.  Actual damages in an amount to be determined at trial, but in no event less than $1,000,000, due to common law unfair competition;

a.  An Order requiring Counterdefendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Counterdefendants who receive actual notice

or knowledge of an injunction by personal service or otherwise, to be preliminarily and permanently enjoined from accessing, using, or in any way interacting with, either directly, indirectly or by proxy, in any manner, any domain and/or protected computer owned, operated or controlled by Counterclaimants, or knowingly or recklessly causing others to do the same, pursuant to 18 U.S.C. § 1030(g));

b. An Order declaring the alleged copyright(s) asserted by Counterdefendants relating to their Website and FFL Guidebook are invalid and unenforceable;

c. An Order declaring that Counterclaimants do not infringe on any valid copyright owned by Counterdefendants relating to Platinum's Website and FFL Guidebook;

d. That Counterclaimants recover from Counterdefendants all damages sustained pursuant to 15 U.S.C. § 1117;

e. That Counterclaimants recover from Counterdefendants all damages sustained pursuant to 17 U.S.C. § 512(f);

f. An Order requiring Counterdefendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Counterdefendants who receive actual notice or knowledge of an injunction by personal service or otherwise, to be preliminarily and permanently enjoined from making false DMCA complaints or notices relating to Platinum's Website and FFL Guidebook and directing same to withdraw any and all previously filed and/or submitted DMCA complaints or notices relating to Platinum's Website and FFL Guidebook;

g. That Counterclaimants recover from Counterdefendants all damages sustained pursuant to 15 U.S.C. § 2;

h. Treble damages in an amount to be determined at trial, due to Counterdefendants' Sherman Act violations;

i. Actual damages in an amount to be determined at trial, but in no event less than $1,000,000, due to common law trespass to chattels;

j. Actual damages in an amount to be determined at trial, but in no event less than $1,000,000, due to common law intentional infliction of emotional distress;

k. Actual damages in an amount to be determined at trial, but in no event less than $1,000,000, due to common law invasion of privacy;

l. That Counterclaimants recover from Counterdefendants all damages sustained pursuant to N.Y. Civil Rights Law §§ 50-51;

m. An Order at the conclusion of the present matter directing Counterdefendants to undertake such remedial efforts as the Court deems necessary to restore Counterclaimants' reputations;

n. An Order requiring a disgorgement of profits from Counterdefendants to Counterclaimants for all claims so applicable;

o. Exemplary or punitive damages in an amount appropriate to punish Counterdefendants and to make an example of Counterdefendants to the community;

p. That Counterclaimants be awarded pre- and post-judgment interest to the maximum extent allowed by law;

q.  An Order awarding attorneys' fees, costs and expenses incurred in connection with this action to Counterclaimants; and

r.  Such other and further relief as the Court may deem just and proper.

Dated: Brooklyn, New York
        July 24, 2017

LEWIS & LIN, LLC

By:  /s/ David D. Lin
David D. Lin (DL-3666)
Justin Mercer (JM-1954)

45 Main Street, Suite 608
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
david@iLawco.com
justin@iLawco.com

*Attorneys for Defendants-Counterclaimants*

## <u>VERIFICATION</u>

I, Milad Oskouie, verify under penalty of perjury under the laws of the United States of America that the following is true and correct:

I am a Director of Osko M Ltd ("OML") and a Director of Platinum Avenue Holdings Pty, Ltd. ("Platinum"), and am familiar with the Verified Answer to Complaint and Counterclaims' factual allegations.

I have reviewed the Verified Answer to Complaint and Counterclaims and, based upon personal knowledge and/or the business records of OML and Platinum, aver that the foregoing factual allegations contained herein are true to the best of my knowledge, except those matters stated upon information and belief, which I believe to be true.

Dated: July 24, 2017

_____

MILAD OSKOUIE

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing document:

**VERIFIED ANSWER TO COMPLAINT AND COUNTERCLAIMS**

has been served via ECF on:

      REVISION LEGAL, PLLC
      Anderson J. Duff
      Eric Misterovich
      John Di Giacomo
      244 5th Avenue, Suite 2230
      New York, NY 10001

      *Attorneys for Plaintiff*

this \_\_\_th day of July , 2017.

                     */s/ David D. Lin*_____
                     David D. Lin