RECEIVED
2019 APR 29  AM 10: 17
S.D. OF N.Y.

Hon. Ronnie Abrams

United States District Court

Southern District of New York

40 Foley Square

New York, NY 10007

## *BMaddox Enterprises v. Oskouie, et al.*, No. 17-CV-1889

Dear Judge Abrams,

I am writing to inform the court that I have obtained a judgement for malicious defamation *per se* in Australia from the Supreme Court of New South Wales from Justice Rothman for 875,000 Australian Dollars plus legal costs against Brandon Maddox (**Oskouie v Maddox [2019] NSWSC 428** ). I have attached here the full reasons of the court and a summary from the court. A link to the judgement is also available here:

https://www.caselaw.nsw.gov.au/decision/5cb54fe1e4b0196eea406153

The judgement is one of the highest damages payouts in Australian defamation history, given that damages are, unlike the USA, capped at a much lower level.

Justice Rothman described Plaintiff as "wholly arrogant" and "high handed".

The defamatory imputations that I have proved wholly untrue include Mr Maddox's outrageous claims that I am a terrorist, fraudster, hacker, fraudulent person, and criminal. They go to the heart of his credibility – not withstanding Mr Maddox's very own admission that he hired "hackers" to "take down" ffltrust.com as well as "building evidence" to "guide the attorneys" because "attorneys are too expensive and time consuming". The latter actions and submitted screenshots have been confirmed as authentic by FBI special agent Matthew Miller of Sioux Falls, FBI. This has been conveyed to the court in my earlier filings.

I am also writing to address some of the Plaintiff counsels misconceptions regarding copyright law.

## Plaintiff's Copyright Arguments

By making general allegations that Defendant's website has copied the Plaintiff's content and the business idea used by the Plaintiff Website, the

Plaintiff misapprehend their rights. Section 102(a) of the Copyright Act codified the "idea/expression dichotomy," under which "every idea, theory, and fact" in a copyrighted work became "instantly available for public exploitation at the moment of publication."

It is for them to identify their claim with precision; it is not for Defendants to guess about the basis for the claims, nor to trawl through material in trying to understand the allegations.

## 2) Plaintiff's Claims of Copying his Idea /Process

Even if the Defendant has used any materials over which Maddox might exercise valid copyrights (which is denied), Defendants use of this material is protected by the Merger doctrine. The merger doctrine applies to functional works, barring protection for the expression because the idea and the expression are so indistinguishable that to protect the expression would also protect the idea.

In the present case, the plaintiff states his guide covers "the many requirements for acquiring a firearms dealing license" and helps his customers "…determine the type of license they need." and "…provides guidance on such laws, how to complete necessary application forms…"

Thus, in essence, his guide is a process or system intended to help his customers obtain a FFL. The requirements of a FFL being dictated by US federal laws. In other words, it is a functional work. The primary purposes being helping customers obtain an FFL—the expression and expressive features being incidental to the work or primary purpose.

Since it is a functional work, the value depends primarily on the accuracy, ingenuity and efficiency of the underlying system concept or method. In any case, given the functional nature of the work, prohibiting competitors (ffltrust) from writing about the the legal nature of the work runs the risk of forcing competitors to draft less effective instructions or guidance. This would be contrary to copyright's social policy.

Copyright protects only the expression of this idea—the words and pictures used to describe obtaining an FFL—and not the idea of the system itself. Because the process or system is an unprotectible idea, it is incorrect for Plaintiff to claim Defendant's book is copied.

An essential element of this "FFL process" is the order in which the various steps and requirements are set. Thus, for example, the copyright for a book describing how to perform a complicated surgery does not give the holder the exclusive right to perform the surgery. Like the series of movements a surgeon makes, the FFL process is, as Brandon claims, designed to "help customers get their FFL". Monopoly protection for such a method can only be secured, if it can be secured at all, by patent.

Plaintiff may claim the arrangement of his book is useful and taken him substantial time to come up with. But the amount of time or effort nor degree of

emotional attachment he has in his Guide is <u>not</u> grounds for copyright protection.

The performance of many ideas, systems, or processes may require thousands of hours of time to perfect. But this does not allow one to gain the monopolistic power to exclude all others from practicing it.

The process remains unprotectible as a process, the design of which, primarily, reflects function and not expression. The objective of the FFL book is "explanation" or "guidance": it tells readers how to obtain an FFL and encourages them to try it. It invites readers to practice the method it describes.

But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book. Consumers (70,000+ according to Plaintiff) would have little reason to buy Plaintiff's book if Plaintiff held a monopoly on the practice of the very activity he sought to popularize.

Rather than "stimulat[ing] artistic creativity for the general public good," copyright protection for the FFL process it would prevent the public from engaging with Plaintiff's idea and building upon it: See Mattel Inc. v. MGA Entertainment Inc., 705 F.3d 1108 1111 (9th Cir.2013)(quoting Twentieth Century Music Corp. V. Aiken, 422 U.S. 151, 156 (1975)).

*(Goldstein on Copyright: "...courts have declined to find that a defendant appropriated the plaintiff's protected expression where the defendant's business forms used language that also appeared in the plaintiff's forms": Continental Casualty Co. v. Beardsley case brief, 253 F.2d 702 (1958). Same result for Rule Book with identical instructions and paraphrasing: Affiliated Hospital Products, Inc., Appellant, v. Merdel Game Manufacturing Company et al., Appellees, 513 F.2d 1183 (2d Cir. 1975))*

**3. The Structure / Arrangement**

The structure is not a Copyrightable as a Compilation / arrangement. Plaintiff contends that the structure of his book is entitled to copyright protection as a "compilation" because his "selection, coordination, and arrangement" of various chapters creates a coherent and expressive composition.

A compilation must represent an "original work[] of authorship," and "[i]n no case" may copyright protection "extend to any idea, procedure, process, [or] system.". The availability of copyright protection for compilations, therefore, does not eliminate the Copyrights categorical bar on copyright protection for ideas.

By claiming copyright protection for the FFL process as a compilation, Plaintiff misconstrues the scope of copyright protection for compilations. That the FFL process may possess many constituent parts does not transform it into a proper subject of copyright protection. Virtually any process or system could be dissected in a similar fashion. Baker's examples of "how-to" treatises are instructive: "A treatise on . . . the construction and use of ploughs, or watches, or churns[,] . . . or on the mode of drawing lines to produce the effect of

perspective" would likely list the steps necessary to perform the process it describes. 101 U.S. at 102. The watchmaking treatise's author could not claim a copyright in the process of making a watch, however, by breaking down the process into multiple steps and labeling it a "compilation."

