USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 8/18/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BMADDOX ENTERPRISES LLC,

Plaintiff,

v.

MILAD OSKOUIE, OSKO M LTD, and
PLATINUM AVENUE HOLDINGS PTY, LTD,

Defendants.

---

MILAD OSKOUIE and PLATINUM AVENUE
HOLDINGS PTY, LTD,

Counterclaim Plaintiffs,

v.

BMADDOX ENTERPRISES LLC and
BRANDON MADDOX,

Counterclaim Defendants.

---

No. 17-CV-1889 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff BMaddox Enterprises LLC brings this action for copyright infringement, false advertising, unfair competition, trade-secret misappropriation, and deceptive trade practices against Defendants Milad Oskouie, Osko M Ltd, and Platinum Avenue Holdings Pty, Ltd. Plaintiff alleges that Defendants copied its website and other proprietary materials that guide citizens through the process of federal firearms licensing. Now before the Court are Plaintiff's motions for summary judgement against Oskouie and for default judgment against Osko M Ltd and Platinum Avenue

Holdings Pty, Ltd.  For the reasons that follow, Plaintiff's motions are granted in part and denied in part.

## BACKGROUND

The following facts are drawn principally from Plaintiff's Rule 56.1 Statement ("56.1 Stmt."), Dkt. 82, the Declaration of Milad Oskouie in Opposition to Plaintiff's Application for a Preliminary Injunction ("Oskouie Decl."), Dkt. 27, the Declaration of Brandon Maddox in support of the instant motion for default judgment ("Maddox Decl."), Dkt. 207, and the exhibits thereto.  Unless otherwise noted, the facts are undisputed.  Where disputed, the facts are construed in the light most favorable to Oskouie, the non-moving party.  *See, e.g., Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

## I.    The Parties and Their Relationship

Brandon Maddox ("Maddox") is the controlling member of Plaintiff BMaddox Enterprises LLC ("BMaddox"). 56.1 Stmt. ¶ 1.  Since 2005, Plaintiff has created and sold educational materials related to federal firearms licensing through its website at *ffl123.com* ("Plaintiff's Website"), serving "more than seventy-five thousand customers."  *Id.* ¶¶ 1-2.  Plaintiff has obtained several copyright and trademark registrations for that website and the materials contained therein.  Effective April 19, 2011, Maddox secured Copyright Registration No. TX 7-388-901 (the "'901 Registration") for his *Federal Firearms License Guide & Class 3 License Guide*, which was first published in 2009 ("Plaintiff's FFL Guidebook").  *Id.* ¶ 6.  Plaintiff obtained Copyright Registration No. TX0008400540 (the "'540 Registration") for the "look and feel" of Plaintiff's Website, effective September 8, 2017, and Registration No. TX0008400000 (the "'000 Registration") for the HTML code of Plaintiff's Website, effective August 10, 2017.  *Id.* ¶¶ 7-8.

Defendant Milad Oskouie, "an Australian businessman and former lawyer," is a director of Defendants Osko M Ltd ("Osko"), and Platinum Avenue Holdings Pty, Ltd ("Platinum").  Oskouie

Decl. ¶¶ 2-3; 56.1 Stmt. ¶ 43.   Until June 2017, Defendant Platinum operated a website at *FFLTrust.com* ("Defendants' Website") which sold educational materials for securing federal firearms licenses.   Oskouie Decl. ¶ 3.   Oskouie declares that Osko, "a British limited company, … has no material involvement in the operation of [Defendants'] website." *Id.*   Plaintiff has proffered evidence that certain pages of Defendants' website, as of June 28, 2017, contained a copyright notice reading "Copyright © 2016 – Osko m Ltd. All Rights Reserved" as well as the statement "Osko M Ltd a NRA Business Alliance Partner" at the bottom of every page.   56.1 Stmt. ¶ 38.

In late 2013, BMaddox hired a freelance web developer in order to increase traffic to Plaintiff's Website.   56.1 Stmt. ¶ 10.   That freelancer introduced Maddox to Oskouie as "a collaborator working out of Australia." *Id.* ¶ 11.   At that time, Oskouie was involved with an internet marketing firm called Infinite Conversions Pty Ltd, which specialized in optimizing the performance of third-party websites.   Oskouie Decl. ¶ 4.   Through that relationship, Oskouie learned about federal firearms licenses and the "revenue potential for educational materials" on the subject, and "decided to pursue an online business to compete with Plaintiff." *Id.* ¶ 7.

## II.   Hacking of Maddox's Web Accounts

In December 2015, Maddox began receiving notices from internet service providers that his accounts were being accessed in Australia.   On December 16 and 17, 2015, Maddox received messages from Microsoft stating that someone from Sydney, Australia, using the IP address 203.191.202.50, had accessed Plaintiff's Microsoft account.   56.1 Stmt. ¶¶ 16-17.   Two weeks later, Maddox received a similar message that someone from Sydney had accessed his Google Chrome account.   *Id.* ¶ 18.   Australian IP addresses, including 203.191.202.50 and 203.219.96.190, were used to access BMaddox's Upwork.com account at least one hundred nine (109) times.   *Id.* ¶ 20.   This Australia-based party accessed Plaintiff's saved passwords and logged into a number of online

services used by Plaintiff in connection with its website business, including its "email marketing account" and "an email list of more than 100,000 prospective customers." *Id.* ¶ 24.

On January 16, 2016, three such services used in connection with Plaintiff's Website— Dropbox, a cloud-based file storage system, MailChimp, an email marketing system, and Rackspace, a website hosting service—each notified Plaintiff that someone in Sydney had accessed, or attempted to access, Plaintiff's accounts. *Id.* ¶ 26. Around this time, a third party also obtained access to the Wordpress account used to operate "the backend of [Plaintiff's] Website." *Id.* ¶ 27. In the same time period, Plaintiff's Website was altered in such a way that it was no longer indexed by search engines, effectively removing BMaddox's Website and e-commerce business from online search results. *Id.* ¶ 28. Local police in Australia informed Plaintiff that the IP addresses used to access its accounts were tracked to two different internet cafes in Chatswood, Australia. Dkt. 214, Declaration of Anderson J. Duff in Support of Motion for Summary Judgment ("Duff SJ Motion") ¶ 5. According to Google Maps, "Chatswood is a five-minute drive from Defendant Oskouie's old address." *Id.*

## III.   The Launch of FFLTrust

On or about December 26, 2015, Oskouie registered the domain *ffltrust.com* on behalf of Platinum. 56.1 Stmt. ¶ 32; Oskouie Decl. ¶ 8. According to Oskouie, Platinum engaged a freelance web developer "to create a WordPressTM-based website for <FFLTrust.com> that Platinum could easily edit and manage," and "to improve upon <FFL123.com> in layout, offers and images." Oskouie Decl. ¶¶ 8-9. Oskouie further declares that he drafted and created a federal firearms license e-book ("Defendants' FFL Guidebook") based on legal research, the assistance of freelance writers, and print books and subscriptions, including some from Plaintiff's website. *Id.* ¶¶ 11-13. Platinum launched Defendants' Website in January 2016. *Id.* ¶ 15. Plaintiff discovered the existence of the website on or about February 2016. 56.1 Stmt. ¶ 35.