Recipes further illustrate the point: a cake recipe could be viewed as a "compilation" of carefully arranged and selected steps which may, of course, reflect the personal preferences and tastes of the recipe's author yet the recipe would remain, in most instances, a process that is not eligible for copyright protection.

Plaintiff cannot copyright protection for the FFL process as a compilation by separately identifying the steps and chapters it contains.

Moreover, the functional considerations at the heart of the legal requirements behind obtaining FFL process compel the very selection and arrangement of material for which he claims copyright protection.

Read in light of the requirements as set out by statute, it demonstrates that the overarching reason for the organization of the Chapters in the FFL process is to further the basic goals of the method: namely, to obtain an FFL.

The FFL process's composition renders it more effective as a process or system, but not any more suitable for copyright protection as an original work of authorship.


Respectfully submitted,


Milad Oskouie

25 April 2019



Supreme Court

New South Wales

| | |
|---|---|
| Case Name: | Oskouie v Maddox |
| Medium Neutral Citation: | [2019] NSWSC 428 |
| Hearing Date(s): | 29 June 2018 |
| Date of Orders: | 18 April 2019 |
| Decision Date: | 18 April 2019 |
| Jurisdiction: | Common Law |
| Before: | Rothman J |
| Decision: | (1)  The defendant shall pay the plaintiff an amount of $875,000 for damages caused by the defendant's defamatory publications; |
| | (2)  The defendant shall pay the plaintiff interest at the rate of 5.5% per annum on the amount of $425,000 from 16 February 2017 until the date of this judgment; |
| | (3)  The defendant shall pay the plaintiff interest on $875,000 at the rate of 7.5% per annum from the date of this judgment until the date of payment in full; |
| | (4)  The defendant shall pay the plaintiff's costs of and incidental to the proceedings on the following bases: |
| | (a)  on an indemnity basis on and from 28 September 2016; |
| | (b)  otherwise, costs, prior thereto, if any, on the ordinary basis. |
| Catchwords: | DEFAMATION – Remedies – Aggravated damages – malice – damage to reputation – compensatory – |

special damages – buffer in absence of precise
calculation – compensatory and special damages
awarded

| Legislation Cited: | Civil Procedure Act 2005 (NSW), s 100 |
| | Defamation Act 2005 (NSW), ss 14(2), 34, 35, 40 |

| Cases Cited: | Ali v Nationwide News Pty Ltd [2008] NSWCA 183 |
| | Carson v John Fairfax & Sons Ltd (1993) 178 CLR 44; |
| | [1993] HCA 31 |
| | David v Abdishou [2012] NSWCA 109 |
| | Dingle v Associated Newspapers Ltd [1964] AC 371 |
| | Dow Jones & Company Inc v Gutnick (2002) 210 CLR |
| | 575; [2002] HCA 56 |
| | Holt v TCN Channel Nine Pty Ltd (2014) 86 NSWLR 96; |
| | [2014] NSWCA 90 |
| | John Fairfax & Sons Ltd v Kelly (1987) 8 NSWLR 131 |
| | Palmer-Bruyn and Parker Pty Ltd v Parsons (2001) 208 |
| | CLR 388 ; [2001] HCA 69 |
| | Phillips v Robab Pty Limited [2014] NSWSC 1520 |
| | Reader's Digest Services Pty Ltd v Lamb (1982) 150 |
| | CLR 500; [1982] HCA |
| | Vilo v John Fairfax & Sons Ltd & Anor [2000] NSWSC |
| | 1206 |

| Category: | Principal judgment |

| Parties: | Milad Oskouie (Plaintiff) |
| | Brandon Lane Maddox (Defendant) |

| Representation: | Counsel: |
| | A Norrie (Plaintiff) |
| | Ex Parte (Defendant) |
| | |
| | Solicitors: |
| | HAL Lawyers (Plaintiff) |
| | Ex Parte (Defendant) |

| File Number(s): | 2017/199951 |

## JUDGMENT

1    **HIS HONOUR:** The plaintiff, Milad Oskouie, claims damages for defamation
arising from defamatory material published by the defendant, Brandon Maddox

principal of B Maddox Enterprises LLC (hereinafter "the Company"), in a number of emails and on a website.

## Background

2    The plaintiff was born in Iran in 1986 and arrived in Australia, with his parents, in late 1989. He has lived in Australia for most of his life, thus far; and was admitted as a legal practitioner of the New South Wales Supreme Court on 18 February 2013, having completed studies at the University of New South Wales and graduated in Arts and Law in February 2012.

3    For a short period, recently, the plaintiff has lived in London, UK.

4    The Company is based in Sioux Falls, South Dakota in the United States of America and the defendant is a firearms dealer. The Company operates retail outlets and trades as "Dakota Silencer". The defendant also owns and operates a website www.ffl123.com, which is an on-line outlet that retails two multi-chapter e-books entitled, respectively, "Federal Firearms License [sic] Guide" and "Class 3 (SOT) Licence Guide".

5    The Company's Website had, at 26 September 2016, over 70,000 customers who had purchased a subscription to access one or other of the e-book content. As at 18 April 2018, the number of customers had increased to over 75,000.

6    In addition to being principal of the Company, the defendant asserts that he is a prominent author and commentator in the press, social media and elsewhere. He says he has a reputation as a commentator on the subject of federal firearms licensing in the United States.

7    The material before the Court includes the website description of the defendant, authored by the defendant, to that effect, from which the Court draws the inference, if not otherwise express, that the material published by the Company is authored or approved by its principal, the defendant in these proceedings. There are also documents relating to proceedings in the United States of America between the parties and a statement in those proceedings by the defendant herein.

**Publications**

8    The defamatory publications, identified in the Statement of Claim consist of a website (www.miladoskouie.com, hereinafter "the Website") and emails sent to customers and prospective customers of the Company in late June/early July 2016, 16 February 2017, 17 February 2017, 19 February 2017 and 25 February 2017. The content of each of those emails is before the Court.

9    Further, except for the first email in late June/early July 2016, each of the emails includes a link to the Website. The Website was launched on about 16 February 2017. Since its inception, it has altered in content and has updated information about the plaintiff.