4

**IV.    Similarities Between Plaintiff's and Defendants' Websites**

Side-by-side comparisons of Plaintiff's and Defendants' websites—and the material contained therein—evidence numerous similarities between the two.   First, the introduction to Defendants' FFL Guidebook contains the same number of paragraphs as the introduction to Plaintiff's FFL Guidebook; both are entitled "Dealing in Machine Guns, Silences & Short Barrel Rifles" and their content is identical except for minor modifications.   56.1 Stmt. ¶ 44; *see* Maddox Decl., Ex. C-1.   For example, the second paragraph in Plaintiff's version says "Please read the last few sentences again until that makes sense," while Defendants' version states "I recommend you re-read the last sentences until you understand them."   Maddox Decl., Ex. C-1.   Whereas Plaintiff's website provides a link to Maddox's "SOT license," Defendants' provides a link to that of its ostensible founder, Henry Jackson.   *See id.*   The content, title and visual aids that appear in Chapter 6.2 of the Plaintiff's FFL Guide are also replicated in the corresponding portion of Defendants' FFL Guide.   56.1 Stmt. ¶ 45; *see* Maddox Decl., Ex. C-2.   The same is true of Chapter 9.4, "Accurate Logs":  both versions use the same title, the same accompanying graphic, the same checkout promotion, and substantially similar content with minor modifications.   56.1 Stmt. ¶ 46; *see* Maddox Decl., Ex. C-3.   Chapter 15 of both FFL Guidebooks, which bears the title "Additional Resources," identifies the same ten resources in the same, non-alphabetical, order.   56.1 Stmt. ¶ 47; *see* Maddox Decl., Ex. C-4.

Moreover, Plaintiff has obtained several federal firearms licenses, which are published in its FFL Guidebook.   56.1 Stmt. ¶ 64; *see* Maddox Decl., Ex. H-1.   Several images of federal firearms licenses issued were also published on Defendants' Website.   56.1 Stmt. ¶ 65.   Although the names and other identifying information make it appear that the licenses were issued to a person named Henry Smith and FFL Trust Enterprises, the text "BMADDOX ENTERPRISES LLC" still appears in small text on each of those licenses.   *Id.*; Maddox Decl., Ex. H-2 at 2, 4, 7, 9.

The design and format of the two websites are also substantially similar.  Both websites feature tabs entitled "FFL License Guide", "Class 3 Guide", and "Both Guides;" the tabs are placed in the same location within the site.  56.1 Stmt. ¶ 48; *see* Maddox Decl., Ex. D-1.  The sixteen bullet points that run down the right-hand side of the "Class 3 (SOT) Guide" promotion contain the same information in the same order on both websites; the content of those bullet points is virtually identical. *See id.*  The sections of Defendants' Website entitled "FFL License - Frequently Asked Questions" features questions that duplicate those that appear on Plaintiff's Website; they also appear in the same non-alphabetical order.  56.1 Stmt. ¶ 49; *see* Maddox Decl., Ex. D-2.  Both begin with the question "What are the benefits of getting an FFL License," and end with the question "Why do you do this?" *See* Maddox Decl., Ex. D-2.  Sixty-four of the articles published on Defendants' Website are published with the exact same title as articles appearing on Plaintiff's Website, and use the same domain structure.  56.1 Stmt. ¶ 50; Maddox Decl., Ex. D-3.  For example, an article entitled "FFL Cost" can be found at www.ffl123.com/how-much-does-a-ffl-cost and also at www.ffltrust.com/how-much-does-a-ffl-cost.  *See id.*

The privacy policy published on Defendants' Website features the same ten subsections, in the same order as the policy on Plaintiff's Website; the policy uses text that is identical in every respect except for the words identifying each respective domain name.  56.1 Stmt. ¶ 51; Maddox Decl., Ex. D-4.  The glossary of terms on both websites features the same 48 terms in the same non-alphabetical order.  56.1 Stmt. ¶ 52; Maddox Decl., Ex. D-5.  The terms of use that appeared on the Infringing Website on June 28, 2017 identified "Minnehaha County, Luxembourg" in the venue provision.  56.1 Stmt. ¶ 54.  Minnehaha County is the county where BMaddox operates in South Dakota.  *Id.*

There are also numerous similarities between the customer reviews posted on both websites. 56.1 Stmt. ¶ 53.  For example, a review by "Stephen S. of Waco" on Plaintiff's Website contains

nearly identical text to a review by "Brad S. of Lubbock" on Defendants' Website. *Compare* Maddox Decl., Ex D-6 at 2 ("The interview was only about two and a half hours. That was pretty short from what I have been hearing from other people.") with *id.* at 3 ("The interview was around two and a half hours.  That was quite short from what I have been hearing from other people.").  The second to last sentence in both reviews ends with two periods.  *Id.*

The evidence also indicates that Defendants have replicated Plaintiff's email newsletter. Plaintiff regularly sends email newsletters to its consumers and prospective consumers.  56.1 Stmt. ¶ 57.  A regular email newsletter for the Defendants' Website has been sent to Plaintiff's consumers and prospective clients.  *Id.*  The email list used by Defendants' Website includes one of Maddox's in-laws who did not sign up to receive such emails and does not make their email address public.  *Id.* With respect to content, the newsletter often replicates BMaddox's newsletters almost word for word. *Id.*  For example, both newsletters entitled "Get FFC License Approved From Home," make the following claim with the same emphasis: "Because with an A+ rating from the *Better Business Bureau* and almost two decades of 100% positive Powerseller feedback on eBay, I have the best reputation in the business!"  *See* Maddox Decl., Exs. F-1, F-2.   While Plaintiff's newsletter included a picture of Maddox, Defendants' newsletter contains a picture that purports to represent FFLTrust.com president, Henry Jackson.  *Id.*  The photo is identical to an image "from the photography licensor Shutterstock titled Portrait Businessman Passport Identity."  56.1 Stmt. ¶ 58; Maddox Decl., Ex. I.