**Imputations**

10   The imputations pleaded from the late June/early July 2016 email include:

    (a)    that the plaintiff is a hacker;

    (b)    that the plaintiff had illegally accessed the Company's email lists; and

    (c)    that the plaintiff is a fraudulent person.

11   The Court has read the late June/early July 2016 email and accepts that each of the pleaded imputations arises from the email, hereinafter referred to as "the first impugned publication".

12   The email of 16 February 2017 is also before the Court. It refers to emails sent by the plaintiff, who is described as an "Islamic Hacker" in the email and named. It also describes him as "this international criminal". The email of 16 February 2017 will hereinafter be referred to as "the second impugned publication".

13   The third impugned publication is another website available when one follows the link in the second impugned publication, being a website in the name of www.miladoskouie.com. This third impugned publication is available if one follows the link to the name Milad Oskouie or if one follows the link to the word or address "Australianhacker.com" in the second impugned publication.

14   The third impugned publication has a colour facial photograph of the plaintiff. The defendant published this third impugned publication. The third impugned

publication contains subsequent links using certain keywords such as "See Here"; "Example"; and "Click Here".

15    If one were to follow the link on the word "Click Here", which is found immediately adjacent to the words "Australian Police Report", it would take the reader to a document that appears to be a statement from the defendant to the NSW Police dated 26 September 2016. The defendant has not provided any such statement to NSW Police, on the material before the Court.

16    The document found by following the link is not dated, not signed and not witnessed. This statement is to be referred to as "the fourth impugned publication".

17    The imputations from the second, third and fourth impugned publications, giving them their ordinary and natural meaning, are:

    (a)    that the plaintiff is sending spam emails to the Company and its customers;

    (b)    that the plaintiff is a hacker;

    (c)    that the plaintiff is a criminal;

    (d)    that the plaintiff illegally altered official firearms documents;

    (e)    that the plaintiff is a fraudulent person;

    (f)    the plaintiff has not told the truth when he claimed to be a lawyer;

    (g)    the plaintiff falsely claimed to be a lawyer; and

    (h)    that the plaintiff falsely claimed to have attended law school.

18    On 17 February 2017, the defendant published a further email to the Company's customers and prospective customers concerning the plaintiff, hereinafter "the fifth impugned publication". This email was identical in content to the first impugned publication and conveys the same imputations, but includes the further link to the Website, www.miladoskouie.com. These are respectively the sixth and seventh impugned publications.

19    On 19 February 2017, the defendant published a further email with the subject line "Islamic Hacker alerts getting spam …". This was published to the Company's friends and it was published of and concerning the plaintiff and, once more, had imputations in or to the same effect, being a publication with the same or similar content, as the second impugned publication. This email of

19 February 2017 will hereafter be referred to as "the eighth impugned publication".

20    On 25 February 2017, the defendant published another email with the same or similar subject line and the same or similar content. Hereinafter that will be "the eleventh impugned publication". There are fourteen impugned publications.

## Requests to Cease and Desist Publications

21    On 10 July 2016, the plaintiff's legal representatives wrote to the defendant's legal representatives in Australia seeking that the defendant cease and desist from publishing the defamatory material to which the Court has already referred. The defendant has not complied with that request.

22    On 28 October 2016, the plaintiff's legal representatives wrote to the defendant's legal representatives in the United States of America, with a similar request. Again, the defendant has failed to comply with the request. The Website, www.miladoskouie.com, was still operational at the time of hearing and had been operational from its inception, continuously, until that time. As far as the Court is aware, the Website is still operational.

23    On 2 April 2017, the plaintiff's legal representatives again wrote to the defendant's legal representatives in the United States of America referring, inter alia, to the inappropriateness of the publication of a letter dated 8 July 2016. Neither the defendant nor his legal representatives has replied to that letter.

24    Notwithstanding the letters from the plaintiff or his legal representatives, on 20 May 2017, the defendant published another letter, dated 19 May 2017, on the same Website with the subject line: "Subject - Your Son Milad Oskouie", which was, purportedly, addressed to the plaintiff's parents and informing them of "up-to-date information" online at the Websites or to which the Court has already referred. This letter shall be referred to as "the fourteenth impugned publication". The imputations that arise from its ordinary natural meaning are:

(a)    that the plaintiff hates Christians;

(b)    that the plaintiff hates Americans;

(c)    that the plaintiff is a criminal; and

(d)   that the plaintiff is a terrorist.

25   On 15 June 2018, the Court (McCallum J, as her Honour then was) issued default judgment in the proceedings, a Defence not having been filed, despite service of the Statement of Claim on Mr Maddox on 23 October 2017. The claim before the Court, now, is the assessment of damage.

**Defamatory Meaning**

26   It is trite that the test for whether a publication is defamatory, or conveys defamatory imputations, is if it could reasonably be postulated that "the ordinary reasonable reader" would consider that the publication conveyed the meaning alleged and the meaning would tend to lower the plaintiff in the estimation of right-thinking members of the community. As stated, the issue must be determined from the perspective of that which would have been understood by an ordinary reasonable reader.

27   The ordinary reasonable reader is said to be of fair average intelligence; fair-minded; not overly suspicious; not naive; not straining or forcing meanings; not "avid for scandal"; and, one who reads the entirety of the publication about which complaint is made: *Amalgamated Television Services Pty Ltd v Marsden* (1998) 43 NSWLR 158 at 165; [1998] NSWSC 4; *Haddon v Forsyth* [2011] NSWSC 123. In the words of Hunt CJ at CL, in *Marsden*:

> "The ordinary reasonable meaning of the matter complained of may be either the literal meaning of the published matter, or what is implied by that matter, or what is inferred from it: *Jones v Skelton* (at 650; 1065). In deciding whether any particular imputation is capable of being conveyed, the question is whether it is reasonably so capable, and any strained or forced or utterly unreasonable interpretation must be rejected: *Jones v Skelton* (at 650; 1065). The ordinary reasonable reader (or listener or viewer) is a person of fair average intelligence, who is neither perverse, nor morbid or suspicious of mind, nor avid for scandal: *Lewis v Daily Telegraph Ltd*. That person does not live in an ivory tower but can and does read between the lines in the light of that person's general knowledge and experience of worldly affairs." (*Marsden* at 165.B, references omitted.)