On June 15, 2016, in accordance with procedures outlined in the Digital Millennium Copyright Act ("DMCA"), Maddox sent a takedown notice on behalf of BMaddox to internet service provider MailChimp that related to the content of the emails sent from Defendants' Website.  56.1 Stmt. ¶ 60; Maddox Decl., Ex. G-1.  On June 20, 2016, Oskouie sent a counternotice on behalf of Platinum, declaring that "the claims of copyright violation should be rejected because the complainant does not hold the copyright to the material in question, is not the designated

representative of the copyright holder, and therefore lacks standing to assert that my use of the material is a violation of any of the owner's rights."  Maddox Decl., Ex. G-2.  That counternotice listed Platinum's address as 8 Ward St. Willoughby, Sydney NSW 2068.  56.1 Stmt. ¶ 61.  Records provided by PayPal in response to a subpoena indicate that there is a PayPal account associated with "FFL Experts" at that address and the email address trustffl@gmail.com.  *Id.* ¶ 23.  On January 16, 2017, Maddox sent a DMCA takedown notice on behalf of BMaddox to Amazon Web Services alleging that Defendants' Website "active web content" infringed copyrighted intellectual property.  Maddox Decl., Ex. G-3; 56.1 Stmt. ¶ 62.  Oskouie sent a counternotice on January 23, 2017, bringing the same objections as in his June 2016 counternotice.  Maddox Decl., Ex. G-4.  On April 3, 2019, the NRA Business Alliance sent an email to its members stating that "[i]t has come to our attention that a company called FFL Trust has used our NRA Business Alliance logo without our knowledge or permission.  56.1 Stmt. ¶ 41.  As of July 30, 2020, Defendants' Website was still asserting to consumers that its operators had a relationship with the NRA Business Alliance.  56.1 Stmt. ¶ 42.

## PROCEDURAL HISTORY

Plaintiff initiated this action under seal on March 14, 2017, and moved *ex parte* for a temporary restraining order, an order to disable Defendants' website, and an asset restraining order. *See* Dkt. 6, 17.  Pending a hearing on Plaintiff's application for a preliminary injunction, the Court temporarily restrained Defendants from transferring or disposing of any money or assets.  Dkt. 15. Defendants appeared at the June 29, 2017 show cause hearing, and thereafter filed an answer and counterclaim against Plaintiff and Brandon Maddox.  Dkt. 32.  On July 25, 2017, Defendants moved for a temporary restraining order and preliminary injunction against Plaintiff and Maddox, and submitted a sworn declaration in support.  Dkt. 34.  At a July 28, 2017, hearing, the Court denied Defendants' motion, combined the hearing on Plaintiff's request for a preliminary injunction with the trial on the merits following the completion of discovery, and confirmed that the temporary restraining

order against Defendants would be in effect until this matter was resolved.  Dkt. 39.  On September 8, 2017, Magistrate Judge Pitman, to whom this case was referred, recommended vacatur of the temporary restraining order.  Dkt. 58.  The Court subsequently adopted that recommendation.  Dkt. 78.

Judge Pitman entered a scheduling order that required fact discovery to be completed by no later than March 30, 2018.  Dkt. 66.  On February 1, 2018, Defendants moved to stay the action on the grounds that Oskouie had been diagnosed with Stage B Leukemia.  Dkt. 87, 89.  Plaintiff challenged the veracity of that claim.  Finding that Defendants "failed to submit adequate evidence that Oskouie has been diagnosed with and will require treatment for Stage B Leukemia," and noting various other anomalies in Defendants' submissions to that effect, Judge Pitman denied the application for a stay without prejudice.  Dkt. 110.  That same day, Judge Pitman ordered Defendants to  "produce all documents that are responsive to plaintiff's document request, served on defendants' counsel on November 6, 2017."  Dkt. 111.  On May 11, 2018, Defendants' counsel, the third attorney to file an appearance on their behalf in this action, moved to withdraw because of failure to pay legal fees.  Dkt. 150.  In a subsequent letter—filed prior to any ruling on the withdrawal motion— Defendants' attorney informed the Court that he had "learned some facts which further make[] it impossible for me to ethically represent [Oskouie]."  Dkt. 168.

On May 16, 2018, Plaintiff moved for sanctions on the basis that each Defendant had failed to meaningfully respond to interrogatories or requests for documents that were served upon them on November 6, 2017.  Dkt. 153.  On June 18, 2018, consolidating arguments made in a prior motion for sanctions, Plaintiff moved to sanction Defendants on the grounds that they had submitted fraudulent and meritless documents, in violation of Fed. R. Civ. P. 11.  Dkt. 161.  On August 30, 2018, Judge Pitman granted the motion for Defendants' counsel to withdraw and stayed the case until October 5,

2018 so as to permit Defendants to retain new counsel.  Dkt. 169.  By email dated October 5, 2018, Oskouie advised the Court that he would be proceeding *pro se.*

On September 30, 2019, Judge Pitman denied the motions for Rule 11 sanctions.  Dkt. 178. In that opinion, he further denied the motion for discovery sanctions, but ordered Defendants to produce all remaining discovery by October 21, 2019, warning that "an unjustified failure to comply with this Order will result in the imposition of sanctions, which may include the entry of a default judgment against all defendants."  *Id.* at 18.

The case was subsequently reassigned to Magistrate Judge Cave.  On October 22, 2019, Plaintiff filed a letter motion to renew its motion for sanctions, on the basis that Defendants had failed to produce any documents in response to Judge Pitman's September 30 order.  Dkt. 180.  Judge Cave granted Plaintiff's letter motion in an order that "reminded" Oskouie "that he cannot represent the entity defendants and counter-claimants, Osko M Ltd. and Platinum Avenue Holdings Pty, Ltd," and warned that failure to appear through counsel could "risk an entry of default against them."  Dkt. 186. The order permitted Plaintiff to seek a certificate of default from the Clerk of Court should an attorney not enter an appearance on behalf of the entity defendants by February 28, 2020.  *Id.*  On March 3, 2020, following a request for an extension of time to find representation, Judge Cave granted a two-month extension of the deadline by which the entity defendants had to be represented by counsel. Dkt. 188.  On June 18, 2020, the Clerk issued a certificate of default against Platinum and Osko.  Dkt. 197.  Plaintiff filed the instant motion for default judgment on July 17, 2020.

On July 30, 2020, Plaintiff moved for summary judgment against Oskouie.  Dkt. 210 ("SJ Mot.").  Appended to that motion was a notice to *pro se* litigants who oppose motions for summary judgment, which advised, *inter alia*, "If you do not respond to the motion for summary judgment on time with affidavits and/or documents contradicting the material facts asserted by the Plaintiff and Counterclaim Defendants, the Court may accept their facts as true."  Dkt 210-1.

10

**STANDARD OF REVIEW**

**I.      Summary Judgment**

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal quotation marks omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted).  To survive summary judgment, the moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If the party satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*

Summary judgment determinations are made on the basis of admissible evidence in the record. "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designat[ing] specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The opposing party "may not rely on conclusory allegations or unsubstantiated speculation." *Brown*, 654 F.3d at 358.  A party asserting that a fact is, or is not, genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  Unsworn statements in a brief are not evidence. *See, e.g., Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) (per curiam).