28   The process by which one determines the defamatory imputations that have been conveyed, if any, is a process by which the Court, either a judge or jury, ascertains the objective meaning of the publication in its context and does not deal with the subjective understanding of any particular reader or the subjective intention of the publisher. In *Haddon*, Simpson J (as her Honour then was)

described the process as one "undertaken, in a sense, in an evidentiary vacuum". Her Honour cited and relied upon the judgment of Brennan J in *Reader's Digest Services Pty Ltd v Lamb* (1982) 150 CLR 500, at 506, 507; [1982] HCA 4, and her Honour, Simpson J, said:

> [16]   In *Lamb*, Brennan J (as he then was, and with whom Gibbs CJ and Stephen, Murphy and Wilson JJ agreed) said:
>
>> 'Whether the alleged libel is established depends upon the understanding of the hypothetical referees who are taken to have a uniform view of the meaning of the language used, and upon the standards, moral or social, by which they evaluate the imputation they understand to have been made. They are taken to share a moral or social standard by which to judge the defamatory character of that imputation ... being a standard common to society generally ...' (p 506, internal references omitted)
>
> Later, his Honour said:
>
>> ' The defamatory nature of an imputation is ascertained by reference to general community standards, not by reference to sectional attitudes.' (p 507)
>
> His Honour added that, notwithstanding that, a particular impact of a defamatory imputation may be proved. This, of course, was in relation to the assessment of damages.
>
> [17]   In the circumstances of the present case, the exercise has a degree of artificiality. As will become apparent from what I write below, the emails in this case were published to an extraordinarily limited number of recipients, each of whom had a close association with the environment in which they were published, and in which the events with which they were concerned took place. Most, if not all, had at least some prior knowledge of the relevant facts and circumstances. It might, therefore, be expected that they would read the emails differently from the 'ordinary reasonable reader' or 'hypothetical referee' who did not have that inside knowledge."

29   The Court must take a common sense approach to the existence of imputations and their meaning. On the face of the documents published by the defendant, which are before the Court, the pleaded imputations arise and will be the basis for the assessment of damage.

## Principles on the Assessment of Damage

30   The *Defamation Act 2005* (NSW) (hereinafter "the Act") contains a number of provisions that are particularly relevant to the issues relating to the calculation of damage. First, by operation of s 34 of the Act, the amount of damages that a Court should award should ensure that there is an appropriate and rational relationship between the harm sustained by the plaintiff and the amount of damages awarded. Secondly, by operation of s 35 of the Act and the last

orders published in the Gazette of 29 June 2018 (p 3970), the amount of ordinary damages is capped at $398,500.

31    The foregoing cap on damages does not apply to special damages that may be awarded. Nor does it apply to compensatory damages, where the Court is of the view that aggravated damages ought to be awarded.

32    The evidence before the Court is that the defamatory imputations are contained in the emails and on the Website to which the Court has referred. The publication of those items occurs when each person gains access to the publication or receives the email: *Dow Jones & Company Inc v Gutnick* (2002) 210 CLR 575; [2002] HCA 56 at [26]; *David v Abdishou* [2012] NSWCA 109 at [259].

33    As already indicated, the number of persons who have received the emails and who have gained access to the Website is substantial. There are approximately 75,000 such persons and each of them is or was a client or potential client of the plaintiff.

34    Moreover, the evidence before the Court is such that the Court draws the inference that potential employers research applicants for positions by performing a Google search. When a person performs a Google search, the defamatory publications, to which reference has been made, appear and the imputations are, relevantly, unanswered and continuing.

35    The significance of the material published was and is great. The plaintiff, in his Affidavit, stresses the importance, both from his own position and the position of his family, of the fact that he obtained a law degree and was admitted to practise law. Yet, without any information on which one could base such an allegation, the defendant has published that, in effect, the plaintiff has fraudulently asserted that he has a law degree and is admitted to practise. This is a significant and most damaging assertion and imputation, which particularly hurt the plaintiff.

36    I am satisfied that the plaintiff has been significantly distressed by the assertions made and the imputations that are contained in the various

publications. The ordinary reasonable reader of the Website and the emails would understand the publications as being most defamatory.

37   By any ordinary moral or social standards to refer to a person as a criminal or a hacker or to be acting fraudulently, both as to the business he was conducting or the qualifications that he possesses, must be defamatory and seriously so: *Reader's Digest Services Pty Ltd v Lamb* (1982) 150 CLR 500; [1982] HCA 4; *Phillips v Robab Pty Limited* [2014] NSWSC 1520.

38   The plaintiff bears the onus of proving that the publications occurred. The plaintiff has done this.

39   The plaintiff also bears the onus of proving that the imputations arise, as alleged and are defamatory. The plaintiff has also satisfied each of those for each such publication.

40   The Court has applied the "ordinary reasonable reader" test, the description of which has been recited earlier. Each of the publications is defamatory and gives rise to the alleged imputations.

41   Each of those imputations has injured the reputation of the plaintiff and his standing amongst people with whom he has dealt in society and in business. The grapevine effect has been significant.

42   As earlier stated, the defendant has not filed a Defence and does not seek to justify any of the publications on any basis. Further, the defendant adduces no evidence to ameliorate the effect of the defamatory imputations that were published by him. Moreover, the defendant does not seek to suggest that, to the extent that any of the comments in the publications are the statement of opinion, they are honestly held.

43   Damages that are awarded in defamation proceedings that have been successfully prosecuted must be such as "to ensure that there is an appropriate and rational relationship between the harm sustained by the plaintiff and the amount of damages awarded": s 34 of the Act. There is in place, as already stated, a cap to which the Court has referred.

44   An award of damages for defamation serves three purposes: consolation for personal distress and hurt caused to the plaintiff; reparation for the harm done

to the plaintiff's personal and business reputation; and vindication of the plaintiff's reputation: *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 44; [1993] HCA 31.

45    Damages are assessed on the basis of calculating or assessing proper compensation for the injury to the reputation and injury to feelings. The entitlement of the plaintiff to have his reputation vindicated does not give rise to a separate head of general damages. Rather, the Court, in assessing the damages for injury to reputation and injury to feelings, does so on the basis that the amount so awarded should be sufficient to vindicate the plaintiff's reputation. The vindication of reputation is a function of the award of the damages and the reasons for those damages that are awarded: *Holt v TCN Channel Nine Pty Ltd* (2014) 86 NSWLR 96; [2014] NSWCA 90.