Pursuant to Local Civil Rule 56.1, a moving party in the Southern District of New York must further provide "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," with each numbered paragraph citing "evidence which would be admissible, . . . as required by Fed. R. Civ. P. 56(c)." Moreover, "[e]ach numbered paragraph in the statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). "Any represented party moving for summary judgment against a party proceeding pro se shall serve and file as a separate document, together with the papers in support of the motion, the [] 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1 attached." Local Civil Rule 56.2.

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted). Moreover, "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants, particularly where motions for summary judgment are concerned." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (internal quotation marks and citations omitted) (per curiam). "Courts read the pleadings, briefs, and opposition papers of pro se litigants 'liberally and interpret them to raise the strongest arguments that they suggest.'" *Rivera v. Goulart*, No. 15-CV-2197 (VSB), 2018 WL 4609106, at *2 (S.D.N.Y. Sept. 25, 2018) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)).

## II.    Default Judgment

Pursuant to Fed. R. Civ. P. 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Although "the typical Rule 55 case [is one] in which a default has entered because a defendant failed to file a timely answer[,] . . . a district court is also empowered to enter a default against a defendant [that] has failed to . . . otherwise defend."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 129 (2d Cir. 2011) (internal quotation marks omitted).  The Second Circuit has "embraced a broad understanding of the phrase 'otherwise defend,'" and has ruled that a district court is justified in imposing default where an entity defendant has "disregarded the district court's order that the defendant appear through counsel."  *Id.* at 129-130 (citing *Eagle Associates v. Bank of Montreal*, 926 F.2d 1305 (2d Cir. 1991)); *see also Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 192 (2d Cir. 2006) (noting that a default judgment may be entered against a corporation that fails to appear through counsel), *cert. denied*, 549 U.S. 1114 (2007).

"The court may set aside an entry of default for good cause."  Fed. R. Civ. P. 55(c).  As the Federal Rules of Civil Procedure do not define "good cause," the Second Circuit has established three criteria for determining whether to relieve a party from default: "(1) the willfulness of default, (2) the existence of any meritorious defenses, and (3) prejudice to the non-defaulting party."  *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 186 (2d Cir. 2015) (internal quotation marks omitted) (per curiam).

"A court's decision to enter a default against defendants does not by definition entitle plaintiffs to an entry of a default judgment."  *Id.* at 187.  Rather, "the court may . . . enter a default judgment if liability is established as a matter of law when the factual allegations of the complaint are taken as true."  *Id*.  "[A] default is an admission of all well-pleaded allegations against the defaulting party."

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).   Nevertheless, the dispositions of motions for default judgments "are left to the sound discretion of a district court" based on its assessment of "the individual circumstances of a given case and [evaluation of] the credibility and good faith of the parties," and considering the "preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).

## DISCUSSION

Plaintiff claims that Platinum and Osko (collectively, the "Entity Defendants"), by virtue of default, and Oskouie, based on the undisputed facts in the record on summary judgment, are liable as a matter of law for: 1) copyright infringement for the FFL Guide, the look and feel of Plaintiff's website, and its HTML code; 2) misrepresentations in violation of the DMCA; 3) false advertising under the Lanham Act; 4) violation of the Computer Fraud and Abuse Act ("CFAA"); 5) misappropriation of trade secrets; and 6) deceptive business practices.   Plaintiff asserts all claims against all of the defendants.   Moreover, as Oskouie's liability is based on the same legal framework and nearly identical facts as that of the Entity Defendants, the Court will address both motions in tandem.   Before addressing liability on the substantive counts, the Court must determine, as a threshold matter, whether to set aside the Clerk's entry of default.

## I.      Whether to Set Aside the Entry of Default

The Entity Defendants, through Oskouie, argue that the entry of default was improper because they previously appeared through counsel and responded to the Complaint.   *See* Dkt. 209 ("Opp to DJ") at 4-5.   The Court finds this argument unpersuasive in light of the Second Circuit's broad understanding of the phrase "otherwise defend" in the context of Fed. R. Civ. P. 55(a).   The Court of Appeals has on multiple occasions affirmed the entry of default where an entity defendant has not appeared through counsel.   *See, e.g., Grace*, 443 F.3d at 192; *see also Lattanzio v. COMTA*, 481 F.3d 137, 140 (2d Cir. 2007) (stating that partnerships, corporations, and limited liability companies must

14

appear through licensed counsel).  Indeed, the Second Circuit has previously determined that entry of default was justified in the very situation presented here, where an entity "defendant withdrew its counsel without retaining a substitute" after filing an answer, and defendants were made aware that "their conduct likely would result in a default." *Mickalis Pawn Shop*, 645 F.3d at 130.  Here, Judge Cave warned the Entity Defendants in October 2019 that failure to retain counsel could result in a default, *see* Dkt. 186, and ultimately provided them with more than seven months to obtain counsel. Because the Entity Defendants failed to do so within that ample time frame, the entry of default in June 2020 was both proper and consistent with the law.

Nor have the Entity Defendants shown any "good cause" to set aside the entry of default. First, the record demonstrates that the Entity Defendants' default was willful.  In the context of default, the Second Circuit has defined willfulness to "refer to conduct that is more than merely negligent or careless, but is instead egregious and . . . not satisfactorily explained." *Bricklayers & Allied Craftworkers*, 779 F.3d at 186 (internal quotation marks omitted).  Here, the Entity Defendants provided no reasonable explanation for their failure to obtain substitute counsel over a seven-month period in the midst of long-standing litigation.   Oskouie represented only that "numerous lawyers" that he contacted were "reluctant to take on the case due to the sheer number of filings thus far and for the fear they themselves may become subject to the Plaintiff's wrath." Dkt. 187.  Whether or not those representations are credible, the Court finds them insufficient to demonstrate that the failure to obtain counsel was merely negligent or careless.   Second, the Entity Defendants fail to meet their burden of offering evidence sufficient to establish a complete and meritorious defense.  Other than the invocation of the merger doctrine, and the blanket denial of the allegations against them, the Entity Defendants have cited no affirmative defenses.  Because, as discussed below, the Court finds the merger doctrine inapplicable to the facts of this case, that contention is rejected.

In sum, the Court declines to set aside the entry of default.  In any case, setting aside default would have no material result on this case.  The allegations and evidence against Oskouie largely track the allegations against the Entity Defendants, which appear to be alter egos of Oskouie.  Even if the Court treated the motion for default judgment as a motion for summary judgment, the result would be the same.