46    The Court of Appeal in *Ali v Nationwide News Pty Ltd* [2008] NSWCA 183 discussed the assessment of damages and made the following comments:

> "[72]    The harm caused to the plaintiff by the publication of the defamation often lies more in his own feelings, what he thinks other people are thinking of him, than in any actual change made manifest in their attitude towards him. Thus '*[a] solatium for injured feelings, however innocent the publication by the defendant may have been, forms a large element in the [general compensatory] damages*': *Cassell & Co Ltd v Broome* [1972] AC 1027 at 1124 per Lord Diplock.
>
> [73]    A person who is defamed receives damages because he or she has been injured in his or her reputation; that is, because he or she was publicly defamed. Damages in a defamation action vindicate the plaintiff to the public, and are consolation for a wrong done: *Uren v John Fairfax & Sons Pty Ltd* [1966] HCA 40; (1966) 117 CLR 118 at 150 per Windeyer J.
>
> [74]    The damages awarded in a defamation action have to be regarded as demonstrating that the plaintiff has been vindicated in his or her reputation: *Dingle v Associated Newspapers Ltd* [1964] AC 371 at 396 per Lord Radcliffe; *Carson* at 69 per Brennan J. The level of damages should reflect the high value the law places upon reputation and, in particular, upon the reputation of those whose work and life depend upon their honesty, integrity and judgment: *Crampton v Nugawela* (1996) 41 NSWLR 176 at 195; applied in *John Fairfax Publications Pty Ltd v O'Shane (No 2)* [2005] NSWCA 291 at [3] per Giles JA, Ipp JA agreeing.
>
> [75]    The harm done by the defamatory publication for which general compensatory damages are recoverable, does not come to an end when the publication is made: *Cassell* at 1124 per Lord Diplock. '*It is impossible to track the scandal, to know what quarters the poison may reach*': *Ley v Hamilton* (1935) 153 LT 384 at 386 per Lord Atkin. Accordingly, the damages awarded for defamation must be such that '*in case the libel, driven underground, emerges from its lurking place at some future date, [the plaintiff] must be able*

to point to a sum awarded by a jury sufficient to convince a bystander of the baselessness of the charge': *Cassell* at 1071 per Lord Hailsham of St Marylebone LC. Mahoney ACJ referred to this statement with approval in *Crampton* at 193, holding (at 194 – 195) that '[t]he award must be sufficient to ensure that, the defamation having spread along the "grapevine"… and being apt to emerge "from its lurking place at some future date", it was "sufficient to convince a bystander of the baselessness of the charge"'; see also *Carson* at 70.

[76]   In assessing damages the tribunal of fact is entitled to take into consideration '*the mode and extent of the publication, that the defamatory statement was never retracted, that no apology was ever offered to the respondent, and that the statement had been persisted in to the end*'. Such circumstances might in the opinion of that tribunal '*increase the area of publication and the effect of the libel on those who had read it or who would thereafter read it, might extend its vitality and capability of causing injury to the plaintiff*': *Herald & Weekly Times Ltd v McGregor* (1928) 41 CLR 254 at 263 per Knox CJ, Gavan and Starke JJ. The assessment of damages involves an understanding of the nature and seriousness of the imputations and the defendants' conduct: see *Coyne v Citizen Finance Ltd* [1991] HCA 10; (1991) 172 CLR 211 at 241.

[77]   Finally under these general observations, we would observe that the defendant must take the plaintiff as it finds him or her: *Humphries v TWT Ltd* (1993) 113 FLR 402 at 418 - 419 per Miles CJ; *Bashford v Information Australia* [2000] NSWSC 665 at [42] per Davies AJ."

47   In the matter before the Court, there are a number of publications each of which seems to overlap in terms of the imputations that are conveyed. Ordinarily, evidence of other publications of the same defamatory imputations does not ameliorate or affect the damage in any particular publication from defamatory imputations: *Dingle v Associated Newspapers Ltd* [1964] AC 371; *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 44; [1993] HCA 31. Damages are assessed on the effect of the particular publication and in the defamatory imputations that are contained within it, generally, without regard to like or similar publications that may have existed.

48   However, in these proceedings, the number and nature of the defamatory publications allows for the drawing of an inference that the purpose of the defendant in publishing the material was to damage the plaintiff, his reputation and his feelings. There is no suggestion that the defendant believed the truth of any of the imputations or statements made in any of the impugned publications.

49   Aggravated damages may arise where the defendant has engaged in reckless publication of the matter impugned; the failure by the defendants to make

enquiries prior to publication; and the failure by the defendants to retract or apologise to the plaintiff. There are other bases, but they are not relevant for current purposes.

50 Rarely, does the issue of aggravated damages arise from actual malice, being the intention, without justification or excuse, to commit the defamation. Ordinarily, it relies upon reckless disregard.

51 Where, however, as here, the inference can be drawn that the intention of the defendant was ill-will or malevolence, being actual or express malice, aggravated damages arise. The defamation in these proceedings affects the plaintiff's social activity; his family relationship; and his business activities. Given the areas in which the plaintiff and the defendant do business, the grapevine effect would be significant: *Palmer-Bruyn and Parker Pty Ltd v Parsons* (2001) 208 CLR 388 at [88]-[89]; [2001] HCA 69.

52 In defamation proceedings, the plaintiff is assumed to have had a good reputation prior to the publication of the defamatory material. The plaintiff bears no onus to prove that reputation.

53 Nevertheless, on the material before the Court and in these proceedings, the plaintiff has undertaken that task. He has proved that he had a reputation as being one of great integrity; who enjoyed his work; had significant social contact with people and they consider him honest and agreeable; and placed great weight, as earlier stated, on his qualifications as a lawyer and his admission to practise as a lawyer.

54 Damage is assumed in defamation proceedings, without the need to prove actual damage. Nevertheless, in these proceedings, the plaintiff has proved actual hurt feelings and damage to his reputation that, in each case, has been significant and, in each case, has been aggravated by the wilful conduct of the defendant. The defendant was approached to cease and desist and simply ignored such requests.

55 It should be made clear that aggravated damages are still compensatory and that exemplary damages may not be awarded by the Court.

56   The knowledge by the plaintiff of the falsity of the claims made and the persistent manner of the continued defamation of him has caused grief and distress beyond that which would normally have been caused and, on his uncontroverted and un-denied evidence, has caused serious injury to his feelings and reputation.