## II.   Admissible Evidence on Summary Judgment

In determining whether there are genuine disputes of material fact, the Court's inquiry is limited to the admissible evidence in the record.  *See* Fed. R. Civ. P. 56.  Plaintiff has submitted, as required by Local Civil Rule 56.1, a statement of material facts in support of its motion for summary judgment.  Each of those facts is accompanied by citation to otherwise admissible evidence in the record.  Although Plaintiff served the 56.1 statement on Oskouie with the required warning that failure to respond to the summary judgment motion "with affidavits and/or documents contradicting the material facts asserted by the Plaintiff" would permit the Court to accept as true the facts asserted therein, Oskouie has not responded to it.  Oskouie was on notice that failure to controvert the facts asserted in the 56.1 Statement would be deemed an admission.  As a result, the Court deems each material fact asserted by Plaintiff as admitted for purposes of this motion, to the extent that such facts are supported by the evidence cited.  *See, e.g., Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000) (affirming grant of summary judgment on the basis of uncontested assertions in the moving party's Local Rule 56.1 statement) (per curiam); *Gubitosi v. Kapica*, 154 F.3d 30, 31 & n.1 (2d Cir. 1998) (accepting as true facts contained in defendants' statement of material facts because plaintiff failed to file a response); *Arline v. Potter*, 404 F. Supp. 2d 521, 527 (S.D.N.Y. 2005) (same).

**III.    Liability on Substantive Counts**

    **A.    Copyright Infringement**

Plaintiff alleges that Defendants' Website and FFL Guide infringe upon three copyrights for which it has valid registrations: the '901 Registration for his FFL Guide (Count 1), the '540 Registration for the "look and feel" of Plaintiff's Website (Count 2), and the '000 Registration for the HTML code underlying that website (Count 3).   SJ Mot. at 4.   Oskouie argues that Plaintiff has no valid claim to a copyright because the underlying works, which seek to help users in navigating a legal process, are "functional" rather than "expressive."   Dkt. 216, ("SJ Opp.") at 6.   Oskouie's arguments are meritless.

"To establish a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"   *Abdin v. CBS Broadcasting Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).   According to the Copyright Act, "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright" in any judicial proceeding.   17 U.S.C. § 410(c).   "The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court."   *Id.*   As Plaintiff obtained its '901 registration a little more than two years after the publication of the FFL Guide, *see* 56.1 Stmt. ¶ 6, that registration is entitled to a statutory presumption of validity.   By contrast, the '540 registration and '000 registration were obtained well beyond the five-year mark from the 2005 launch of Plaintiff's website, *id.* ¶¶ 1, 7, 8, and are therefore not entitled to such a presumption.   Nevertheless, as Oskouie has adduced no evidence to cast doubt on the validity of these copyright registrations, the Court finds that they suffice as prima facie evidence of a copyright.   *See Urbont v. Sony Music Ent.*, 831 F.3d 80, 89 (2d Cir. 2016) ("[T]he party

challenging the validity of the copyright [registration] has the burden to prove the contrary." (internal quotation marks omitted)).

With respect to the second element of copying, the record establishes that Defendants' FFL Guide and Website were copied by Oskouie. "Since direct evidence of copying is seldom available, [c]opying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that substantial similarities exist as to protectible material in the two works." *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995) (internal quotation marks omitted). The following record evidence establishes that Oskouie had access to Plaintiff's Website and the underlying material. Oskouoie performed work on Plaintiff's website. 56.1 Stmt. ¶¶ 10-11. Shortly thereafter, Plaintiff received multiple notices that someone from Sydney, Australia was accessing various accounts used in connection with the website. *Id.* ¶¶ 16-22. The IP addresses from which this hacking occurred are linked to an email address associated with Defendants' website, *id.* ¶ 23, and tracked to the vicinity of Oskouie's residence, *id.*, halfway across the world from Maddox's home in South Dakota.

The record reflects numerous similarities between Plaintiff's copyrighted work and the materials available on Defendants' Website. With respect to the FFL Guidebook, the introduction, Chapter 6.2, and Chapter 9.4 contain the same title, the same structure, and feature the same images. *Id.* ¶¶ 44-46. The content of the two versions is virtually identical, with only minor modifications. *See id.* The Court finds this evidence more than sufficient to establish plagiarism. The same is true of the "look and feel" of the two websites, as indicated by a side-by-side comparison between screenshots of the two websites. *Id.* ¶ 48. The FAQs and glossary of terms are nearly identical in content and arranged in the same non-alphabetical order. *Id.* ¶¶ 50, 52. Perhaps the most damning evidence of copying are the exemplars of customer reviews provided by Plaintiff. Although the names are different, the content of the two exemplars are virtually identical. *Id.* ¶ 53. The similarities

extend to the mistaken use of two periods in the second to last sentence of the first review. *Id.* The Second Circuit has stated that common errors in two similar works provide "the strongest evidence of piracy." *Lipton*, 71 F.3d at 471-72 (internal quotation marks omitted). As a result, the Court determines that summary judgment would be proper on the first two counts of copyright infringement.

For similar reasons, the Court concludes that default judgment should be entered against the Entity Defendants on these two counts. First, the Complaint alleges that Oskouie is the sole shareholder of both Entity Defendants, and that all three acted in concert to launch the infringing website. *See, e.g.,* Compl. ¶¶ 8-12. Second, the evidence described above tracks the allegations in the Complaint. Accepting as true the factual allegations contained therein, the Complaint establishes that the Entity Defendants are liable as a matter of law. *See Bricklayers & Allied Craftworkers*, 779 F.3d at 186.

With respect to the HTML code, the copyright infringement alleged in Count 3, the question of substantial similarity is closer. The 56.1 Statement, citing to the Maddox Declaration, attests that "[t]he HTML code for the Infringing Website as viewed on February 20, 2017 is substantially similar to the HTML code for BMaddox's Website as viewed on February 20, 2017." 56.1 Stmt. ¶ 56 (citing Maddox Decl. ¶¶ 14, 15). These allegations of substantial similarity are a legal conclusion that the Court cannot credit on summary judgment. Plaintiff has also submitted copies of the HTML code of each website. Absent admissible evidence from an expert in computer programming, however, the Court cannot determine, on the basis of those exhibits alone, whether the HTML codes are substantially similar or whether any such similarity is circumstantial evidence of copying. As a result, the Court cannot conclude, as a matter of law, that the code for the website was copied. Summary judgment on that count is therefore denied. Nor are there are sufficient factual allegations in the complaint to make that determination. *See* Compl. ¶ 95 ("Plaintiff's HTML code includes sections

that appear in only slightly modified forms in the Infringing Website's HTML code").  Default judgment is accordingly denied on that count as well.

### B.      Digital Millennium Copyright Act

According to Section 512(f) of the DMCA:

Any person who knowingly materially misrepresents under this section—

(1) that material or activity is infringing, or
(2) that material or activity was removed or disabled by mistake or misidentification,

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f).