57   It is not only that the defendant has not apologised to the plaintiff, which, of itself, would be relevant and is relevant to the assessment of damages for injuries to feelings; it is that the defendant, on the inferences that I have drawn, has deliberately set out to injure the plaintiff and in doing so has caused injury to the plaintiff's feelings beyond that which would ordinarily arise. The Court considers that aggravated damages arise and the plaintiff should be awarded damages which include aggravated damages.

58   Further, the malice of the defendant in publishing the Website is also disclosed by the publication by the defendant, on the Website, of personal information that would allow other persons to know about the plaintiff and, possibly, facilitate the fraudulent use of the plaintiff's property or documents. That personal information included the date and place of birth of the plaintiff; the last known Australian address of the plaintiff, which includes the plaintiff's parent's address; the current London address of the plaintiff; his last known Australian mobile phone number; his last known United Kingdom mobile phone number; and his personal email address. Further, the Website includes letters, written by the defendant, to the plaintiff's parents.

**Special Damages**

59   The plaintiff also seeks special damages for loss of income. The evidence before the Court allows the drawing of an inference that the defendant's publications have caused pecuniary loss to the plaintiff. As already stated, the plaintiff is a qualified lawyer and practised as same.

60   When the plaintiff went to London, he worked as in-house counsel for eBay with an annual salary of £120,000. That employment was for the period between December 2016 and February 2017: see Affidavit of Milad Oskouie, Affirmed 18 April 2018 at [17].

61   The plaintiff was dismissed from that employment almost immediately after the publication of the defamatory material or some of it. At that time the plaintiff was still on his probationary period of employment. Despite a request for same, the plaintiff was not provided with any reason for his dismissal.

62   The obvious inference available, given the coincidence between the publication of the Website and his dismissal from his probationary period of employment, was that the timing of the dismissal and the fact of the dismissal related to the publication and, in particular, to the allegation that he had "hacked" an online retailer. Since that time the plaintiff has been unable to gain employment as a solicitor.

63   In the plaintiff's experience, to which he attests (Affidavit of Milad Oskouie, Affirmed 18 April 2018 at [22]), most employers resort to Google to conduct online searches of job applicants. It is also the Court's experience that one or other internet search is conducted.

64   A search of Google reveals the defamatory publications of the defendant. In particular, it reveals the Website and much of the material including all of the defamatory imputations.

65   Nevertheless, there is no expert report quantifying the loss in wages suffered as a result or seemingly as a result of the defendant's impugned publications. However, the plaintiff has been waiting tables at a local restaurant, with a salary, annualised, of £20,800 per annum.

66   That diminished capacity to earn income, or the lesser earnings, has persisted for over two years already. While it is difficult to assess the time over which the plaintiff will continue to be unable to gain meaningful employment, there must be a significant period during which that will occur. Of course, the vindication of the plaintiff as a result of these proceedings may impact upon the loss in wages or salary caused by the malicious attack on him by the defendant.

## Conclusion

67   The plaintiff obtained a default judgment from the Court. In part, the default arises from the recalcitrance of the defendant in dealing with the defamatory imputations to which this judgment refers.

80   Were it not for the assessment of the Court that aggravated damages arise, the defamation would not be in the worst category of case, if only because it was published to a select group and those that sought access to the Website, either because they were otherwise familiar with the defendant or because they searched the Internet for the name of the plaintiff. Nevertheless, in some senses, that has a worse effect on the feelings and reputation of the plaintiff than might otherwise be the case.

81   As a consequence of the manner in which the defamation was published (and the number of them), and in particular the Website, the effect is that anyone who seeks to search for anything to do with the plaintiff is regaled by these defamatory imputations. Last, unlike a general publication such as a newspaper, where people with a particular interest may not read the story or hear the broadcast at the time, this publication lasts forever and will haunt the plaintiff for years to come.

82   As was made clear by the High Court in *Carson* (at 102 and following) the element of punishment is often a legitimate factor in an award of aggravated damages even in New South Wales. The Court said:

> "In my opinion, the element of punishment is often a legitimate factor in an award of aggravated damages even in New South Wales .... A jury which increases its award of damages in a defamation action commits no error if it thinks that the plaintiff cannot be properly compensated for the harm done to him or her unless the damages contain an amount to punish the defendant for the hurt which he or she has inflicted on the plaintiff or to deter the defendant from further defaming the plaintiff. Nor does the jury commit any error if it increases the damages because the conduct of the defendant towards the plaintiff arouses its anger or indignation."

83   I do not take into account any issue of punishment. Nevertheless, the conduct of the defendant in these proceedings arouses anger and indignation and has plainly severely aggravated the hurt suffered by the plaintiff.

84   Bearing in mind the range of damages that have been provided for defamations of this kind, the non-economic damage, including aggravated damages, for all of the 14 publications, including the Website, must be at a level that appropriately compensates the plaintiff for his hurt; the damage to his reputation; and the social consequences of the damage to his reputation. I assess that amount at $425,000.

85   On the question of special damages, the evidence before the Court is that for over two years the plaintiff has lost approximately £100,000. That damage will continue, at least for some period of time, until the vindication associated with this judgment, or caused by it, takes effect.

86   The Court must do the best it can in terms of the economic loss suffered by the plaintiff. The Court needs to take account of vicissitudes and the possibility that employment may not have been obtained otherwise.

87   Notwithstanding that last statement, there is no historical or evidentiary material, which would support the proposition that the plaintiff was, prior to the defamatory material being published, unemployable or a person who would not easily obtain employment.

88   In the circumstances, bearing in mind the past loss of approximately £200,000 and estimating the future loss and reducing the whole figure by vicissitudes of 15% to arrive at a "buffer", I assess the special damages at $450,000. It should be noted that £200,000 is approximately $365,000.

89   In all the circumstances I award the following amounts:

Non-economic loss: $425,000

Economic loss: $450,000

Total: $875,000

90   The Court needs then to turn to the question of costs and interest.

**Costs and Interest**

91   Pursuant to the terms of s 100 of the *Civil Procedure Act 2005* (NSW), the Court has the discretion to award interest, payable up to judgment on the amount awarded. There are appropriate rates set for interest prior to judgment in relation to non-economic loss.

92   Ordinarily, in awarding interest on defamation damages, the rate of interest takes account of the assumption that damages represent, at least in part, a loss spread over the period from the date of publication until the date of judgment.