Plaintiff claims that he was injured by Oskouie's misrepresentations in two counternotices sent to the DMCA, on June 20, 2016 and January 23, 2017.  *See* 56.1 Stmt. ¶¶ 61, 63.  In both cases, Oskouie represented to the service provider that Plaintiff lacked the copyright to the material in question.   The Court notes, however, that Plaintiff did not register his copyrights in his website until more than six months after Oskouie sent his second challenged notice.  *See id.* ¶¶ 7-8 (establishing that copyright registrations were obtained in August and September 2017).  Plaintiff has not alleged, or adduced any evidence, that it owned a copyright in this website other than those embodied in those registrations.  Consequently, it has not established that Oskouie's statements were false when made, let alone that Oskouie did not have a good-faith belief that Plaintiff lacked copyright protection over those materials.  As a result, the Court cannot determine that Oskouie is liable, as a matter of law, under the DMCA.  The motions for default judgment and summary judgment are therefore denied.

### C.  Lanham Act False Advertising

Plaintiff next claims that Defendants engaged in false advertising in violation of the Lanham

Act.  Pursuant to Section 43(a) of that Act:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any … false or misleading description of fact, or false or misleading representation of fact, which….
>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  The "touchstone of whether a defendant's actions may be considered

'commercial advertising or promotion' under the Lanham Act is that the contested representations

are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills,*

*Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  A false advertising claim under § 43(a) must

also allege that: (1) "the statement in the challenged advertisement is false"; (2) the defendant

"misrepresented an inherent quality or characteristic of the product"; (3) the defendant "placed the

false or misleading statement in interstate commerce"; and (4) "the plaintiff has been ... injured as a

result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill

associated with its products." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)

(internal quotation marks and citations omitted).

Plaintiff grounds his Lanham Act claim in Oskouie's "email campaign to poach and mislead

Plaintiff's hard earned, loyal customers."  SJ Mot. at 10.  The evidence in the record establishes that

Defendants "copied an email list of more than 100,000 prospective customers," 56.1 Stmt ¶ 24, and

sent to Plaintiff's consumers and prospective clients email newsletters containing substantially similar

content to those produced by Plaintiff, *id.* ¶ 57.  Plaintiff has not, however, adduced evidence that it

suffered any monetary or reputational injury as a result of the email campaign.  As noted above, a

causal connection between the infringing conduct and a cognizable injury is a required element of any Lanham Act claim.  *See Merck Eprova AG*, 760 F.3d at 255.

Plaintiff does not claim that the campaign resulted in a loss of its customer base, or that it led any consumers to believe that FFL123.com was affiliated with FFLTrust.com.  The only evidence in the record that purports to demonstrate some lessening of goodwill is a portion of a thread of an online forum called "Maryland Shooters," entitled "Is FFL123.com a joke?," but with the first two pages of the thread omitted.  56.1 Stmt. ¶ 59; *see* Dkt. 28-2.  In the portions of the thread submitted to the Court, one user named "Ridler12" raises concerns about the veracity of FFLTrust.com and claims that it is operated by the same company as FFL123.com, while two other users point out that the companies are separate entities, operated in different locations by different people.  *See* Dkt. 28-2. Even if this thread were proof that Plaintiff suffered reputational damage by confusion between its and Defendants' website, it makes no reference to the false advertising campaign on which the Lanham Act claim is based, or to any other misrepresentation made by Defendants.  It cannot therefore sustain Plaintiff's burden to prove, as a matter of law, that it was injured by behavior that ran afoul of the Lanham Act.  Accordingly, the Court denies summary judgment on the Lanham Act claim.   Plaintiff will be required to prove a cognizable injury should it decided proceed to trial on this claim.

The Complaint similarly fails to allege any injury suffered by the campaign.   Plaintiff alleges only that the false statements of fact disseminated by Defendants "in fact caused or are likely to cause Plaintiff competitive or commerce injury."  Compl. ¶ 119.  Without any factual support, the Court cannot credit this allegation as well-pled for purposes of default judgment.   Moreover, considering the absence of evidence in the record on summary judgment that Plaintiff was "injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products," *Merck Eprova AG,* 760 F.3d at 255 (internal quotation marks and citations omitted),

the Court declines to grant default judgment against the Entity Defendants.  *See Enron Oil Corp.*, 10 F.3d at 95.

**D.      Computer Fraud and Abuse Act**

Plaintiff maintains that Defendants' actions in hacking his computer violated the CFAA and entitle it to injunctive relief.   The relevant subsection of the CFAA is violated when a party "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period," 18 U.S.C. § 1030(a)(4).  The statute defines "protected computer" as a computer that is "used in or affecting interstate or foreign commerce or communication."  *Id.* § 1030(2)(B).

"Any person who suffers damage or loss by reason of a violation of [the CFAA] may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  *Id.* § 1030(g).   A civil action may be brought only if certain conditions are met, namely, as relevant here, if the violating conduct produced either a  "loss to 1 or more persons during any 1-year period . . .  aggregating at least $5,000 in value," or "a threat to public health or safety." *Id.* §§ 1030(g), 1030(c)(4)(A)(i).  The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred,  or  other  consequential  damages  incurred  because  of  interruption  of  service."   *Id.* § 1030(e)(11).  The Court finds that Plaintiff has failed to satisfy his burden of establishing that Defendants are liable under the CFAA as a matter of law.

Although Plaintiff has demonstrated that Oskouie accessed a protected computer without authorization, he has nevertheless failed to prove that he suffered any losses as a result.  As a threshold

matter, Plaintiff's undisputed involvement in licensing in 42 states through its website, *see* 56.1 Stmt. ¶ 2, means that its computers qualify as "protected" within the meaning of the CFAA.  Moreover, the undisputed facts establish that multiple accounts associated with Plaintiff's website were hacked by a user in Australia.  *See* 56.1 Stmt. ¶¶ 16-31.  Plaintiff's marketing account, containing an email list of more than 100,000 prospective customers, was accessed as part of this effort.  *Id.* ¶ 24.  Days after this hacking began, Oskouie registered the domain *ffltrust.com*, *id*. ¶ 32, and launched a website that contained content that is substantially similar to the hacked information, *id.* ¶¶ 43-59.  The temporal coincidence between the hacking and Oskouie's launching of the infringing website, combined with the undisputed fact that Oskouie is based in Australia, is sufficient circumstantial evidence to establish that Oskouie accessed Plaintiff's computer without authorization and with an intent to defraud.  That Oskouie began sending marketing materials to the same email list that was accessed in the hacking, *see id.* ¶ 57, is further proof that Oskouie accessed Plaintiff's computers without authorization.