93  This matter was the subject of discussion by McHugh JA (as his Honour then was) in *John Fairfax & Sons Ltd v Kelly* (1987) 8 NSWLR 131, following which the practice had been to award interest at half the ordinary rate for non-economic loss, unless there is some good reason to depart from that practice: *Vilo v John Fairfax & Sons Ltd & Anor* [2000] NSWSC 1206. In *Vilo*, Simpson J (as her Honour then was) said:

> "In this case, as in others, I think it should be taken that the damage to the plaintiff's reputation, and the injury he suffered, was spread (perhaps not evenly) over the period of seventeen years. But it must be taken to cease on the award of damages. Although it may be reasonable to conclude that the greater damage was occasioned in the earlier part of the period, thus tilting the balance slightly in favour of the plaintiff for a larger interest rate, I think to do justice to both parties it is more appropriate to treat the injury as spread evenly over the period. This would justify a halving of the interest rate declared by the High Court. I propose to award interest on the whole of the damages, over the whole of the period, at a rate of 2 percent." (*Vilo*, at [25], noting that the then ordinary rate was 4% per annum)

94  The original comment by McHugh JA in *John Fairfax*, supra, (with which reasons on this issue Kirby P agreed) was relevantly in the following terms:

> "The correct approach in theory would seem to be that, since the plaintiff was entitled to damages immediately upon publication, the proper inquiry is first to determine to what extent the award was increased by reason of continuing injury. In strict theory the interest, in respect of this additional sum, would need to take account of the fact that the injury was spread over a period after publication. That is, leaving aside any question of future loss, the matter should be approached on the basis that the plaintiff is prima facie entitled to interest on the whole amount of the award from the date of publication. However, that amount has to be reduced for any sum additional to 'vindication damages' awarded in consequence of injury suffered between publication and verdict. This approach gives rise to obvious difficulties of assessment. But if, as I think is the case, the plaintiff is entitled to at least part of his damages from the date of publication, the choice is between awarding no interest at all or attempting to calculate interest on a basis which, although not mathematically perfect, achieves a measure of justice. Since it is unfair to plaintiffs to deprive them of interest for the period in which they have been deprived of their money, interest ought to be awarded to the extent that it is fair and proper." (At 143D-F)

95  The practice of halving the interest rate for the entire period from the date of publication is not a universal approach. Even in the comments above of McHugh JA, reference was made to exceptions associated with future damage.

96  In the current proceedings, the special damages have been calculated on the basis of two years of past economic loss and a degree of future loss, albeit small, given that this judgment vindicates the plaintiff completely. However, the

non-economic loss, given the intransigence of the defendant in continuing to publish, will accumulate and continue to cause hurt feelings, damage to reputation and the like.

97    The Court has not sought to calculate future damage associated with the continued publication of the defamatory imputations. As a consequence, it seems most appropriate for the Court to award interest at the prescribed rate, in full, at least from the date of the publication of the Website, namely, 16 February 2017.

98    The foregoing calculation does not take account of the emails sent to customers and prospective customers in late June/early July 2016, but, overall is an appropriate accommodation of the interest that is payable on the past damages, which have accrued since July 2016 until the date of judgment.

99    The Court is exercising a discretion in determining to award interest and when determining the rate at which interest shall be calculated. In my view, given the nature of the damage and the future continuing damage, the awarding of the prescribed interest rate for pre-judgment interest over the entire period since the publication of the Website represents a fair and just outcome and appropriate compensation for the plaintiff. That interest rate will be applicable to the non-economic loss. The economic loss will not be the subject of pre-judgment interest.

100   The Court then turns its attention to the question of costs. As already noted, the plaintiff has regularly and continuingly sought to have the defendant remove the defamatory material. The defendant has refused.

101   The removal of such material may and, on the evidence before the Court, would have caused the plaintiff not to proceed or continue with the litigation. At the very least, the removal of the offending material would have contradicted the inference that the material has been published from a motive of actual malice.

102   The defendant must have known of the falsity of the imputations, or at least the majority of them.

103  Costs are not a punishment of the unsuccessful party. They are part of the
     compensation to the plaintiff or the defendant for the requirement to enforce or
     protect their interests.

104  Costs are in the discretion of the Court, which discretion must be exercised
     judicially. Ordinarily, costs follow the event and the successful party will be
     awarded costs to compensate them for the loss in being required to enforce
     their rights or defend them.

105  The discretion to award costs that apply to proceedings generally is informed
     by the terms of s 40 of the Act, which provides that the Court, in awarding costs
     in defamation proceedings, may have regard to the manner in which the
     proceedings were conducted by the respective parties (including a party's
     superior financial position) and any other matters. Further, where proceedings
     are successfully brought by a plaintiff, costs are to be awarded on an indemnity
     basis, if the Court is satisfied that the defendant unreasonably failed to make a
     settlement offer or agree to a settlement offer proposed by the plaintiff,
     including an offer to make amends.

106  While the terms of the correspondence between the plaintiff and the defendant
     cannot be an offer to make amends, because, among other reasons, it was
     served by a plaintiff, it may be a concerns notice. In order for a document to be
     a "concerns notice", it requires only that it be in writing and inform the publisher
     of the defamatory imputations that the aggrieved person considers are or may
     be carried about the aggrieved person by the publication: see s 14(2) of the
     Act.

107  By letter dated 28 September 2016, the plaintiff's legal representatives wrote to
     the legal representatives of the defendant and to the defendant, by email and
     by post, referring to previous correspondence from the plaintiff's former lawyer,
     Mr Hazan, who had given notice of the defamatory material and had sought an
     apology and removal of same. That letter was apparently sent on 23 May 2016.
     That letter may have amounted to a concerns notice pursuant to the Act. The
     letter of 28 September 2016 does not. The contents of the 23 May 2016 letter
     are not before the Court, except by limited reference.

108   Nevertheless, the letter of 28 September 2016, followed by a further letter of 2 April 2017, are letters that make clear that the plaintiff was seeking to have the defamatory material removed from the Website and an apology issue, failing which proceedings in defamation would be commenced. That letter was ignored in that it was not the subject of any reply.

109   In the circumstances, and bearing in mind the provisions of s 40 of the Act, it seems to me that the conduct of the defendant, or lack of conduct, has forced the plaintiff to commence proceedings for the protection of his rights and the only appropriate compensation is to award costs, to be assessed in a manner that properly compensates for the requirement on the plaintiff to commence the proceedings and to prosecute them.