To succeed on the merits of a CFAA claim, however, Plaintiff must also prove "damage or loss" of at least $5,000 attributable to an alleged violation of that statute.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 439 (2d Cir. 2004).  Plaintiff has demonstrated that the third party with unlawful access to its accounts "altered [Plaintiff's] Website in such a way that it was no longer indexed by search engines, effectively removing BMaddox's Website and e-commerce business from online search results, causing significant damage to BMaddox's business."  *See id.* ¶ 28.  "At the time that BMaddox's Website was de-indexed, it generated roughly ten thousand dollars ($10,000) in profit per week."  *See id.* ¶ 30.  Because "Plaintiff did not immediately notice that Entity Defendants had de-indexed its website," it provides only an "estimated amount of revenue lost due to the interruption of service," which it calculates at $20,000.  Dkt. 202, Declaration of Anderson J. Duff in Support of Motion for Default Judgment ("Duff DJ Decl.") ¶¶ 39-40.  As noted above, Plaintiff provides no evidence that it suffered any loss of sales because of Defendants' actions.  Instead, Plaintiff's

estimates of loss are directly tied to the revenue typically generated by its website, implying that the website was incapable of producing any profits during the unspecified time that it was de-indexed. Yet Plaintiff makes no such allegation, nor does it adduce any evidence to suggest that a total interruption of service resulted from Defendants' hacking.  Nor can the Court reasonably infer that a failure to appear in search results would result in a complete loss of revenue.  That Plaintiff evidently maintains regular contact with current and prospective customers through its email list casts further doubt on the veracity of Plaintiff's estimates of loss.

Construing the facts in the light most favorable to Defendants, and resolving all ambiguities in their favor, the Court cannot conclude, as a matter of law, that Plaintiff has satisfied CFAA's threshold-loss requirement.  The motion for summary judgment is therefore denied.

For similar reasons, the Court declines to grant default judgment on the CFAA.  The Complaint alleges only that "Defendants' actions have caused Plaintiff losses aggregating of at least $5,000 in value," Compl. ¶ 128.  The Court need not credit such a "[t]hreadbare recital[]" of one "of the elements of a cause of action," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Should Plaintiff proceed to trial on this count, it must prove that it incurred cognizable loss as a result of Defendant's CFAA violations.

### E.    Misappropriation of Trade Secrets

According to Count 6 of the Complaint, Defendants' theft of Plaintiff's email list constitutes a misappropriation of trade secrets pursuant to New York law.  "'To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.'"  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Id*. (internal quotation marks omitted).  New York courts consider the following factors to determine whether information qualifies as a trade secret:

> "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Haber*, 188 F.3d at 44 (quoting *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993)).  Applying these principles, the Second Circuit has held that "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *Id.* (internal quotation marks omitted).  Customer lists do not, however, qualify categorically as trade secrets:  "The question of whether or not a customer list is a trade secret is generally a question of fact." *Id*. (internal quotation marks omitted).

Applying these principles, the Court finds that Plaintiff has not met its burden on summary judgment of establishing that its email list qualifies as a trade secret under New York law.  Other than "estimat[ing]" its value at $50,000, Plaintiff adduces no facts about its "email list of customers and prospective customers."  56.1 Stmt. ¶ 25.  Although Plaintiff argues in its memorandum of law that the list "was not known outside Plaintiff's business," "collected by Plaintiff over the course of many years," "kept secret and protected by virtue of … several B2B services with password protected accounts," and "completely unavailable to anyone but Plaintiff,"  Pl. SJ Memo at 14,  those arguments find no support in the record.  The record is devoid of any evidence about the extent to which this information is known outside Plaintiff's business, about what measures, if any, were used to guard its secrecy, or the ease with which it could be acquired or duplicated by others.  As a result, the Court

cannot determine as a matter of law that this particular email list qualifies as a trade secret. The motion for summary judgment is therefore denied.

The allegations in the Complaint are similarly deficient. Plaintiff alleges only that its "Trade Secrets are valuable," and "unknown to its competitors" and that it "took measures to maintain the secrecy of it[s] Trade Secrets, including password-protecting the accounts." Compl. ¶¶ 132-133. Placing information behind password protection does not automatically transfer information into a trade secret, however. Because the allegations do not allow the Court to determine the extent to which Plaintiff guarded its secrecy, and correspondingly, the extent to which this information was ascertainable by a potential competitor, it cannot conclude as a matter of law that the email list was a trade secret. Default judgment is therefore denied on that count. As above, Plaintiff must prove that its email list constitutes a trade secret a trial.

### F.     Deceptive Trade Practices

New York General Business Law Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). "To state a claim under § 349, a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). "[A]ny person who has been injured by reason of any violation" of the section may bring suit. N.Y. Gen. Bus. Law § 349(h). "Nevertheless, to successfully state a claim under Section 349 the gravamen of the complaint must be consumer injury or harm to the public interest." *Electra v. 59 Murray Enterprises, Inc*., 987 F.3d 233, 258 (2d Cir. 2021) (internal quotation marks omitted).

Plaintiff fails to allege or prove the necessary elements to state a claim under § 349. A plaintiff must plead facts showing actual injury, not merely the alleged deceptive act. *See, e.g., Bildstein v. MasterCard Int'l Inc.,* 329 F. Supp. 2d 410, 415 (S.D.N.Y. 2004). The Second Circuit has stated that

the injury must be separate and distinct from the deceptive act.  *Spagnola*, 574 F.3d at 74 (citing *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43 (1999)).  Accordingly, "allegations of consumer confusion are generally not sufficient consumer harm to state a section 349 claim."  *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 324 (S.D.N.Y. 2010).  Here, the record reflects only that Defendants misrepresented that their website was an NRA Business Alliance Partner and published altered versions of federal firearms licenses issued to Plaintiff's customers.  56.1 Stmt ¶¶ 39-42, 64-66.  These gambits were "calculated to inspire unearned consumer confidence."  Pl. SJ Memo at 14.  Nonetheless, Plaintiff cites no evidence that suggests that any consumer was injured by these misrepresentations.  That deficiency is fatal to its motion for summary judgment.  As the Complaint makes no allegations of consumer harm, or injury to the public interest resulting from Defendants' deception, default judgment is also improper.

Nor has Plaintiff produced any evidence that it was injured by Defendants' deceptive acts, let alone in a manner that is cognizable under § 349.  In its memorandum of law, Plaintiff claims that it "has suffered irreparable harm to its reputation and monetary damages directly linked to [] Oskouie's deceptive practices, which dishonestly siphon consumers away from [Plaintiff]."  Pl. SJ Memo at 16.  These contentions are not only conclusory in nature, but also find no support in the record.   As noted above, Plaintiff provides no evidence of reputational or monetary loss stemming from Defendants' actions, such as siphoning any consumers from his website.  *See* Part III.C.  Nor does Plaintiff provide any factual explanation how the above-described deceptive practices resulted in any loss to its business or reputation.  The Complaint is similarly deficient on this front.  The only relevant allegation of injury is conclusory: "Plaintiff has been injured as a result of Defendants' deceptive acts."  Compl. ¶ 140.  As a result, neither default judgment nor summary judgment is appropriate on § 349.