110   In those circumstances, costs will be awarded on an indemnity basis on and from 28 September 2016 and, if there be any costs associated with the proceedings prior thereto, otherwise on the ordinary basis.

111   The Court makes the following orders:

(1)   The defendant shall pay the plaintiff an amount of $875,000 for damages caused by the defendant's defamatory publications;

(2)   The defendant shall pay the plaintiff interest at the rate of 5.5% per annum on the amount of $425,000 from 16 February 2017 until the date of this judgment;

(3)   The defendant shall pay the plaintiff interest on $875,000 at the rate of 7.5% per annum from the date of this judgment until the date of payment in full;

(4)   The defendant shall pay the plaintiff's costs of and incidental to the proceedings on the following bases:

(a)   on an indemnity basis on and from 28 September 2016;

(b)   otherwise, costs, prior thereto, if any, on the ordinary basis.

**********

DISCLAIMER - Every effort has been made to comply with suppression orders or statutory provisions prohibiting publication that may apply to this judgment or decision. The onus remains on any person using material in the judgment or decision to ensure that the intended use of that material does not breach any such order or provision. Further enquiries may be directed to the Registry of the Court or Tribunal in which it was generated.



**Judgment Summary**
Supreme Court
New South Wales

## Oskouie v Maddox [2019] NSWSC 428

Rothman J

The Supreme Court has ordered judgment in favour of Mr Milad Oskouie (the plaintiff) in defamation proceedings, awarding $875,000 in damages to be paid by Mr Brandon Lane Maddox (the defendant), and a further payment of interest at the rate 5.5% per annum on the amount of $425,000 from 16 February 2017 until 18 April 2019, the date of the judgment.

Mr Oskouie had lived in Australia for most of his life and was admitted as a legal practitioner of the Supreme Court of New South Wales on 18 February 2013. For a short period, Mr Oskouie was employed as in-house counsel for eBay, but was dismissed almost immediately after Mr Maddox's publication of defamatory material. Since that time, he has been unable to gain employment as a solicitor.

Mr Maddox is a principle of the B Maddox Enterprises LLC (the Company). Mr Maddox asserts that he is a prominent author and commentator in the press and online on the subject of federal firearms licensing in the United States. The Company's website, which was authored by Mr Maddox, had, at 26 September 2016, over 70,000 customers who had purchased access to his e-books.

The matters complained of by Mr Oskouie consist of a website (www.miladoskouie.com), launched on about 16 February 2017, and several emails Mr Maddox sent to customers and prospective customers of the Company between late June 2016 to 25 February 2017. Except for the first email, each of the emails included a link to the Website, which has continually updated information about Mr Oskouie since its inception.

On 10 July 2016 and on 28 October 2016, Mr Oskouie's legal representatives wrote to the defendant's legal representatives, seeking Mr Maddox to cease and desist from publishing the defamatory material. Mr Maddox failed to comply with both requests.

The Court determined that the matters of which Mr Oskouie complained gave rise to defamatory imputations. The impugned publications stated that the plaintiff was an "Islamic Hacker", a fraudulent person who falsely claimed to be a lawyer and described him as a terrorist, amongst other things.

The Court found that the ordinary reasonable reader of the website and the emails would understand the publications as most defamatory. The Court noted that the publication of the defamatory imputations occurs each time a person gains access to the publication on the website or receives the email.

This summary has been prepared for general information only. It is not intended to be a substitute for the judgment of the Court or to be used in any later consideration of the Court's judgment.

Mr Maddox did not file a Defence and did not seek to justify any of the publication on any basis. Moreover, he did not adduce any evidence to ameliorate the effect of the defamatory imputations which he had published.

In determining the award of damages, the Court found that the effect of the publications would have had a grapevine effect on Mr Oskouie's reputation and his standing amongst people with whom he has dealt in society and in business. The conduct of Mr Maddox gave rise to aggravated damages and the Court also found that Mr Maddox is liable for special damage for Mr Oskouie's loss of income as well as his inability to gain meaningful employment.

This summary has been prepared for general information only. It is not intended to be a substitute for the judgment of the Court or to be used in any later consideration of the Court's judgment.

SENDER: 32 CORONATION COURT, BREWSTER GARDENS,
LONDON, W10 6AL, UN
UNITED KINGDOM



Despatch Pack CP72    Administration of Great Britain
Administration de Grande Bretagne

**From:** Name and Address of Sender Nom et Adresse d'l'expéditeur
GIANNI GIACCHETTA
32 CORONATION COURT
BREWSTER GARDENS LONDON
Postcode W10 6AL    ☎ +447501703329

VAT No / Exporters reference :

**A barcoded service label must be affixed to the parcel.**

**To:** Name and Address of Addressee Nom et Adresse du destinataire
UNITED STATES DISTRICT COURT OF THE SDNY
PRO SE INTAKE UNIT
THURGOOD MARSHALL US COURTHOUSE
40 FOLEY SQUARE, ROOM 105
Post town and
Zip/Postcode NEW YORK, NEW YORK 10007
Country UNITED STATES    ☎ +1(212)805-0175

Date of Despatch
Date de dépôt

Gross weight
Poids brut
kgs    gms
82.

Importers reference (if any) (tax code/VAT No/importer code) (optional)    Senders Reference (if any)



RECEIVED
SDNY PRO SE OFFICE
2019 APR 29 AM 10: 18
S.D. OF N.Y.



PARCEL FORCE WORLDWIDE

IAG

FEDEX AWB COPY - PLEASE PLACE IN POUCH

COUNTRY MFG: GB
CARRIAGE VALUE:
CUSTOMS VALUE: 1.00 UKL

NM PCTA
AWB (US)

FedEx Express
Pro Se Intake Unit
40 Foley Square Room 105
New York, NY 10007
UNITED STATES, US

TRK# 7868 6362 6317
Form 0430
10:30A    INTL PRIORITY
PKG:YOUR PKG

DESC1: Correspondence
DESC2:
DESC3:
DESC4:
REF: EE686838974GB

PRO SE INTAKE UNIT
40 FOLEY SQUARE ROOM 105
NEW YORK NY 10007

REF: EE686838974GB
0012128050175

NM PCTA
1000 NY-US
EWI

TRK# 7868 6362 6317
0430
10:3    INTL PRIORITY