IV.     **Relief**

Having found that Plaintiff has established that Defendants are liable as a matter of law for Counts 1 and 2, the Court now addresses whether Plaintiff has established entitlement to damages for those counts.

A.      **Monetary Damages**

Plaintiff seeks statutory damages in the amount of $100,000 for the "willful infringement" of its '901 copyright registration, for infringement of the copyright to its FFL Guidebook, as alleged in Count 1.

Once liability has been established under the Copyright Act, "a plaintiff may, in lieu of an award of actual damages and profits, request that statutory damages under 17 U.S.C. § 504(c) be awarded." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 262 (2d Cir. 2005).  The district court may grant anywhere between $750 and $30,000 for each copyright infringed. *See* 17 U.S.C. § 504(c)(1).  And it may do so on summary judgment. *See, e.g., Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010); *Island Software*, 413 F.3d at 262–63.

Upon a determination that the infringement was committed willfully, the court may, in its discretion, increase the statutory damages award to as much as $150,000 per infringed work. 17 U.S.C. § 504(c)(2).  "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software,* 413 F.3d at 263.  As a plaintiff is not required to show that the defendant "had knowledge that its actions constitute[d] an infringement," proof that "the defendant recklessly disregarded the possibility that its conduct represented infringement" will suffice. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001) (internal quotation marks omitted).

The evidence clearly establishes that Defendants' infringement of Plaintiff's copyright in its FFL Guidebook was willful within the meaning of the Copyright Act.  Oskouie copied, with minor modifications, entire portions of a guidebook created by Plaintiff.   He was apparently able to access the material contained on Plaintiff's website, including the FFL Guidebook, by hacking into Plaintiff's accounts.  During that time, he received two DMCA takedown notices, both of which he challenged.  Under those circumstances, the Court can easily conclude that Oskouie either knew, or at the very least recklessly disregarded the possibility, that his plagiarism constituted copyright infringement.

The Court retains wide discretion in setting the amount of the damages award within the statutory parameters. *See, e.g., Fitzgerald Pub. Co. v. Baylor Pub. Co.,* 807 F.2d 1110, 1116 (2d Cir. 1986).  In determining the appropriate award, the Court may determine the expenses saved and the profits reaped by the infringers, the revenues lost by plaintiff, the value of the copyright, and the deterrent effect on others besides the defendant. *See id.* at 1117.   Assessment of the defendant's culpability is also relevant. *Id.*  Considering these factors, the Court determines that $100,000, as requested by Plaintiff, is an appropriate amount.

Plaintiff does not seek statutory damages for the infringement of its copyright on the look and feel of its website, as alleged in Count 2. *See* Pl. SJ Mot. at 16.   Instead, it seeks actual damages in the amount of $202,500, which corresponds to the estimated total cost of maintaining Plaintiff's website during the time of Defendants' infringement.  The record before the Court does not, however permit a calculation of the actual damages suffered by Plaintiff or the amount of profits reaped by Defendant by infringing that copyright.   In pertinent part, the Copyright Act provides that:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

30

17 U.S.C. § 504(b).  "[T]he primary measure of recovery is the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement."  *Fitzgerald Pub. Co*, 807 F.2d at 1118.  Because Plaintiff has provided no evidence of the effect of Defendants' infringement on the market value of its website, granting a damages award at this stage would be inappropriate, whether on summary or default judgment.  *See Lupien v. Citizens Utilities Co.*, 159 F.3d 102, 107 (2d Cir. 1998) (stating that a plaintiff moving for summary judgment bears the burden of proving actual damages).

In the context of a default judgment, a court is required to "ascertain the amount of damages with reasonable certainty."  *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).  "There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence."  *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) (citing Fed. R. Civ. P. 55(b)(2)).  Because the Court cannot ascertain damages on the record before it, it will refer the case, by separate order, to Magistrate Judge Cave for an inquest into damages.  With respect to Oskouie, the calculation of damages may be determined at trial.

## B.    Injunctive Relief

Plaintiff also seeks a permanent injunction.  The Copyright Act authorizes the Court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  It is well established that a court may grant a permanent injunction as part of a default judgment.  *See Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 546 (S.D.N.Y. 2015) (collecting cases).

Whether to issue a permanent injunction depends on (1) the likelihood that plaintiff will suffer irreparable harm if an injunction is not granted; (2) whether remedies at law such as monetary damages are inadequate to compensate plaintiff for that harm; (3) the balance of hardships; and (4) whether the public interest would not be disserved by a permanent injunction. *See Salinger v. Colting*, 607 F.3d 68, 77–78 (2d Cir. 2010).

The Court finds that all four of these factors weigh in favor of a permanent injunction in this case. As to the first, the continued existence of Defendants' website and FFL guidebook, both of which contain nearly identical content to Plaintiff's copyrighted content, demonstrably threatens Plaintiff's property interest in copyrighted material. Similarly, as "a copyright holder possesses the right to exclude others from his property," *Salinger*, 607 F.3d at 78 (internal quotation marks omitted), no legal remedy or award of monetary damages can adequately protect Plaintiff's interest in the copyrights that are currently being infringed by Oskouie. As to the third factor, the balance of hardships tips decisively in the Plaintiff's favor. *See Rovio Entm't*, 97 F. Supp. 3d at 547 ("As to the balance of hardships, '[i]t is axiomatic that an infringer ... cannot complain about the loss of ability to offer its infringing product.'" (quoting *WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 287 (2d Cir. 2012)). Because "the public has an interest in not being deceived," *id.* (internal quotation marks omitted), especially about issues dealing with firearms, the fourth factor also counsels in favor of a permanent injunction here.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment against Oskouie on Counts 1 and 2, and denies the motion in all other respects. The Court similarly grants Plaintiff's motion for default judgment against Osko and Platinum on Counts 1 and 2, and denies the motion in all other respects. Plaintiff is entitled to $100,000 of statutory damages on Count 1. By

32

separate order, this case is referred to Magistrate Judge Cave for an inquest into damages on Count 2, with respect to the Entity Defendants.

Following the inquest into damages, Judge Cave will issue a Report & Recommendation on the appropriate award of damages for Count 2.   After reviewing that Report & Recommendation, and any timely objections made thereto, the Court will issue an Order that accepts, rejects, or modifies the findings and recommendations made therein.   *See* 28 U.S.C. § 636(b)(1)(C).   Within two weeks of the filing of that Order, Plaintiff shall notify the Court whether it intends to pursue trial on the remaining counts, and/or with respect to damages for Count 2 against Oskouie.

SO ORDERED.

Dated:     August 18, 2021
               New York, New York

_____
Ronnie Abrams
United States District Judge